# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BETSY FEIST,** individually, and on behalf of all others similarly situated, | ) ) ) Case No. 11-cv-5436 (JGK) |
| Plaintiff, | ) ) ) |
| vs. | ) ) ) |
| **RCN CORPORATION** and **PAXFIRE, INC.,** | ) ) ) |
| Defendants. | ) ) ) |

# BETSY FEIST'S MEMORANDUM IN SUPPORT OF MOTION
# TO DISMISS PAXFIRE'S COUNTERCLAIMS

## Table of Contents

Page

Table of Authorities……………………………………………………………………iii

I.   BACKGROUND ...........................................................................................1

II.  INTRODUCTION .........................................................................................2

III. ARGUMENT ................................................................................................6

    A.   Standard on a Motion to Dismiss.........................................................6

    B.   Paxfire's Counterclaims Contain Allegations that Are Unfounded and
        Untrue ...................................................................................................7

    C.   Paxfire Cannot State a Claim for Tortious Interference ......................8

        1.   Paxfire's Tortious Interference Claims are Barred by the First
                Amendment Protection Provided by the Noerr-Pennington
                Doctrine....................................................................................8

        2.   Paxfire Failed to Allege the Elements of a Tortious Interference
                Claim ........................................................................................9

            a.   Paxfire Failed to Adequately Allege that it Had Business
                Relationships or Valid Contracts with Third Parties .....................9

            b.   Paxfire Failed to Allege that Ms. Feist Knew of the Alleged
                Relationships or Contracts ...........................................................11

            c.   Paxfire Failed to Allege that Ms. Feist Interfered with the
                Business Relationships or Procured the Breach of Any
                Contract....................................................................................11

            d.   Paxfire Failed to Allege that Ms. Feist Acted "Solely out of
                Malice," or used "Dishonest, Unfair, or Improper Means"...........13

            e.   Paxfire Has Failed to Adequately Allege Damages, or that
                Ms. Feist Caused Paxfire's Damages............................................14

    D.   Paxfire Cannot State a Claim for Defamation ......................................16

        1.   The Allegedly Defamatory Statements are Privileged and Ms. Feist
                is Immune from the Defamation Claims...................................16

2.      Even If the Statements are not Privileged, Paxfire Has Not Stated a
        Claim for Defamation .................................................................................20

        a.      Paxfire Has Not Set Forth the "Particular Words
                Complained of"...................................................................................21

        b.      Paxfire Has Failed To Adequately Identify the Persons to
                Whom the Allegedly Statements Were Made.................................22

        c.      Paxfire Has Failed to Adequately State When the Allegedly
                Defamatory Statements Were Made ...............................................22

        d.      Paxfire Has Failed To Sufficiently Allege Injury .........................23

IV.     CONCLUSION...........................................................................................25

**TABLE OF AUTHORITIES**

Page(s)

CASES

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009)................................................................................6, 15

*Bath Petroleum Storage Inc. v. Market Hub Partners, L.P.,*
    229 F.3d 1135, 2000 WL 1508873 (2d Cir. 2000) ....................................8

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)......................................................................................6

*Carvel Corp. v. Noonan,*
    3 N.Y. 3d 182 (2004) ..................................................................................12

*D.A. Collins Constr. Co. v. ICOS/NCCA a Joint Venture,*
    No. 91-933, 1994 WL 328626 (N.D.N.Y June 28, 1994).......................14

*Diario El Pais, S.L. v. Nielsen Co.,*
    No. 07-11295, 2008 WL 4833012 (S.D.N.Y Nov. 2008).....................9, 15

*DiFolco v. MSNBC Cable LLC,*
    622 F.3d 104 (2d Cir. 2010).......................................................................10

*E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.,*
    365 U.S. 127 (1961)......................................................................................8

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.,*
    312 F. Supp. 2d 379 (E.D.N.Y. 2004) ...................................................9, 10

*Floyd Harbor Animal Hosp. v. Doran,*
    No. 06-18109, 2009 N.Y. Misc. LEXIS 5610 (N.Y. Sup. Ct. Suffolk Cnty. Dec. 3, 2009) ..........................................................................................................23

*Friends of Rockland Shelter Animals, Inc. v. Mullen,*
    313 F. Supp. 2d 339 (S.D.N.Y. 2004)........................................................8

*Gianni Versace, S.p.A., v. Versace,*
    No. 01-9645, 2003 WL 470340 (S.D.N.Y. Feb. 25, 2003).....................12

*Gristedes Foods v. Poospatuck (Unkechauge) Nation,*
    No. 06-1260, 2009 WL 4547792 (E.D.N.Y. Dec. 1, 2009)....................19

*I.G. Second Generation Partners, L.P. v. Duane Reade,*
    17 A.D. 3d 206 (1st Dep't 2005) ...............................................................8

*Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon,*
   No. 07-1445, 2010 WL 2596927 (D. Conn. June 24, 2010).....................................8

*John R. Loftus, Inc. v. White,*
   150 A.D.2d 857 (3d Dep't 1989) ..........................................................................13

*Jones v. SmithKlineBeecham,*
   No. 07-0033, 2007 U.S. Dist. LEXIS 59980 (N.D.N.Y Aug. 14, 2007) ................18

*Joyce v. Thompson Wigdor & Gilly LLP,*
   No. 06-15315, 2008 U.S. Dist. LEXIS 43210 (S.D.N.Y. June 3, 2008) ................23

*Kirch v. Liberty Media Corp.,*
   449 F.3d 388 (2d Cir. 2006)...................................................................................9

*Kopperl v. Bain,*
   No. 09-1754, 2010 WL 3490980 (D. Conn. Aug. 30, 2010).................................6

*Lacher v. Engel,*
   33 A.D. 3d 10 (1st Dep't 2006) .................................................................17, 19, 20

*Liberman v. Gelstein,*
   80 N.Y.2d 429 (N.Y. 1992) ..................................................................................24

*Lore v. City of Syracuse,*
   583 F. Supp. 2d 345 (N.D.N.Y 2008) ........................................................21, 22, 24

*McNally v. Yarnall,*
   764 F. Supp. 853 (S.D.N.Y.1991)..........................................................................19

*O'Brien v. Alexander,*
   898 F. Supp. 162 (S.D.N.Y. 1995)....................................................................17, 18

*People ex rel. Bensky v. Warden,*
   258 N.Y. 55 (1932) ...............................................................................................18

*Primetime 24 Joint Venture v. Nat'l Broad. Co.,*
   219 F.3d 92 (2d Cir. 2000).......................................................................................9

*RFP LLC v. SCVNGR, Inc.,*
   --- F. Supp. 2d ----, 2011 WL 1810488 (S.D.N.Y. May 12, 2011)............12, 13, 15

*Rizzo v. Edison, Inc.,*
   172 F. App'x 391 (2d Cir. 2006) ...........................................................................20

*Rosenberg v. Metlife, Inc.,*
   493 F.3d 290 (2d Cir. 2007)..................................................................................18

*Roth v. Atex Prods., Inc.*,
   35 Misc. 2d 136 (N.Y. Sup. Ct. Nassau Cnty. 1962) .............................................23

