UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BETSY FEIST**, individually, and on behalf of all others similarly situated, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>**RCN CORPORATION** and **PAXFIRE, INC.**, )<br>)<br>Defendants. ) | CASE NO. 11 CIV 5436 (JGK) |

**OPPOSITION OF COUNTERCLAIM PLAINTIFF PAXFIRE, INC. TO MOTION OF COUNTERCLAIM DEFENDANT BETSY FEIST TO DISMISS PAXFIRE'S COUNTERCLAIMS**

Counterclaim Plaintiff Paxfire, Inc. ("Paxfire"), by its undersigned attorney, hereby opposes Counterclaim Defendant's Motion to Dismiss Paxfire's Counterclaims.

Counterclaim Defendant Betsy Feist ("Ms. Feist") misrepresents the allegations brought by Paxfire, and also seeks to assume a privilege to which she is not entitled.  The defamatory and otherwise tortious statements made by Ms. Feist include those made by her **prior** to the filing of her complaint, and thus the judicial privilege that she asserts does not apply.  Also, she mischaracterizes the statements that are the subject of Paxfire's Counterclaims, redrafting these Counterclaims in the hope of thereby make them more subject to attack.

Further, Ms. Feist's assertion that she had no knowledge of Paxfire's contracts and business relationships is entirely specious, as demonstrated by the inclusion in her

Complaint of the names of companies with which Paxfire had such contracts and relationships.

Feist's remaining arguments are similarly specious and her motion must be denied. In support of this Opposition Paxfire submits the following:

## MEMORANDUM

The standard applicable to a motion to dismiss is that "'a court must accept the allegations contained in complaint as true, and draw all reasonable inferences in favor of the non-movant,' and deny the motion 'unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Nagbou v. Mayrose*, 2010 U.S. App. LEXIS 24424, at *1-2 (2d Cir. Nov. 30, 2010), quoting *Ad-Hoc Comm. of Baruch Black and Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir. 1987).

The standard for pleading in federal courts is that of notice pleading, whereby all that is required is a "short and plain statement of the claim . . . ." Fed. R. Civ. P. 8(a)(2). Elements such as knowledge, intent and other conditions of a person's mind may be alleged generally. Fed. R. Civ. P. 9(b).

## Background

On August 4, 2011, Plaintiff and Counterclaim Defendant Betsy Feist filed her Class Action Complaint naming Paxfire and the RCN Corporation accusing these companies, *inter alia*, of: (1) profiling the search habits of Internet users; and (2) selling

and otherwise distributing for remuneration such information to third parties.  Paxfire did none of these things.[1]

The Complaint was and is meritless.  Nonetheless, the press reaction was swift and merciless.  As a result, Paxfire lost clients,[2] and lost business with clients and companies with which it had business relations.[3]  The Complaint was filed while Paxfire was in the midst of negotiating a sale of the company, which immediately failed[4].  The value of Paxfire's business, including its good faith and name recognition, plummeted.  Paxfire suffered enormous damages.

The onslaught began with an Internet news article from the New Scientist, **which was published before Ms. Feist's Complaint was filed**. A copy is attached.

## Argument

Paxfire's Counterclaims fall into two categories:

(1) Counts One through Five, alleging various forms of tortious interference with Paxfire's business relationships through the disclosure of Ms. Feist's allegations to the media before the filing of Ms. Feist's lawsuit, and through the filing of the lawsuit itself; and

(2) Counts Six and Seven, alleging defamation resulting from statements made by Ms. Feist, directly and through her attorneys and agents, to the press.

---

[1] Cntrcl. ¶¶ 16-27.
[2] Cntrcl. ¶¶ 43, 63.  In addition, Paxfire proffers to the Court that, if asked to amend its Complaint, it would add the following ISPs to those who have terminated Paxfire's contracts as a result of Ms. Feist's complaint: Wide Open West, Sprint, Global Crossing, Local Net; and Commission Junction to the Advertising Aggregators who have terminated their contracts with Paxfire for the same reason.
[3] Cntrcl. ¶¶ 51, 58, 71.
[4] Cntrcl. ¶ 82(c).