*Roth v. United Fed'n of Teachers*,
   787 N.Y.S. 2d 603 (N.Y. Sup. Ct. Kings Cnty. 2004) ..........................................21

*Scalisi v. Fund Asset Mgmt, L.P.*,
   380 F.3d 133 (2d Cir. 2004) ...................................................................................6

*Sexter & Warmflash, P.C. v. Margrabe*,
   38 A.D. 3d 163 (1st Dep't 2007) ...........................................................................18

*Sharma v. Skaarup Ship Mgmt. Corp.*,
   916 F.2d 820 (2d Cir.1990) ...................................................................................15

*Sheng Gang Deng v. Shag Qing Chen*,
   2010 N.Y. Misc. LEXIS 2135 (N.Y. Sup. Ct. N.Y. Cnty. May 13, 2010) ...........24

*Stephan v. Cawley*,
   890 N.Y.S. 2d 371, 2009 WL 1740827 (N.Y. Sup. Ct. N.Y. Cnty. 2009) ...........21

*Szwarce v. Buenaventura*,
   82 N.Y.S.2d 292 (N.Y. Sup. Ct. N.Y. Cnty. 1948) ..............................................23

*T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*,
   312 F.3d 90 (2d Cir. 2002)......................................................................................8

*TC v. Valley Cent. Sch. Dist.*,
   777 F. Supp. 2d 577 (S.D.N.Y. 2011)...................................................................24

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965)................................................................................................8

*Universal City Studios, Inc. v. Nintendo Co.*,
   797 F. 2d 70 (2d Cir. 1986)...................................................................................14

*Wiener v Weintraub*,
   22 N.Y.2d 330 (1968) ...........................................................................................18

*Williams v. Williams*,
   298 N.Y.S.2d 473 (N.Y. 1969) .............................................................................19

*Youmans v. Smith*,
   153 N.Y. 214 (1897)..............................................................................................17

## I.   BACKGROUND

On August 4, 2011, Ms. Feist, through her counsel, filed a complaint alleging that Paxfire, together with Internet service provider ("ISP") RCN, redirected and intercepted ISP users' Internet searches in order to profit. Dkt. No. 1 ("the Complaint" or "Cpl."). The Complaint's allegations were founded upon personal knowledge as to her own acts, and upon "information and belief based on the investigation conducted by Plaintiff's counsel, including consultation with technology experts", Cpl. at 1, identified as "researchers affiliated with the International Computer Science Institute (ICSI) and the University of California, Berkeley." Cpl. ¶ 5. In support of her claims, Ms. Feist also cited an Internet diagnostic tool, Netalyzr, which was developed by ICSI and which verified that her "ISP appears to . . . redirect traffic . . . in cooperation with a company called Paxfire." Cpl. ¶ 23. The Complaint was filed after extensive testing, analysis, research, and investigation by a team of computer scientists associated with a prominent university and computer science research organization. The Complaint stands on solid ground.

Paxfire then filed counterclaims against Ms. Feist (the "Counterclaims" or "CC"), alleging that she made defamatory statements and tortiously interfered with Paxfire's business relationships and contracts by filing her Complaint, CC ¶¶ 40-77, 83, 90, and by "communicat[ing] with media outlets such as the New Scientist and the Electronic Frontier Foundation [EFF]" regarding the allegations that would be contained in the Complaint, CC ¶ 36. Paxfire seeks $80 million in damages. CC at 29.

Paxfire's Counterclaims are grossly deficient and should be seen for what they are: an attempt to intimidate Ms. Feist into dismissing her Complaint and well-founded claims of wrongdoing. For this reason, as elaborated herein, Paxfire's Counterclaims should be dismissed in their entirety.

## II.   INTRODUCTION

Paxfire does not allege that Ms. Feist is an activist of any kind, that she is a competitor of the company, or that she has the expertise required to independently identify the interception and redirection of Internet searches. Yet the theory of Paxfire's counterclaims is that Ms. Feist sought to "interfer[e] with, obstruct[], and destroy[] Paxfire's contracts, agreements, and ongoing business relationships," and, to that end, orchestrated the allegations against Paxfire, and "communicated" them to academic and research-based "media outlets such as the New Scientist and the Electronic Frontier Foundation" "all for the purpose of having them publish such allegations," "to generate publicity," and to "destroy[] Paxfire's . . . business." CC ¶¶ 36, 39. These allegations are implausible on their face.

The allegations are also vague and unsupported. Beyond identifying the Complaint, Paxfire fails to specify the alleged tortious or defamatory statements, who made the statements (beyond Ms. Feist, her agents, or attorneys), when they were made (beyond sometime "on or prior to" the filing of the Complaint), in what manner they were made, and to whom Ms. Feist or her "agents" spoke. Nor does Paxfire specify any terms of its purported contracts or the context of the business relationships it claims to have had. Although Paxfire claims, generally, to have contracts and business relationships with "Advertising Aggregators," it names only one; and with regard to its purported business relationships with "Trademark Holders," it does not name or describe a single entity. Paxfire also fails to allege damages.  Instead it conclusorily alleges only two breached contracts, and fails to allege that Ms. Feist's alleged actions caused either breach. For these reasons alone, Paxfire's counterclaims should be dismissed.

Moreover, despite claiming that Ms. Feist caused "damages," Paxfire fails to identify a single publication in which Ms. Feist's alleged statements appeared, or a single ISP, Advertising Aggregator, or Trademark Holder to whom Ms. Feist spoke. Had Paxfire identified the articles

published by the only "media outlets" it identifies, CC ¶ 36, it immediately would be apparent that the counterclaims are without any reasonable basis.

One of the articles was published by the Electronic Frontier Foundation (EFF), which Paxfire characterizes as a "media outlet." Although EFF publishes a blog, it is not primarily a media outlet, but rather "a donor-funded nonprofit" "civil liberties group" focused on "defending free speech, privacy, innovation, and consumer rights," and has "championed the public interest in every critical battle affecting digital rights." Electronic Frontier Foundation, *About EFF*. (Sept. 26, 2011, 1:00 PM), http:www.eff.org/about. The article was a blog post published on August 4, 2011 and headlined: "Widespread Hijacking of Search Traffic in the United States."[1] Ex. A (all exhibits referenced herein are attached to the Declaration of Peter E. Seidman, filed concurrently with this motion). The byline heading EFF's post made clear that the "Technical Analysis" was performed by "ICSI researchers . . . with Peter Eckersley," EFF's Technology Projects Director. The article states that "Earlier this year, two research papers"—not statements made by Betsy Feist—"reported the observation of strange phenomena in the Domain Name System (DNS) at several US ISPs. *Id.* On these ISPs' networks, some or all traffic to major search engines, including Bing, Yahoo! and (sometimes) Google, is being directed to mysterious third party proxies. . . . **[P]arallel investigations by the ICSI Networking Group and EFF** have since revealed a company called Paxfire as the main actor behind this interception." *Id.*

---

[1]On a motion to dismiss, the court may consider statements or documents incorporated into the complaint by reference or integral to the complaint, matters of which judicial notice may be taken, and documents possessed by, or known to, the plaintiff, and upon which the plaintiff relied in bringing suit. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007); *see also Schnall v. Marine Midland Bank,* 225 F. 3d 263, 266 (2d Cir. 2000); *Staehr v. Hartford Fin. Servs. Group, Inc.,* 547 F.3d 406, 425 (2d Cir.2008); Fed. R. Evid. 201(b).