I.  **No Judicial Privilege Applies**

As an initial matter, the statements made to the press at issue in Paxfire's Counterclaims, were made at a time **that no lawsuit had yet been filed**.[5] For that reason, Ms. Feist's statements are not protected by the judicial privilege. *Cantu v. Flanigan*, 2007 U.S. Dist. LEXIS 63065, at *22-23 (E.D.N.Y. Aug. 27, 2007) (holding that defamatory statements made to the press prior to the filing of a brief are not protected by the judicial privilege); *see also Uni-Service Risk Mgmt. v. N.Y. State Ass'n of Sch. Bus. Officials*, 62 A.D.2d 1093, 1094 (N.Y. App. Div. 1978) (holding that judicial privilege did not apply because the defamation statement was made before the commencement of the litigation); *Kenny v. Cleary*, 47 A.D.2d 531, 532 (N.Y. App. Div. 1975)(holding that defamatory statements made before the commencement of a judicial proceeding and do not qualify for the absolute privilege of judicial privilege). Neither are they protected by Section 74 of the New York Civil right's Law. *See Williams v. Williams*, 23 N.Y.2d 592, 598-99 (N.Y. 1969) (cautioning that § 74 was not designed to provide plaintiffs with a means to skirt defamation laws).

Among the news sources that released the information to the public are the New Scientist and Google Alerts[6], the latter publicizing the former. A copy of the New Scientist article is attached, as is a copy of Google Alerts sent by email to Mr. Mark Lewyn, president of Paxfire.[7] As can be seen, the original New Scientist article was published on August 4, 2011. The Google alert announcing the New Scientist's article

---

[5] Cntrcl. ¶ 36.
[6] *Id.*
[7] As noted in Counterclaim Defendant's Memorandum in Support of her Motion to Dismiss, at n. 1, on a motion to dismiss, the court may consider statements or documents incorporated into the complaint by reference or integral to the complaint, of which judicial notice may be taken. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *see also Schnall v. Marine Midland Bank*, 225 F.3d 263, 266 (2d Cir. 2000); *Staehr v. Harford Fin Servs. Group, Inc.* 547 F.3d 406, 425 (2d 2008); Fed R. Evid 201(b).

4

was issued at 12:40 p.m. EST on the same day.   However, Ms. Feist's Complaint was not filed in this court until 3:39 p.m. EST on August 4th, **some three hours after the New Scientist article appeared**.

    Among the statements appearing in the article is the following:

> Reese Richman, a New York law firm that specialises [spelling in original] in consumer protection lawsuits, today filed a class action against one of the ISPs and Paxfire, which researchers believe provided the equipment used to hijack and redirect the searches.  The suit, filed together with Milberg, another New York firm, alleges that the process violated numerous statutes, including wiretap laws.

    Despite the fact that no lawsuit had been filed at the time that the article appeared, the author identified the two law firms which now represent Ms. Feist; stated that they had filed a class action lawsuit against Paxfire; and stated that Ms. Feist asserted that Paxfire "violated numerous statutes, including wiretap laws."

    Clearly, Ms. Feist, directly or through her attorneys or agents, has disclosed defamatory information concerning Paxfire to the New Scientist at a time **prior** to the filing of her lawsuit, and thus at a time that no judicial privilege did or could attach to those statements.

    Similarly, the Electronic Frontier Foundation ("EFF") published a "blog" on August 4, 2011, concerning Paxfire.  In substantive part, it said:

> [Paxfire's] proxies collect the users' web searches and the corresponding search results, mostly forwarding them to and from the intended search engines. This allows Paxfire and/or the ISPs to directly monitor all searches made by the ISPs' customers and build up corresponding profiles, a process on which Paxfire holds a patent. It also puts Paxfire in a position to modify the underlying traffic if it decides to.

This paragraph contains numerous false and misleading statements, including the following **false** statements[8]:

- These proxies collect the users' web searches and the corresponding search results

- This allows Paxfire and/or the ISPs to directly monitor all searches made by the ISPs' customers and build up corresponding profiles.