(Emphasis added.) This article contains no statements attributed to Ms. Feist or her Complaint; indeed, it does not even mention either.

The other article was published by the New Scientist on August 4, 2011, under the headline: "US internet providers hijacking users' search queries." Ex. B. This article states that "U.S. Patents"—not Ms. Feist— "suggest that [Paxfire] may be part of a larger plan to allow ISPs to generate revenue by tracking the sites their customers visit" and refers to "evidence collected by Christian Kreibich and Nicholas Weaver at the International Computer Science Institute in Berkeley, California, who discovered the redirection and have been monitoring it for several months." *Id.* The August 4, 2011 New Scientist article refers to Ms. Feist and the litigation only insofar as it states that the Complaint was filed, the firms that filed it, and that the complaint "alleges that the process violated numerous statutes, including wiretapping laws"; but even there, the article makes clear that the source of the allegations is ISCI, not Ms. Feist.[2] The article also includes technical details that were absent from the Complaint—evidently, because the reporter spoke directly with the researchers. Moreover, Jim Giles, the author, had been following the Netalyzr and working with ICSI long before Ms. Feist's involvement in this litigation. Indeed, Mr. Giles's previous article entitled "Understanding your Netalyzr results," was published in New Scientist in May 2010, Ex. C, more than a year before Ms. Feist filed her Complaint. Paxfire does not plausibly allege, nor can it, that Mr. Giles's August 2011 article (or any other) was published at the behest of Ms. Feist in order to "generate publicity of her false,

---

[2] The relevant paragraph reads in its entirety as follows: "Reese Richman, a New York law firm that specializes in consumer protection lawsuits, today filed a class action against one of the ISPs and Paxfire, **which researchers believe** provided the equipment used to hijack and redirect the searches. The suit, filed together with Milberg, another New York firm, alleges that the process violated numerous statutes, including wiretapping laws." (Emphasis added.)

pejorative, and unfounded allegations, all for the purpose of . . . destroying Paxfire's business. " CC ¶39.

Thus, the articles published by the only "media outlets" Paxfire identifies establish that EFF and the New Scientist independently discovered, researched, and reported on Paxfire's wrongful conduct. Indeed, it was Ms. Feist who relied in part upon *their* research, as well as the source upon which the New Scientist and EFF also relied (ICSI), in bringing her Complaint— not the other way around. Because neither of the articles was published because of or was based on Ms. Feist's statements, and, because there are no allegations that any third party read either the articles or the Complaint, there is no reasonable basis for the claim that Ms. Feist interfered with Paxfire's contracts or business relationships.

In addition, the First Amendment protections afforded by the Noerr-Pennington Doctrine provide an independent basis for dismissing the tortious interference counterclaims. *See infra* § III.C.1. Moreover, Paxfire has failed to adequately allege **any** of the elements of a tortious interference claim—any information about Paxfire's contracts or business relationships; how Ms. Feist would have known of the alleged business relationships and contracts that Paxfire claims were breached; or how Ms. Feist directed her actions toward these entities in an attempt to interfere with the business relationships or procure the breach of any contracts. Nor does Paxfire adequately allege that Ms. Feist acted maliciously, did not investigate her claims, or that her purpose in filing the Complaint was not legitimate.

The defamation claims fail because Ms. Feist's Complaint, and her purported "communications" with media outlets regarding the Complaint, are subject to New York's common law and statutory privileges. Moreover, the defamation allegations are not sufficiently pleaded. Accordingly, Plaintiff's counterclaims should be dismissed.

## III.   ARGUMENT

### A.   Standard on a Motion to Dismiss

"At the pleading stage, governed by Rule 12(b)(6), [plaintiff] must satisfy the [*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)] and [*Ashcroft v. Iqbal . . .* , 129 S. Ct. 1937 (2009)] requirement of factual, non-conclusory allegations stating a plausible claim that defendant's conduct caused specific economic harm in a quantifiable amount." *Kopperl v. Bain*, No. 09-1754, 2010 WL 3490980, at *4 (D. Conn. Aug. 30, 2010) ("Defendants' formulaic repetition in each counterclaim of the mantra that they 'suffered damages' as the result of [plaintiff's] conduct does not satisfy the pleading requirements of *Twombly* and *Iqbal*. Nor is the deficiency cured by reference to the 40 prefatory paragraphs." *Id.*).

The complaint must include something more than "an unadorned, the-defendant-unlawfully harmed-me accusation." *Iqbal,* 129 S. Ct. at 1949. To survive a motion to dismiss, a complaint must set forth sufficient facts to "state a claim to relief that is plausible on its face," *id.*, and crosses "the line from conceivable to plausible," *Twombly,* 550 U.S. at 570.

While allegations must generally be accepted as true on a motion to dismiss, the Court is not bound to accept as true a "legal conclusion couched as a factual allegation," conclusory allegations that are contradicted by documents referred to in the complaint or that are central to plaintiff's claim, unwarranted deductions of fact, or unreasonable inferences; "[t]hreadbare recitals of . . . a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949-50; *Scalisi v. Fund Asset Mgmt, L.P.*, 380 F.3d 133, 137 (2d Cir. 2004).

**B.   Paxfire's Counterclaims Contain Allegations that Are Unfounded and Untrue**

Many of Paxfire's allegations are conclusory, directly contradicted by judicially-noticeable documents and facts, or based on unreasonable inferences. Such allegations should be disregarded. For example:

- Paxfire alleges that Ms. Feist "sought to put an end to these Paxfire's [sic] business practices," CC ¶ 33, which Paxfire claims consist of "Error Traffic" and other services, CC ¶¶ 7-8. Paxfire, however, does not (because it cannot) specify, in either Ms. Feist's Complaint, or the two "media outlets" Paxfire has identified, where Ms. Feist or the researchers take issue with Paxfire's "Error Traffic" services.

- Paxfire denies "identify[ing] the person who was an End User and engaged in searches using the Internet," CC ¶ 16, and states that this is the type of defamatory or tortious information communicated by Ms. Feist, CC ¶¶ 34, 36. However, neither Ms. Feist's Complaint nor the August 4, 2011 articles allege or claim that Paxfire identifies End Users. At most, Ms. Feist's complaint alleges that Internet users who are logged into an account while searching can have that search history connected to his or her identity; as alleged in the Complaint, this is just one of several risks that users face as a result of RCN and Paxfire's alleged conduct. Cpl. ¶ 24.

- Paxfire alleges that "[o]n or prior to August 4, 2011, and prior to filing her Class Action Complaint," Ms. Feist "communicated with media outlets such as the New Scientist and the Electronic Frontier Foundation" "for the purpose of having them publish" her allegations. CC ¶ 36. Paxfire apparently infers this from the August 4, 2011, news articles published by those entities, which report on the same wrongdoing alleged in Ms. Feist's Complaint. This inference is unreasonable, as is the implication that Ms. Feist caused the articles to be published, and neither should be accepted as true. *See supra*, Introduction.