One of the authors of this blog was Peter Eckersley of EFF.  Mr. Eckersley has an ongoing relationship with Feist's counsel, having served as an Independent Monitor for them in a case filed by one of these firms in this District.  *Chin v. RCN Corp.*, Case No. 1:08-cv-07349-RJS, Doc. No. 33.  These false statements appear in Feist's Complaint.[9]  This allows the Counterclaim Plaintiff, Paxfire, to rely upon the inference that Feist, directly or through her attorneys, communicated these false statements to EFF in the hope that they would be published, as they were.[10]

As is true for the doctrine of judicial privilege, Section 74 of the New York Civil right's Law does not protect the Counterclaim Defendant's defamatory press communications concerning baseless allegations made in a complaint.  This is well explained by the New York Court of Appeals in *Williams*, 23 N.Y.2d at 598-99:

> While the facts of this case may appear to fit within the wording of section 74, it would require us to attribute an extreme maliciousness to the Legislature to hold that the statute was intended to protect the defendant's attempt at defamation.  If no action were found to lie in this case, the courts would be sanctioning an ingenious means of defamation.

*  *  *  *  *

---

[8] EFF ultimately retracted and clarified this blog.
[9] Cntrcl. ¶ 36(a) & (b).
[10] In discovery, Paxfire will endeavor to take the depositions of Peter Eckersley, and a corporate designee of EFF, James Giles (the author of the new Scientist article) and a corporate designee of the New Scientist to determine the full extent of the information that was communicated among these entities and Ms. Feist.

> The purpose of section 74 of the Civil Rights Law . . . is the protection of reports of judicial proceedings which are made in the public interest. In light of this purpose, it is impossible to conceive of the Legislature's intending to protect the defendant's pervasion of judicial proceedings. It would be contrary to reason to say that the Legislature considered it necessary to protect such defamation in order to implement the salutary aims of the statute.
>
> * * * * *
>
> We conclude that it was never the intention of the Legislature in enacting section 74 to allow "any person" to maliciously institute a judicial proceeding alleging false and defamatory charges based thereon and escape liability by invoking the statute. "Society has a pervasive and strong interest in preventing and redressing attacks upon reputation", and the courts are delegated with the responsibility of protecting that right. (*Rosenblatt v. Baer*, 383 U.S. 75, 86).

Significantly, the public disclosures in Williams occurred after the complaint was filed; in the instant case, the disclosure to the New Scientist and EFF occurred **before** the complaint was filed, which argues more strongly that Section 74, a statute intended to protect the press' right to report to the public ongoing activities in the people's courts, does not apply here, where the relevant to filing in those courts has not yet occurred.

## II.     The Doctrine of Judicial Privilege Does Not Apply to Claims of Tortious Interference with Contracts or Business Relationships

Assuming *arguendo* that the doctrine of judicial privilege was applicable in this case, it does not apply to claims of tortious interference with contract or business relationships. *Strategic Capital Corp. v. New Strong Group Ltd.*, 2009 U.S. Dist. LEXIS 36606, at *23-24 (S.D. Tex. April 24, 2009) (" Judicial Privilege is, normally, a defense from a suit for libel or slander when the offending communications are made in connection with judicial proceedings . . . . There is no case that applies judicial privilege as a defense against a claim for tortious interference. It is just the opposite."), *citing*

7

*International Shortshop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1268-69 (5th Cir. 1991) ("That a civil complaint carries with it the imprimatur of the docket clerk's seal does not, in our view, make a bad faith lawsuit any less tortious or any more privileged."); *but see Pelagatti v. Cohen,* 536 A.2d 1337, 1342 (Pa. Super. 1987), *appeal denied*, 548 A.2d 256 (Pa. 1988)(recognizing an absolute privilege for filing a sham legal action, and a limited privilege for discussions in the press).