- Paxfire alleges that statements regarding redirection, interception, monitoring, or monetization of searches are tortious and defamatory. But these allegations are negated by Paxfire's patents—through which Paxfire had already informed the public of its ability to perform these functions. Ms. Feist cannot be held liable for stating, or example, that Paxfire performs certain search redirections, Cpl. ¶ 8,17, 22, or that Paxfire "can monitor searches," Cpl. ¶ 14, when Paxfire's patents make these very statements. *See, e.g.,* Ex, E, Patent #7,933,951 (describing "[a] computer system for **redirecting** Internet communications"; "the invention provides an Internet appliance for **monitoring and controlling communication traffic.**"; "the Internet appliance can be configured to analyze all traffic passing through an ISP, identify traffic of interest (e.g., unresolvable queries or queries for a hostname of a particular web site), and redirect that traffic," discussing "**redirecting valid hostnames (non error)**"; See also Ex. F, Patent # 7,631,101 (noting that "the PSP [the "Search Profiler"] will **return customer specific content based upon the**

**profile stored for that customer or ISP**. . . . This launch page is built in real time **based upon profile information stored for the ISP or based upon the IP address of the requestor.** The IP address may be used to localize the requester **all the way down to a known individual user**."; noting that "the information is obtained **by intercepting the communication from the user** at a name level" and that "the first device is capable of **intercepting and analyzing** communications between the user and the DNS." (Emphasis added.)

Paxfire's allegations are implausible, devoid of factual support, unwarranted, and unreasonable. They need not be accepted as true.

### C.   Paxfire Cannot State a Claim for Tortious Interference

#### 1.   Paxfire's Tortious Interference Claims are Barred by the First Amendment Protection Provided by the Noerr-Pennington Doctrine

Paxfire cannot "surmount the significant hurdles imposed by the 'Noerr Pennington' Doctrine, established by the United States Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657 (1965)." The doctrine protects litigants from liability for exercising their First Amendment rights to influence governmental action through litigation. *Bath Petroleum Storage Inc. v. Market Hub Partners, L.P.*, 229 F.3d 1135, 2000 WL 1508873, at *1 (2d Cir. 2000). "The *Noerr-Pennington* doctrine generally immunizes from liability a party's commencement of a [] court proceeding." *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002); *see also I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D. 3d 206, 208 (1st Dep't 2005) ("Defendant's commencement of the declaratory action is immunized [from liability for tortious interference with contract] by the *Noerr-Pennington* doctrine. . . ."). The doctrine "has been held to protect the exercise of a defendant's First Amendment rights even when such action would normally constitute tortious interference." *Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon*, No. 07-1445, 2010 WL 2596927, at *8 (D. Conn. June 24, 2010) (citations omitted); *see also Friends of Rockland Shelter Animals, Inc. v.*

*Mullen,* 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004) (applying Noerr-Pennington doctrine to tortious interference claim). The doctrine has also been "extended . . . to encompass concerted efforts incident to litigation," including pre-trial actions. *See Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219 F.3d 92, 100 (2d Cir. 2000).

### 2.      Paxfire Failed to Allege the Elements of a Tortious Interference Claim

"Tortious interference claims have a limited scope and an extremely high pleading standard." *Diario El Pais, S.L. v. Nielsen Co.*, No. 07-11295, 2008 WL 4833012, at *7 (S.D.N.Y Nov. 2008). To state a claim for tortious interference with business relationships or contracts, Paxfire must allege that: 1) Paxfire had a business relationship or a valid contract with a third party; 2) Ms. Feist knew of that relationship or contract; 3) Ms. Feist intentionally interfered with the business relationship or procured the third-party's breach of the contract; 4) Ms. Feist acted solely out of malice, or used dishonest, unfair, or improper means; 5) The contract was breached or the business relationship was injured; and 6) damages. *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 400 (2d Cir. 2006) (regarding tortious interference with business relationships).[3]

### a.      Paxfire Failed to Adequately Allege that it Had Business Relationships or Valid Contracts with Third Parties

Paxfire does not adequately allege that Paxfire had the requisite contracts or business relationships. A "failure to specify which contracts . . . were interfered with and whether or not those contracts were terminable at will warrants dismissal of this claim." *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.*, 312 F. Supp. 2d 379, 405-06 (E.D.N.Y. 2004)

---

[3] *See also Combina Inc. v. Iconic Wireless Inc.*, No. 4222/2011, 2011 WL 3518185, at *5 (N.Y. Sup. Ct. Kings Cnty. Aug. 11, 2011). ("plaintiff must plead defendants 'engaged in the use of wrongful or unlawful means to secure a competitive advantage over plaintiffs, or that defendants acted for the sole purpose of inflicting intentional harm on plaintiffs'") (citations omitted); *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996) (addressing tortious interference with contracts).

("without pleading anything beyond the existence of 'contracts,' we cannot find that the interference alleged is wrongful or improper, and therefore tortious." *Id.*) (internal quotation omitted). Paxfire claimed generally to have had "a valid contract" and "ongoing business relationship" with each of the ten ISPs, an "ongoing business relationship" with unidentified "Trademark Holders," and maintained "a valid contract and agreements" and "ongoing business relationship with advertising aggregators, including LinkShare." CC ¶¶ 41, 47, 53-59, 61, 67. Paxfire alleged only two breached contracts: one with XO Communications, and one with the only named "Advertising Aggregator," LinkShare. CC ¶¶ 43, 63. Paxfire does not allege that any of the other nine ISPs ended their contracts.

Paxfire failed to allege anything else about the purported contracts—such as when they started, their duration, whether they were terminable at will, what services or products were to be provided, or any other terms. Similarly, Paxfire alleges nothing about the "business relationships" it purports to have with any of the three third-parties, beyond that they exist and were somehow "injured." And Paxfire's complete failure to explain what a "Trademark Holder" is, let alone identify one, is in itself fatal to its claim. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 115 (2d Cir. 2010) ("Aside from the fact that these allegations are too conclusory, vague, and lacking in a factual basis to make out [a] tortious interference claim, the complaint fails entirely to describe any third party with whom [plaintiff] had prospective business relations to be interfered with. ***The lack of such an allegation is fatal to this claim.***") (internal citations omitted; emphasis added). Paxfire's failure to adequately allege that it had business relationships or valid contracts requires that the counterclaims be dismissed.

**b.**   **Paxfire Failed to Allege that Ms. Feist Knew of the Alleged Relationships or Contracts**

Even assuming for the sake of argument that Paxfire's conclusory allegations that the purported contracts and business relationships exist are true, they still are insufficient because Paxfire fails to allege how Ms. Feist would have known of them.[4] Paxfire names only two companies with which it lost contracts—XO Communications and LinkShare. Paxfire alleges that Ms. Feist "knew or had reason to know" of these contracts, but neither entity was mentioned in Ms. Feist's Complaint. Nor does Paxfire allege that these contracts were publicly available or otherwise discoverable by Ms. Feist. Paxfire also fails to allege the identities of any "Trademark Holders," let alone that (or how) Ms. Feist knew of any relationships or contracts with them.