**III. Paxfire's Counterclaims Are Legally Sufficient**

Having addressed Counterclaim Defendant Feist's spurious assertions of privilege, we now turn to her concerns over the legal sufficiency of Paxfire's Counterclaims

As an initial matter, Counterclaim Defendant Feist mischaracterizes Paxfire's Counterclaims. Ms. Feist seeks to recast Paxfire's claims as concerning Ms. Feist's false statements regarding Paxfire's technology, to-wit whether Paxfire technology somehow violated Ms. Feist's rights and whether Ms. Feist knew enough about Paxfire's technology to justify her bringing this Complaint. Although numerous statements of Ms. Feist concerning Paxfire's technology are false, Paxfire's Counterclaims are more limited. They allege only that Ms. Feist defamed Paxfire, and tortiously interfered with its business relationships by falsely publicizing, and causing to be published, **false** statements regarding its business practices, specifically[11]:

(a) Paxfire identified persons who were End Users and engaged in searches using the Internet;

---

[11] Cntrcl. ¶¶ 33, 36.

(b) Paxfire collected and compiled information about End Users of ISPs in a manner that constituted profiling of such End Users, or of the searches of such End Users;

(c) Paxfire shared information about End Users of ISPs, or of their searches, with third parties;

(d) Paxfire sold information about End Users of ISPs, or of their searches;

(e)  Paxfire allowed third parties to access information about End Users of ISPs;

(f) Paxfire allowed third parties to access searches by End Users of ISPs;

(g) Paxfire allowed third parties to monitor searches by End Users of ISPs;

(h) Paxfire allowed third parties to intercept searches by End Users of ISPs;

(i) Paxfire disclosed confidential or private information relating to the use of the Internet by End Users of ISPs;

(j) Paxfire converted personal information of End Users of ISPs, including search histories, by providing such to third parties; and

(k) Paxfire received or retained money from third parties as a result of sharing and/or allowing access to the personal information of End Users of ISPs.

A. The Claims of Tortious Interference with ISPs Customers Are Legally Sufficient

Counterclaims I and II allege that Ms. Feist intentionally filed her complaint and caused defamatory statements to be published in the news media for the purpose of destroying its business by tortiously interfering with its contracts and business relationships with its ISP customers.

The elements of a claim of tortious interference with contract are: "(1) the existence of a valid contract between plaintiff and a third party, (2) defendant's

knowledge of the contract, (3) defendant's intentional procurement of a breach of the contract without justification, (4) actual breach of the contract, and (5) resulting damages." *Snyder v. Sony Music Entertainment, Inc.*, 252 A.D.2d 294, 299 (N.Y. App. Div. 1999).

Counterclaim Defendant Feist asserts that Paxfire cannot satisfy the requirement that Ms. Feist knew about any contracts that Paxfire now claims she interfered with. For two separate reasons, this is incorrect.

In her Complaint, Ms. Feist provides a broad description of Paxfire's business relationships, identifying ten Internet Service Providers (ISPs) as being Paxfire customers.[12] Among the ISPs that Ms. Feist identifies as such is Wide Open West. Although Wide Open West is not specified in Paxfire's Counterclaims as one of the companies with which Ms. Feist tortiously interfered, Paxfire proffers to the Court that, in any amended Counterclaims that the Court might ask Paxfire to file, Paxfire can and will allege that as a direct result of Ms. Feist's tortious conduct Wide Open West has terminated its contract with Paxfire.[13]

Paxfire did identify XO Communications in its Counterclaim as one ISP that terminated its contract with Paxfire, also as a result of Ms. Feist's tortious conduct. XO Communications is expressly named in the New Scientist article. Since Paxfire has alleged that Ms. Feist, directly or through her agents or attorneys, communicated with the New Scientist before filing her Complaint, and alleged that, in a similar manner, she leaked her defamatory statements to the New Scientist, Paxfire is entitled to the inference

---

[12] First introductory, unnumbered paragraph of Plaintiff's Complaint.
[13] As a further proffer as to the issue of damages on Counterclaims VI and VII, alleging defamation, Paxfire has to-date lost five ISPs as customers.

that XO Communications was one of the ten ISPs identified in the New Scientist article that was disclosed to that news media outlet by Ms. Fiest.

Paxfire has alleged that Ms. Feist "knew or should have known" that Paxfire had contracts and business relationships with each of the ISPs specified in her Complaint, plus XO Communications, specified in the New Scientist Article.[14] If desired by this Court, Paxfire can amend its Counterclaims to expressly allege that Ms. Feist "knew" that Paxfire had contracts and business relationships with Wide Open West and XO Communication, as well as the basis for such allegations (as set forth above).