**c.**   **Paxfire Failed to Allege that Ms. Feist Interfered with the Business Relationships or Procured the Breach of Any Contract**

Paxfire fails to allege with sufficient particularity what the purported tortious communications were, when they occurred, or how they were made. Paxfire alleges that EFF and New Scientist relied on statements from Ms. Feist in drafting their articles, notwithstanding overwhelming facially apparent evidence to the contrary. *See supra*, Introduction; § III.B. But as demonstrated by the judicially noticeable news articles and the documents on which Paxfire relied in drafting its complaint, EFF worked with ICSI—independently of Ms. Feist—to analyze Paxfire's search interception. *See* Exs. A, B. Jim Giles with New Scientist has been covering ICSI's Netalyzr since May 2010, *see* Ex. C, quoted EFF in his August 2011 story and reported that EFF and ICSI worked together on the research, Ex. B. Likewise, Ms. Feist consulted with

---

[4] Ms. Feist stipulates that she knew, on information and belief, of business relationships between Paxfire and the nine ISPs identified in her Complaint. However, XO Communications was not named among them, and Paxfire does not allege that any of its business relationships or contracts with any other ISP was terminated.

ICSI in drafting her Complaint, Cpl. ¶ 5, but there is no evidence—and no support or plausible allegation—that ICSI, EFF, or New Scientist ever consulted with *her*. Paxfire failed to make any plausible allegations to refute this evidence and "mere suspicions . . . are inadequate to support a claim. . . ." *RFP LLC v. SCVNGR, Inc.*, --- F. Supp. 2d ----, 2011 WL 1810488, at *3 (S.D.N.Y. May 12, 2011) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 217 (2d Cir. 2003)).

Moreover, the defendant against whom a tortious interference claim is lodged **must have directed its alleged wrongful conduct at the third party with whom a plaintiff has a business relationship, and not against the plaintiff itself.** *Carvel Corp. v. Noonan,* 3 N.Y. 3d 182, 192 (2004) ("As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, **conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship**") (emphasis added); *Gianni Versace, S.p.A., v. Versace*, No. 01-9645, 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003) ("[counterclaim] **defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship** with the [counterclaim] plaintiff.") (internal quotation omitted)) (emphasis added). Paxfire has not alleged (and cannot allege) that Ms. Feist directed any conduct or statements to the third parties, let alone that she attempted to convince XO Communications or LinkShare (or any others) to end their business relationship with Paxfire. Nor did Paxfire allege that any third parties read Ms. Feist's Complaint or were aware of any statements Ms. Feist purportedly made to the "media outlets," much less that these purported statements caused them to terminate their contracts or other business relationship.

### d. Paxfire Failed to Allege that Ms. Feist Acted "Solely out of Malice," or used "Dishonest, Unfair, or Improper Means"

Paxfire has failed to allege that Ms. Feist filed her Complaint, or spoke with any "media outlets," with the requisite malice or wrongful means.[5] The motive "must be solely malicious, and the plaintiff has the burden of proving this fact." *John R. Loftus, Inc. v. White*, 150 A.D.2d 857, 860 (3d Dep't 1989) (quoted in *Argilus, LLC v. PNC Fin. Servs. Group, Inc.*, 419 F. App'x 115, 120 (2d Cir. 2011)). If the alleged "'interference [was] intended, at least in part, to advance [their] own competing interests,' then there was no 'wrongful purpose.'" *RFP*, 2011 WL 1810488, at *2 (quoting *PPX Enters, Inc. v. Audiofidelity Enters, Inc.,* 818 F.2d 226, 269 (2d Cir. 1987)). Here, Ms. Feist is a customer of RCN, which utilizes Paxfire's services; she has a legitimate grievance against Paxfire, and filed a case to protect her own interests—her privacy. Ms. Feist has no personal interest in interfering with Paxfire's business relationships or contracts, she merely seeks to protect her online privacy. Indeed, Ms. Feist's Complaint did not allege that Paxfire's public business of providing error redirection services should be stopped. *See* Cpl.

A claim for tortious interference based on the commencement of litigation is viable only under extremely limited circumstances. The Second Circuit has explained that, when allegations of tortious interference arise from the threat or filing of a "civil suit," the litigation must be "wrongful," and the actor must have **"no belief in the merit of the litigation"** or have brought the litigation **"in bad faith, intending only to harass the third parties and not to bring his**

---

[5] "'Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions," and "'extreme and unfair' economic pressure." *Friedman v. Coldwater Creek, Inc.*, 321 F. App'x 58, 60 (2d Cir. 2009) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191 (1980); Restatement (Second) of Torts § 768, Comment e; § 767, Comment c)); *Carvel,* 3 N.Y.3d at 190. "The New York Court of Appeals has never held that *any* misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations." *Friedman*, F. App'x at 60 (emphasis in original).

claim to definitive adjudication." *Universal City Studios, Inc. v. Nintendo Co.*, 797 F. 2d 70, 75 (2d Cir. 1986) (citing *Reinstatement (Second) of Torts))* (emphasis added); *see also D.A. Collins Constr. Co. v. ICOS/NCCA a Joint Venture,* No. 91-933, 1994 WL 328626, at *17 (N.D.N.Y June 28, 1994) (**"Simply put, missing here is any evidence of wrongful or improper conduct on the part of plaintiffs when they sought legal redress against [defendant]"**) (emphasis added).[6]

Here, Paxfire has failed to allege that Ms. Feist, in filing her Complaint or speaking with "media outlets," acted with any malice or motive to interfere with any of Paxfire's business relationships or contracts. There is simply no evidence that Ms. Feist lacks belief in the merit of her litigation, or does not intend to bring her claims to definitive completion. Ms. Feist is an Internet user, who discovered that her searches were being intercepted by a third party, was understandably concerned about her privacy, and had a legitimate grievance.[7]

> ### e.   Paxfire Has Failed to Adequately Allege Damages, or that Ms. Feist Caused Paxfire's Damages

Except for its conclusory allegations that purported contracts with XO Communications and LinkShare were "breached," Paxfire fails to allege any damages whatsoever. Paxfire claims

---

[6] *See also Tap Publ'ns Inc. v. Chinese Yellow Pages (N.Y.) Inc.*, 925 F. Supp. 212, 222 (S.D.N.Y. 1996). In *Mennen Co. v. Gillette Co.,* 565 F. Supp. 648, 657 (S.D.N.Y. 1983), *aff'd,* 742 F.2d 1437 (2d Cir. 1984), for example, the District Court found the plaintiff's case to be so lacking in merit that there was a "substantial overtone . . . to warrant an inference that [the] suit was initiated as a competitive ploy."