Similarly, Paxfire's business relations with all of its ISPs have been damaged, including the relations with the ISPs specified above. If asked by the Court, Paxfire can amend its Counterclaims in a similar manner as proffered above to identify these ISPs, including but not limited to Wide Open West and XO Communications.

B. The Claim of Tortious Interference with Business Relationships with Trademark Holders Is Legally Sufficient

Counterclaim III alleges that Ms. Feist intentionally filed her complaint and caused defamatory statements to be published in the news media for the purpose of destroying its business by tortiously interfering with its business relationships with trademark holders.

The elements of tortious interference with a business relationship are "(1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

---

[14] Cntrcl. ¶ 28.

Paxfire's business relations with all of its trademark holders have been damaged, including the relations with Apple and CA Technologies, expressly identified in the ISPs specified above.[15]  Ms. Feist also specified that Paxfire direct navigation service was operational for some 170 trademarks and their holders.[16]  Clearly she knew that Paxfire had business relations with these trademark holders, and this inference is supported (for the reasons discussed above) by the following:  the New scientist article said that 165 "search terms," including apple, dell, safeway, and bloomingsdale, were subject to Paxfire's direct navigation service; and the EFF blog said that it had identified " 170 brand-related keywords" "redirected" by Paxfire.

For the purpose of satisfying the knowledge element of the tort of tortious interference with contract, it is sufficient to establish that the defendant had knowledge of a previous business relationship with a particular business entity to infer that the defendant had knowledge of an ongoing business relationship. *Italverde Trading, Inc. v. Four Bills of Lading*, 485 F. Supp. 2d 187, 205 (E.D. N.Y.  2007) ("As a result, these invoices, in and of themselves, are sufficient to create an inference that Savino had knowledge of Plaintiffs' ongoing business relationships with its retailers.")

If asked by the Court, Paxfire can amend its Counterclaims, in a similar manner as proffered above and for similar reasons, to identify these trademarks and their holders, and that Ms. Feist knew about the business relations between Paxfire and these trademark holders.

---

[15] Cntrcl. ¶ 21.
[16] Cntrcl. ¶ 20.

C.   The Claims of Tortious Interference with Paxfire's
     Advertising Aggregator Are Legally Sufficient

Counterclaims IV and V alleges that Ms. Feist intentionally filed her complaint and caused defamatory statements to be published in the news media for the purpose of destroying its business by tortiously interfering with its contracts and business relationships with advertising aggregators.

Again, the New Scientist provides the specificity demanded by the counterclaim Defendant. The article states in pertinent part:

> The marketing companies include organisations like Commission Junction, a Santa Barbara, California, a firm that retailers pay to supply traffic to their websites.
>
> Organisations that provide Commission Junction with traffic, which may include Paxfire and the ISPs the Berkeley team monitored, receive a cut of any purchase their users make. The cut is typically around 3 per cent. Commission Junction said that it was investigating the behaviour identified by the Berkeley researchers.

Paxfire proffers that if this court asks it to amend its Counterclaims, for the same reasons specified above, it can and will amend the allegations to include Commission Junction as one advertising aggregator with which it had a contract and a business relationship, and which terminated its contract and business relationship with Paxfire as a result of Ms. Feist's defamation and Complaint.

D.   The Claims of Libel and Slander Are Legally Sufficient

Counterclaim VI alleges slander and Counterclaim VII alleges libel on the part of Ms. Feist, with such defamatory conduct resulting in significant loss of business for Paxfire including the loss of an opportunity to sell the company.

13

Counterclaim Defendant Feist dispenses a potpourri of objections concerning Paxfire's claims of libel and slander. All are meritless.