[7] Furthermore, Ms. Feist is permitted to procure a breach of contract—although she plainly did not—"in the exercise of equal or superior right." *Foster v. Churchill*, 87 N.Y.2d 744, 750-51 (1996) (cited by *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 283 (2d. Cir. 2006)); *see also Aetna Cas. and Sur. Co. v. Aniero Concrete Co.,* 404 F.3d 566, 589 (2d. Cir. 2005) ("A claim for tortious interference with contract cannot rest on conduct that is 'incidental to some other lawful purpose.'") (citations omitted). Ms. Feist's intention to protect her privacy and control who possesses and views her personal, valuable search information is "just cause" for her investigation and filing of litigation, even if it results in the breach of a contract. *See White Plains¸* 460 F.3d at 286.

to have contracts with ten ISPs, CC ¶ 41, and yet alleges that only one (XO Communications) was breached, CC ¶ 43. Paxfire's generic assertions that its "business relationships . . . were injured" will not suffice:

> Where "the underlying business relations remained undisturbed," a claim for tortious interference is "fatally defective." **Interference that does not rise to the level of a breach of agreement or severance of the relationship does not amount to an injury sufficient to make a tortious interference claim.**

*RFP,* 2011 WL 1810488, at *5 (citations omitted; emphasis added) (citing *PPX,* 818 F.2d at 270.

Moreover, to render a tortious interference claim "plausible," *see Iqbal,* 129 S. Ct. at 158, 1949, Paxfire must provide some factual allegations that "but-for" Ms. Feist's alleged acts, Paxfire would not have suffered the alleged harm. *Diario El Pais,* 2008 WL 4833012, at *7 (citing *Sch. of Visual Arts v. Kuprewicz* 771 N.Y.S.2d 804, 813 (N.Y.Sup. Ct. N.Y. Cnty); *See also Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir.1990). Even accepting Paxfire's allegations as true, Paxfire has failed to allege that these harms would not have occurred "but-for" Ms. Feist's alleged acts.

Paxfire acknowledges that numerous media outlets reported on Paxfire's alleged misconduct; these articles, which were independent of Ms. Feist's litigation, may have resulted in the harm. Because these media reports exposed Paxfire's search interception, the discovery of Paxfire's wrongdoing may have caused Paxfire's customers to end their contracts or business relationships. Negative reactions by customers (or any number of other, unrelated economic or business considerations), may have caused Paxfire's clients to end their contracts or business relationships. There are numerous explanations for Paxfire's purported loss, and Paxfire has failed to demonstrate that the XO Communications or LinkedIn contracts (assuming they existed), or any other contract or business relationship, would not have been terminated "but for" Ms. Feist's alleged communications with media outlets or the filing of her Complaint.

### D.    Paxfire Cannot State a Claim for Defamation

The statements about which Paxfire complains all fall squarely within New York's common law and statutory privileges for statements made in the context of litigation. Consequently, Ms. Feist's alleged statements cannot form the basis of a defamation claim, be it for libel or slander. Even if Ms. Feist's statements weren't protected by the privileges, Paxfire's vague allegations do not meet Fed. R. Civ. P. 8's pleading standard or the more stringent requirements for pleading a defamation claim as set forth in New York General Practice Rule 3016(a). There is no plausible legal or factual basis for Paxfire's defamation claims and, accordingly, they should be dismissed.

### 1.    The Allegedly Defamatory Statements are Privileged and Ms. Feist is Immune from the Defamation Claims

Paxfire describes Plaintiff's purportedly defamatory statements as follows:

> On or prior to August 4, 2011, and prior to filing her Class Action Complaint, Counterclaim Defendant Feist directly or through her agents or attorneys, communicated with media outlets such as the New Scientist and the Electronic Freedom Foundation, and informed them, falsely, of the following, and that she was about to file her Class Action Compliant [sic] alleging the following, all for the purpose of having them publish such allegations:

CC ¶ 36. There follows a randomly-lettered list of Paxfire's characterization of purportedly defamatory statements that Paxfire claims were included in Ms. Feist's publicly-filed Complaint (though several of them were not), and which Paxfire alleges were communicated to New Scientist and the Electronic Frontier Foundation in anticipation of and in connection with the filing of the Complaint.[8] Thus, the *only* defamatory statements alleged are statements that were

---

[8] Paxfire provides no factual support for its claim that the statements were ever communicated to EFF or the New Scientist and, indeed, *none* of the information and not a *single statement* appearing in either publication is attributed to Plaintiff or her attorneys. *See supra.*

made in the Complaint and that are the subject of this litigation—and such statements are privileged.[9]

Paxfire's claim that Ms. Feist libeled it "by publishing the aforesaid false, pejorative, and unfounded statements by means of the filing of her Class Action Complaint," CC ¶ 86—the only written statement Paxfire can point to—is clearly unsustainable. It is well established that such statements are protected by New York's common law absolute privilege if they are at all pertinent to the litigation. *Youmans v. Smith*, 153 N.Y. 214, 219 (1897). *Youmans* was a seminal case that "made clear that the rule rests on the policy that counsel should be able to 'speak with that free and open mind which the administration of justice demands' without the constant fear of libel suits." *Lacher v. Engel*, 33 A.D. 3d 10, 13 (1st Dep't 2006) (quoting *Youmans* 153 NY at 223); *See also*; *O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) ("Under New York law, 'in the context of a legal proceeding, statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation.'") (quoting *Grasso v. Mathew*, 164 A.D.2d 476, 479 (3d Dep't 1991)).

---

[9]In addition, because the alleged statements are **"arguably within the sphere of legitimate public concern,** [and are] reasonably related to matters warranting public exposition," they are protected. *Chapadeau v. Utica Observer–Dispatch,* 38 N.Y.2d 196, 199 (1975). "Courts applying New York law have . . . uniformly applied *Chapadeau* to cases involving non-media defendants . . . .'" *Gruss v. Zwirn*, No. 09 Civ. 6441, 2011 WL 2946376, at \*15 (S.D.N.Y. July 14, 2011) (quoting *Konikoff v. The Prudential Ins. Co. of Am.*, 234 F.3d 92 (2d Cir. 2000). Senator Richard Blumenthal expressed the concern over Paxfire's conduct, and stated that he would consult with Senator Al Franken—chair of the senate committee on Privacy, Technology and Law—about whether there should be congressional questioning. *See* Ex. F ("Senator mulls hearings on search rerouting"). Because the alleged statements were of public concern, and Ms. Feist and her attorneys adequately investigated her claims and statements, Paxfire's defamation claim fails. *See Mott v. Anheuser-Busch, Inc.,* 910 F. Supp. 868, 875 (N.D.N.Y. 1995), *aff'd mem.,* 112 F.3d 504 (2d Cir.1996) (noting that the investigation was conducted with the help of respected outside legal counsel, concluding that the "investigation and subsequent reporting were carried out in a thorough and responsible manner," and granting summary judgment under *Chapadeau*).

"The test of 'pertinency' is extremely broad and the proper inquiry is whether the statements at issue "may possibly be pertinent." *People ex rel. Bensky v. Warden*, 258 N.Y. 55, 59 (1932). *See also, O'Brien,* 898 F. Supp at 171. (citing *Grasso*, 164 A.D. 2d at 478, 479, *aff'd*, 101 F.3d 1479 (2d Cir. 1996); *Jones v. SmithKlineBeecham*, No. 07-0033, 2007 U.S. Dist. LEXIS 59980, at *12 (N.D.N.Y Aug. 14, 2007) ("When deciding whether a statement is pertinent, courts apply an 'extremely liberal' standard which is 'whether the statement is *at all pertinent* to the litigation.'") (internal citations omitted).