Paxfire has properly alleged that the defamatory statements were made on or before August 4, 2011, and identified the statements at issue.[17] The statements at issue, being made to news media, do not fall under the "qualified privilege" available to persons having a common self-interest. They were not made incident to "preliminary" or "investigatory" stages of litigation, as they were not made in furtherance of the litigation but rather to new media before the lawsuit commenced for the sole purpose of causing damage to Paxfire. The Counterclaims allege that the defamatory statements were made to specified news media: EFF and the New Scientist. Finally, Paxfire has pleaded adequate injury: loss of clients, injury to ongoing business relationships, and loss of a purchase or merger opportunity, the value of all of which has been set at thirty million dollars, with the exact amount available for further determination during discovery. Paxfire has also alleged that the defamation was defamation *per se*.[18]

## IV.    The Noerr-Pennington Doctrine Does Not Apply

Counterclaim Defendant Feist seeks to misuse the Noerr-Pennington Doctrine, the purpose of which is to protect the right of the people to petition and influence the action of government agencies and officials. Although it has been extended from the anti-trust arena to other types of lawsuits, such as those alleging abuse of process and tortious interference, such instances are still limited to instances where the purpose is to influence governmental, including judicial, as

---

[17] Cntrcl. ¶ 36.
[18] Cntrcl. ¶ 90.

opposed to private action and results. *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500 (1988) (*citing Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) ("[P]rivate action that is not genuinely aimed at procuring favorable government action is a mere sham that cannot be deemed a valid effort to influence government action.").

Paxfire makes two arguments: first, the Noerr-Pennington Doctrine does not apply to Paxfire's Counterclaims, inasmuch as the Counterclaims include tortious conduct that preceded the filing of Ms. Feist's lawsuit; and second, that lawsuit falls under the "sham" exception to the doctrine.

As already discussed, Paxfire's Counterclaims rely substantially upon Feist's communications with the media, communications that occurred prior to the filing of her lawsuit. This being the case, there was no government involvement in those communications. Also, unlike where pending litigation might concern the legitimacy of a trademark and, therefore, the registration of that mark with a federal agency (i.e., the U.S. Patent and Trademark Office), here, no federal regulatory agency is implicated in any of Ms. Feist's claims. Thus the only governmental entity possibly involved would be the courts, and such involvement could not occur until an action was filed.

Turning to the applicability of the doctrine to those portions of Paxfire's Counterclaims that rest upon the filing of Ms. Feist's lawsuit, all Counterclaims fall under the "sham" exception to the doctrine. There is a two-part test to determine whether or not a lawsuit is a sham. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60-61 (1993).

15

The first prong requires a showing that the lawsuit is objectively baseless, in that no reasonable litigant could realistically expect success on the merits. *Id.* at 60. That test can be met here[19]:

(1) Count One alleges that Paxfire violated the Electronic Communications Act by "intercepting" Plaintiff's electronic communications.  However, Plaintiff gave consent to her ISP's methods of processing her communications, and such consent voids any ECPA claim she might have.[20]  *See Kirch v. Embarq Mgmt. Co.*, 2011 U.S. Dist. LEXIS 92701, at *28-29 (Aug. 19, 2011 D. Kan.) (granting summary judgment to defendant because, in the activation agreement, the plaintiff had consented to any monitoring or interception of Internet activity).  Further, the Second Circuit has held that processing a subscriber's electronic communications in the ordinary course of an ISP's business is not an interception for the purpose of the ECPA. *Hall v. Earthlink Network, Inc.*, 396 F.3d 500 (2d Cir. 2005).  Given the state of the law on this issue, Feist could have no expectation of succeeding on this count.

(2) Count IV and V allege that Paxfire converted, and was unjustly enriched by selling or otherwise receiving remuneration for disclosing, Plaintiff's personal search information.  In fact, as Paxfire has alleged in its Answer and Counterclaims — and as will be demonstrated in discovery — Paxfire never sold or distributed such information.[21]  Although Ms. Feist may have determined that Paxfire could

---

[19] Aside from Counts I, IV and V, it was initially unclear whether Paxfire is named in Count III of Plaintiff's Complaint: the caption only identifies RCN Corp. as a defendant, while paragraphs 63-65 of this count use the term "defendants" instead of "defendant."  In written communications among counsel, Plaintiff has asserted that this Count does **not** name Paxfire as a defendant; Paxfire's counsel has requested that Ms. Feist rectify this ambiguity.
[20] *See* First, Second, Third, Fifth, and Eleventh Aff. Defs.
[21] Cntrcl. 16-27.

have obtained, compiled, and sold such information, in fact Ms. Feist had no evidence that Paxfire ever did so.