The privilege applies to statements made before and during the litigation. *Rosenberg v. Metlife, Inc.,* 493 F.3d 290, 291-292 (2d Cir. 2007); *Wiener v Weintraub*, 22 N.Y.2d 330, 331 (1968) ("Although statements made during the course of a judicial or quasi-judicial proceeding are clearly protected by an absolute privilege 'as long as such statements are material and pertinent to the questions involved,' we have indicated that the absolute privilege can extend to preliminary or investigative stages of the process."); 14 N.Y.Prac., New York Law of Torts § 1:50 ("The privilege attaches not only at the trial or hearing phase, but to every step of the proceeding in question, even if it is preliminary and/or investigatory."); see also *Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D. 3d 163 (1st Dep't 2007).[10]

---

[10] Ms. Feist's alleged statements are also protected by the self-interest and common-interest privileges. Under the common-interest privilege, "'defamatory communications made by one person to another upon a subject in which both have an interest' are afforded qualified protection." *Tomasino v. Mount Sinai Med. Ctr. And Hosp.*, No. 97 Civ. 5252, 2003 WL 1193726, at *15 (S.D.N.Y. March 13, 2003) (citation omitted). Here, Ms. Feist had a common interest with the "media outlets" and the court—Internet privacy and the legality of Paxfire's conduct. In addition, the self-interest privilege applies to defamatory statements "made in circumstances inducing a 'correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection of the interest.'" *Konikoff v. The Prudential Ins. Co. of Am.* No. 94 Civ. 6863, 1999 WL 688460, at *12 (S.D.N.Y. 581, 1999) (citations omitted). Accepting Paxfire's allegations as true, it would have been reasonable and correct for Ms. Feist to have believed that there was information that affected a sufficiently

Paxfire further alleges that Ms. Feist slandered it by "verbally publishing" the offending statements to "media outlets," CC ¶ 79, and by "causing the aforesaid media outlets to further publish, in writing," the offending statements. CC ¶ 86.   These statements, however, are privileged under Section 74 of New York's Civil Rights Law, which provides that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding. . . ." *See Gristedes Foods v. Poospatuck (Unkechauge) Nation*, No. 06-1260, 2009 WL 4547792, at *17 (E.D.N.Y. Dec. 1, 2009) (applying § 74 privilege to attorney's statements, published in *Newsday*, that "could be read to imply that the Shinnecock defendants are involved in supplying untaxed cigarettes to the black market"); *McNally v. Yarnall*, 764 F. Supp. 853, 856 (S.D.N.Y.1991) (applying § 74 privilege to attorney's allegedly defamatory statements to New Jersey newspaper where attorney, "in his alleged statement, was merely restating his clients position in defending the action"); *Lacher* 33 A.D. 3d at 12 (applying § 74 privilege to attorneys allegedly defamatory statements to New York Law Journal in an article headlined, "'Malpractice Suit Claims Attorney Padded Bills.'")

Ms. Feist's Complaint is not, as Paxfire implies, *see* CC ¶35, a "sham" litigation filed without a sufficient basis or with any malicious intent. *Cf. Williams v. Williams*, 298 N.Y.S.2d 473 (NY 1969) (§ 74 privilege does not apply where plaintiff has "maliciously institute[d] a judicial proceeding alleging false and defamatory charges" and then circulates "a press release or other communication based thereon and escape liability by invoking the statute."). Rather, Ms. Feist and her counsel thoroughly investigated and are zealously prosecuting her litigation.

---

important interest of hers—the privacy of her information and her Internet use—and the recipients' (the court and the "media outlets") knowledge of the matter would be of service in the lawful protection of her interest.

*Lacher v. Engel* is directly on point. In *Lacher*, the court held that the defendant's statement to the media outlet was covered by the § 74 privilege because:

> The Section 74 privilege, unlike the common-law privilege applicable to statements made in the malpractice complaint and the arbitration proceeding, applies to comments made *about* proceedings. ***Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within 74's privilege***.

33 A.D. 3d at 17.  (Emphasis added). As in *Lacher*, the alleged defamatory statements in the instant case "essentially summarize or restate the allegations of a pleading filed in an action" and, therefore, any communication of those statements fall squarely within § 74's privilege. Consequently, even if the Ms. Feist's alleged statements were false, such statements are "absolutely privileged" under New York's common and statutory law and, therefore, the defamation claims should be dismissed.

### 2.      Even If the Statements are not Privileged, Paxfire Has Not Stated a Claim for Defamation

To plead a defamation claim under New York law, plaintiff must allege that: (1) defendant made a false defamatory statement of fact; (2) the statement was published to a third party; (3) the statement concerned the plaintiff; (4) the defendant was responsible for making the statement; and (5) the statement caused injury. *Rizzo v. Edison, Inc.*, 172 F. App'x 391, 395 (2d Cir. 2006). A cause of action for libel also requires that the statement be written. *Id.*

Paxfire's allegations are subject to both the notice pleading standard imposed by Fed. R. Civ. P. 8, and the more stringent New York Civil Practice Law and Rule 3016 pleading requirement that "the particular words complained of shall be set forth in the complaint." N.Y. C.P.L.R. 3016(a); *Rizzo,* 172 Fed. Appx. at 395 ("A claim for defamation requires no less than a statement, in *haec verba* [verbatim], of the particular defamatory words claimed to have been uttered by defendants."); *Stephan v. Cawley*, 890 N.Y.S. 2d 371, 2009 WL 1740827 (N.Y. Sup.

Ct. N.Y. Cnty. 2009). To meet this pleading standard, the plaintiff must also state "the time, place, manner of the allegedly defamatory statement as well as the persons to whom the statement was made." *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 383 (N.D.N.Y 2008). Paxfire has failed to meet this standard.

### a.   Paxfire Has Not Set Forth the "Particular Words Complained of"

The complaint must set forth "the particular defamatory words claimed to have been uttered by defendant[]," verbatim. *Roth v. United Fed'n of Teachers*, 787 N.Y.S. 2d 603, 609 (N.Y. Sup. Ct. Kings Cnty. 2004). "This requirement is strictly enforced and the exact words must be set forth." *Id.*   Paxfire has failed to set forth a single allegation enumerating the "particular words complained of" and, therefore, does not meet the N.Y. C.P.L.R. 3016(a) pleading requirement.

Instead, Paxfire makes general assertions that, for example, Ms. Feist falsely stated that Paxfire, "identified persons," "collected and compiled information," "disclosed confidential or private information," and "communicated" this information, CC ¶¶ 34, 36.[11] Paxfire fails to describe where or how that information was published. Although Paxfire claims this information was published in the Complaint, it fails to even cite to that document. This is a ground for dismissal. *See Stephan,* 890 N.Y.S. 2d 371 ("Such imprecise qualification or paraphrasing not only opens the complaint to the question of whether the words were ever published, but also renders the complaint defective as a matter of law.").

---

[11]These allegations were preceded by the phrase "such as" which, itself, renders the Counterclaim defective. *Geddes v. Princess Properties International, Ltd.*, 88 A.D.2d 835 (1st Dep't 1982) ("Any qualification in the pleading thereof by use of the words 'to the effect', 'substantially', or words of similar import generally renders the complaint defective." quoting *Gardner v Alexander Rent-A-Car*, 28 A.D. 2d 667 (1st Dep't 1967)).