If the lawsuit is found to be baseless, then the next step is to determine whether the Plaintiff had an improper motive in bringing the lawsuit. *Professional Real Estate Investors,* 508 U.S. at 60-61. As explained by the Fifth Circuit Court of Appeals, "If litigation is in good faith, a token of that sincerity is a warning that it will be commenced and a possible effort to compromise the dispute." *Coastal States Marketing, Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983). No such warning was given here, let alone an opportunity to compromise the eventual lawsuit.[22] To the contrary, the only entities that were given prior notice of the filing of the lawsuit appear to be the press – certainly none was given to Paxfire, demonstrating Ms. Feist improper motive. Ms. Feist took it upon herself to become a vigilante, self-appointed to police the Internet, using the courts to destroy the reputation and business models of companies of whose conduct she did not approve, whether such conduct was lawful or not.[23] The courts are not open to such misuse.

Counterclaim Defendant Feist cite the case of *Primetime 24 Joint Venture v. NBC*, 219 F.3d 92, 100 (2d Cir. 2000), in support of its argument that statements made before the filing of a complaint are protected by the doctrine. Unfortunately, Ms. Feist has misconstrued this case.

In *Primetime 24 Joint Venture*, the Second Circuit was discussing "efforts incident to litigation of the following nature: pre-litigation threat letters, trademark enforcement actions, and settlement offers:

---

[22]Cntrcl. 30, 32.
[23]Cntrcl. 31-33.

17

> Courts have extended Noerr-Pennington to encompass concerted efforts incident to litigation, such as prelitigation "threat letters," *see McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1560 (11th Cir. 1992) (holding that concerted threats of litigation are protected under Noerr-Pennington); *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367-68 (5th Cir. 1983) (same); *Barq's Inc. v. Barq's Beverages, Inc*., 677 F. Supp. 449, 452-53 (E.D. La. 1987) (applying prelitigation rights to enforcement of trademark litigation), and settlement offers, *see Columbia Pictures Indus., Inc. v. Professional Real Estate Investors, Inc.,* 944 F.2d 1525, 1528-29 (9th Cir. 1991), *aff'd*, 508 U.S. 49, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993).

*Primetime 24 Joint Venture*, 219 F.3d at 100.  The statements at issue here are not "incident to litigation" as that term is used in this context by the courts.

In summary, to the extent any question exists as to Paxfire's ability to establish these two prongs, a determination of this question must await the completion of discovery followed by an appropriate evaluation by the trier of fact.  This is not a question to be decided on a motion to dismiss.

## CONCLUSION

For the reasons set forth above, Counterclaim Defendant Feist's Motion to Dismiss must be denied.  In the alternative, Counterclaim Plaintiff Paxfire must be permitted to amend its Counterclaims to satisfy any concerns that this Court may entertain.

Respectfully Submitted,

/s/Andrew Grosso
ANDREW GROSSO, ESQ.
Andrew Grosso & Associates
Georgetown Place
1101 Thirtieth Street, NW, Suite 300
Washington, D.C.  20007
(202) 298-6500 Tel.
(202) 298-5599 Fax
Agrosso@acm.org Email

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of October 2011, a true and correct copy of the foregoing was served electronically on the following:

| | |
|---|---|
| Peter Curtis Neger, Esq.<br>Matthew Derek Care, Esq.<br>Bingham McCutchen LLP<br>399 Park Avenue<br>New York, New York 10022<br>*Counsel for Defendant RCN Corporation* | Melissa Ryan Clark, Esq.<br>Sanford P. Dumain, Esq.<br>Peter Edward Seidman, Esq.<br>Charles Slidders, Esq.<br>Milberg LLP<br>One Pennsylvania Plaza<br>49th floor<br>New York, New York 10119<br>*Counsel for Plaintiff Betsy Feist* |

  /s/ Andrew Grosso