### b.   Paxfire Has Failed To Adequately Identify the Persons to Whom the Allegedly Statements Were Made

A plaintiff in a defamation action must "plead with the requisite particularity the persons to whom the allegedly defamatory statement[s] w[ere] made." *Lore*, 583 F. Supp. 2d at 383. With regard to the third parties to whom the purportedly defamatory statements were made, Paxfire simply states that Ms. Feist "communicated" the allegedly "false and pejorative" statements to "media outlets including the New Scientist and the Electronic Frontier Foundation," CC ¶ 37. The nature and means of the communication are not alleged, the specific persons to whom Ms. Feist purportedly spoke are not alleged, and the identities of the other "media outlets" are not alleged.[12] Paxfire's "assertions are quite broad when considering the multitude of news and other media organizations." *Lore*, 583 F. Supp. 2d at 383.  Paxfire has thus failed to plead with the requisite particularity the alleged recipients of the purportedly defamatory statements.

### c.   Paxfire Has Failed to Adequately State When the Allegedly Defamatory Statements Were Made

A plaintiff in a defamation action must specify *when* the allegedly defamatory statements were made. *Lore*, 583 F. Supp. 2d at 383. Paxfire specified only one date, August 4, 2011, when allegedly defamatory conduct occurred—the filing of "the instant Complaint." CC ¶ 34. Paxfire does not allege any other specific date when the purportedly "pejorative and false" statements or the communication were made to "media outlets." Paxfire has failed to adequately particularize

---

[12] Paxfire also has failed to allege who actually made the purported defamatory statements or that Ms. Feist even knew the statements had been made. *See e.g.*, CC ¶ 36 ("Counterclaim Defendant Feist, directly or through her agents and attorneys communicated with media outlets . . ."). See also CC ¶¶ 38, 79, 86. Furthermore, Paxfire does not particularize the statements made by the "agents or attorneys," identify these "agents or attorneys," describe their relationship with Ms. Feist, or allege that they were acting for or on behalf of Ms. Feist.

when the defamatory statements were made; specific dates are required. *See Szwarce v. Buenaventur*a, 82 N.Y.S.2d 292, 293 (N.Y. Sup. Ct. N.Y. Cnty. 1948) ("If plaintiff claims that defendant uttered slanderous words at more than one time and place, ***each time and place and the words then and there uttered shall be set forth as separate causes of action.***") (emphasis added); *Roth v. Atex Prods., Inc*., 35 Misc. 2d 136, 138 (N.Y. Sup. Ct. Nassau Cnty. 1962) ("[T]o state that the slanderous remarks were uttered in the latter part of a year is too indefinite -- ***a specific date should be pleaded."***)(emphasis added).

### d.    Paxfire Has Failed To Sufficiently Allege Injury

Finally, to satisfy a claim for defamation, a plaintiff must allege special damages or "per se" defamation. "The general rule is that libel or slander is not actionable unless the plaintiff suffers special damages, i.e., those contemplating the loss of something having economic or pecuniary value." *Floyd Harbor Animal Hosp. v. Doran*, No. 06-18109, 2009 N.Y. Misc. LEXIS 5610 (N.Y. Sup. Ct. Suffolk Cnty. Dec. 3, 2009). An exception to this general rule is where the statements are defamatory per se. *Joyce v. Thompson Wigdor & Gilly LLP*, No. 06-15315, 2008 U.S. Dist. LEXIS 43210, at *31-32 (S.D.N.Y. June 3, 2008) ("The requirement of showing special damages does not apply, however, to a statement that is libelous 'per se' -- that is, a statement that is defamatory 'on its face.'").

Paxfire has not sufficiently alleged special damages flowing from the alleged defamatory statements. *See supra*, § II.C.2.e. Paxfire has alleged that the "false and pejorative" statements resulted "in damage to Paxfire's business relationships and reputation," the "termination of contracts and business relationships with ISPs," "the refusal of ISPs . . . to do any business with Paxfire," and "the significant reduction in the valuation of Paxfire" while it was participating in merger and acquisition negotiations. CC ¶¶ 38, 82. However, "[a] review of these allegations. . . , discloses the absence of supporting factual allegations or details" suggesting a "causal

connection" between the purportedly false and pejorative statements and any alleged damages. *Sheng Gang Deng v. Shag Qing Chen,* 2010 N.Y. Misc. LEXIS 2135, at *13 (N.Y. Sup. Ct. N.Y. Cnty. May 13, 2010) (citing *Aronson v Wiersma*, 65 N.Y. 2d 592, 595 (1985)). Paxfire has not provided any support for the suggestion that there is a causal connection between the allegedly defamatory statements and any purported damage.

Paxfire also asserts that, as the purportedly defamatory statements "included allegations of criminal conduct under the Electronic Communications Privacy Act," the false and pejorative statements are "defamation per se." CC ¶¶ 83, 90. "Not every imputation of unlawful behavior, however, is slanderous per se." *Sheng Gang Deng*, 2010 NY Slip Op 31198U at *11. Only allegations of serious criminal activity give rise to per se liability for defamation. "[T]he law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damage." *Liberman v. Gelstein*, 80 N.Y.2d 429, 435 (N.Y. 1992). "[T]he crimes recognized within per se defamation are murder, burglary, larceny, arson, rape and kidnapping." *TC v. Valley Cent. Sch. Dist.*, 777 F. Supp. 2d 577 (S.D.N.Y. 2011) (citing Restatement (Second) of Torts § 571, cmt. g (1977)). A breach of the Electronic Communications Privacy Act ("ECPA") is not a serious offense and clearly cannot be compared to the serious crimes that give rise to per se liability. 18 USCS § 2701. Furthermore, Ms. Feist alleged a breach of the ECPA as a civil not criminal claim, not a criminal charge.

In summary, Paxfire has failed to state "the particular words complained of," N.Y. Civ. Rights Law § 74, and "the time, place, manner of the allegedly defamatory statement as well as the persons to whom the statement was made." *Lore,* 583 F. Supp. 2d at 383. Paxfire's claims for defamation should be dismissed.

## IV.    CONCLUSION

For the foregoing reasons, Ms. Feist respectfully submits that Paxfire's counterclaims must be dismissed in full.

Dated: September 26, 2011                    Respectfully Submitted,

**MILBERG LLP**
<u>        /s/ Peter E. Seidman        </u>
 Sanford P. Dumain
Peter E. Seidman
Melissa Ryan Clark
Charles Slidders
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: sdumain@milberg.com
            pseidman@milberg.com
            mclark@milberg.com
            cslidders@milberg.com

-and-

**REESE RICHMAN LLP**

Michael E. Reese
Kim Richman
875 Avenue of the Americas, 18th Floor
New York, NY 10001
Telephone: (212) 579-4625
Facsimile: (212) 253-4272
E-mail:mreese@reeserichman.com
            krichman@reeserichman.com

*Attorneys for Plaintiff and Counterclaim Defendant Betsy Feist*