# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BETSY FEIST**, individually, and on behalf of all others similarly situated, **)** | |
| **)** | |
| Plaintiff, **)** | |
| **)** | |
| vs. **)** | **CASE NO. 11 CV 5436 (JGK)** |
| **)** | |
| **RCN CORPORATION** and **PAXFIRE, INC**., **)** | |
| **)** | |
| Defendants. **)** | |

## AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF DEFENDANT PAXFIRE, INC., TO PLAINTIFF'S CLASS ACTION COMPLAINT

Defendant PAXFIRE, INC. ("Paxfire"), by its undersigned attorney, answers the Class Action Complaint of Plaintiff BETSY FEIST and asserts Affirmative Defenses to such Complaint.  Further, acting as Counterclaim Plaintiff, Paxfire brings against Counterclaim Defendant BETSY FEIST the following claims under New York law: tortious interference in Paxfire's contracts with its corporate customers and tortious interference with Paxfire's business relationships with its corporate customers, these being Internet Service Providers; and defamation; all for for the purpose of damaging and destroying Paxfire and its business model.

Paxfire seeks compensatory and punitive damages for these intentional torts in an amount in excess of FIFTY MILLION DOLLARS ($50,000,000).

Paxfire states as follows:

## ANSWER

1.      Denied.

2.      Paxfire admits that RCN is in part an Internet Service Provider; that Internet Service Providers ("ISPs") often provide access to the Internet for their customers (known as "End Users" or "Users"); that Users often use browsers when accessing the Internet; and that IP addresses can change frequently.   Paxfire denies all remaining allegations in this paragraph.

3.      Denied.

4.      Paxfire denies that it was involved in any misconduct.  Paxfire lacks sufficient knowledge or information to admit or deny the remaining allegations in this paragraph.

5.      Paxfire lacks sufficient information to admit or deny the allegations in this paragraph.

6.      Paxfire does not dispute that Betsy Feist is an individual who resides in New York.  Paxfire denies that any searches of Ms. Feist were redirected or intercepted by Paxfire via Paxfire-based proxy servers.  Paxfire lacks sufficient information to admit or deny the remaining allegations in this paragraph

7.      Paxfire admits that it is incorporated in Delaware, and has corporate headquarters in Sterling, Virginia.  Paxfire also admits that it provides hardware and software devices to ISPs within the United States ("Paxfire technology"), as part of the services provided by those ISPs to their customers.  Paxfire admits that its webpage contains the following post:

> Paxfire is the proven industry leader in monetizing Address Bar Search and DNS Error traffic for Network Operators. Through our carrier-grade technology, we generate millions of dollars a month in new advertising revenue for our partners by enabling them to participate in the booming $20 billion a year search advertising market. Our service improves the end-user browsing experience and can be deployed rapidly across all network types at no cost to the Network Operator.

Paxfire denies all remaining allegations in this paragraph.

8.      Paxfire admits that it provides its services to ISPs at no upfront expense to the ISPs; that it processes mistyped uniform resource locators ("urls"), and urls that do not resolve to Internet Protocol addresses ("IP addresses") that exist on the Internet, using hardware and software devices, and that it shares revenue generated by such means with those ISPs to which it provides its technology.  Paxfire denies all remaining allegations in this paragraph.

9.      Denied.

10.     Paxfire admits that Defendant RCN provides Internet service.  Paxfire lacks sufficient knowledge or information to admit or deny all remaining allegations in this paragraph.

11.     Paxfire admits that the Plaintiff purports to assert federal causes of action, and that the Court has federal-question jurisdiction over those causes of action.  Paxfire denies all remaining allegations in this paragraph.

12.     Denied.

13.     Paxfire admits that it provided its technology to Defendant RCN.  Paxfire denies all remaining allegations in this paragraph.

14.     Denied.

15.     Denied.

16.     Denied.

17.     Denied.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Paxfire lacks sufficient knowledge or information to admit or deny the allegations in this paragraph.

24.     Denied.

25.     The quoted and referenced language from Joseph Turow, Jennifer King, Chris Hoofnagle, Amy Bleakley, and Michael Hennessy, Americans Reject Tailored Advertising and Three Activities that Enable it (Sept. 29, 2009), and the Federal Trade Commission Preliminary Staff Report, Protecting Consumer Privacy in an Era of Rapid Change at 24 (Dec. 1020) are immaterial to all issues in this Complaint and require no response from Paxfire; and Paxfire has moved to strike this language.  To the extent that any response is necessary to any allegations in this paragraph, Paxfire denies all such allegations.

26.     The allegations in this paragraph are immaterial to all issues in this Complaint and require no response from Paxfire; and Paxfire has moved to strike this language.  To the extent that any response is necessary to any allegations in this paragraph, Paxfire denies all such allegations.

27.     The allegations in this paragraph are immaterial to all issues in this Complaint and require no response from Paxfire; and Paxfire has moved to strike this language.  To the extent that any response is necessary to any allegations in this paragraph, Paxfire denies all such allegations.

28.     Paxfire admits that the Customer Privacy Notice posted by Defendant RCN at any time has been what RCN posted on its website at such time.  Paxfire lacks sufficient knowledge or information to admit or deny the allegations in this paragraph pertaining to the internal practices of RCN.  Paxfire denies all remaining allegations in this paragraph.

29.     Paxfire admits that the Online Policies posted by Defendant RCN at any time has been what RCN may have posted on its website at such time.  Paxfire denies all remaining allegations in this paragraph.

30.     Denied.

31.     Denied.

32.     Denied.

33.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire admits that Plaintiff purports to bring this action on behalf of three classes, but denies the factual existence of and legal sufficiency of each of such classes; and Paxfire denies all remaining allegations in this paragraph.

34.     Paxfire admits that the Plaintiff excludes from her purported classes the persons described in this paragraph.

35.     Paxfire admits that the classes, as defined by the Plaintiff, include thousands of members.  Paxfire denies that the class definitions are appropriate, and denies all remaining allegations in this paragraph.

36.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

37.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

38.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

39.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

40.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

50.     Paxfire admits that the Plaintiff purports to bring this action against Defendant RCN under the Virginia Consumer Protection Act, but denies the applicability of this Act to the conduct of RCN and otherwise to this action.  To the extent that a response is required from Paxfire for any additional allegation in this paragraph, Paxfire denies all such allegations.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Paxfire admits that the Plaintiff and the putative class members, if any, seek the relief specified in this paragraph, but denies the applicability of any such relief.

58.     Paxfire admits that the Plaintiff and the putative class members, if any, seek the relief specified in this paragraph, but denies the applicability of any such relief.

59.     Paxfire admits that the Plaintiff and the putative class members, if any, seek the relief specified in this paragraph, but denies the applicability of any such relief.

60.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

61.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

62.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

63.     Denied.

64.     Denied.

65.     Denied.

66.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

67.     Denied.

68.     Denied.

69.     Denied.

70.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

80.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

81.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

82.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

83.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

84.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

85.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

86.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

87.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

88.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

89.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

90.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

91.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

92.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

## AMENDED AFFIRMATIVE DEFENSES

### First Affirmative Defense
(Consent: ECPA)

Under 18 U.S.C. § 2511(d), Defendant Paxfire is not liable for any violations of the

Electronic Communications Privacy Act because all customers ("Users") of Defendant RCN

Corporation ("RCN") and other Internet Service Providers ("ISPs") using Paxfire technology had

given prior express or implied consent to the use of Paxfire technology.  The privacy policies of

RCN and such other ISPs informed customers that their Internet traffic, comprised of electronic

communications, could be used to deliver or facilitate the delivery of web pages of trademark

holders and of targeted advertising; and provided customers with the ability to opt out of the use

of Paxfire technology.

### Second Affirmative Defense
(Waiver: ECPA)

Defendants are not liable for any alleged violations of the Electronic Communications

Privacy Act, because Users waived any such claims arising from the use of Paxfire technology.

The privacy policies of Defendant RCN and all other ISPs that used Paxfire technology informed

customers that their Internet traffic could be used to deliver or facilitate the delivery of web

pages of trademark holders and of targeted advertising; and provided customers with the ability

to opt out of the use of Paxfire technology.

### Third Affirmative Defense
(Ordinary Course of Business: ECPA)

Pursuant to 18 U.S.C. § 2510(5)(a)(ii), Defendant Paxfire is not liable for any alleged

violations of the Electronic Communications Privacy Act because the use of Paxfire technology,

and any use of that technology to process communications of Users, or to deliver or facilitate the

delivery of web pages of trademark holders and of targeted advertising, was in the ordinary

course of business of Defendant RCN and all other ISPs that used Paxfire technology.

### Fourth Affirmative Defense
(No Intent: ECPA)

Pursuant to 18 U.S.C. § 2511(1), Defendant Paxfire is not liable for any alleged

violations of the Electronic Communications Privacy Act because the use of Paxfire technology,

and any use of that technology to process the electronic communications of Users, was done

without the intention to intercept such communications.

### Fifth Affirmative Defense
(Consent: Conversion, Unjust Enrichment, N.Y. Gen. Business Law)

The claims of Plaintiff and putative class members, if any, for conversion, unjust

enrichment, and violation of the New York General Business Law are barred, in whole or in part,

by consent.  The privacy policies of Defendant RCN and all other ISPs that used Paxfire

technology informed customers that their Internet traffic could be used to deliver or facilitate the

delivery of web pages of trademark holders and of targeted advertising; and provided customers

with the ability to opt out.

### Sixth Affirmative Defense
(Waiver: Conversion, Unjust Enrichment, N.Y. Gen. Business Law)

Defendant Paxfire is not liable for any alleged conversion, unjust enrichment, and

violation for invasion of the New York General Business Law, because Users waived any such

claims arising from the use of Paxfire technology.  The privacy policies of Defendant RCN and

all other ISPs that used Paxfire technology informed customers that their Internet traffic could be

used to deliver or facilitate the delivery of web pages of trademark holders and of targeted

advertising; and provided customers with the ability to opt out.

**Seventh Affirmative Defense**
(Disclaimer of Liability)

The claims of Plaintiff and putative class members, if any, are barred, in whole or in part, by a disclaimer of liability in the Acceptable Use Policies and other agreements (or the equivalents thereof) of Defendant RCN and all other ISPs that used Paxfire technology, which limits claims in any way connected to the networks of RCN and such other ISPs.

**Eighth Affirmative Defense**
(Preemption)

The claims of Plaintiff and putative class members, if any, of conversion, unjust enrichment, and any violation of the New York General Business Law are barred by preemption. The Electronic Communications Privacy Act, 18 U.S.C. ¶ 2510 *et al.*, sets forth the exclusive remedy for conduct that it covers.

**Ninth Affirmative Defense**
(Statute of Limitations)

The claims of Plaintiff and putative class members, if any are barred by the applicable statute of limitations.

**Tenth Affirmative Defense**
(Laches)

The claims of Plaintiff and putative class members, if any are barred by the doctrine of laches.

**Eleventh Affirmative Defense**
(No Interception: ECPA)

Defendant Paxfire is not liable for any violations of the Electronic Communications Privacy Act, because all electronic communications received or processed in any manner by Paxfire were provided to Paxfire by Defendant RCN Corporation ("RCN") and other Internet

Service Providers ("ISPs"), each of which had lawful possession and control of such

communications and were lawfully authorized to provide such communications to Paxfire.

**Twelfth Affirmative Defense**
(No Vicarious Liability)

Defendant Paxfire is not liable for any violations of the Electronic Communications

Privacy Act, conversion, unjust enrichment, or any violations of the New York General Business

Law engaged in or done by Defendant RCN Corporation ("RCN") and other Internet Service

Providers ("ISPs").

**Thirteenth Affirmative Defense**
(Good Faith)

Defendant Paxfire is not liable for any violations of the Electronic Communications

Privacy Act, conversion, unjust enrichment, or any violations of the New York General Business

Law because at all times it acted in good faith, in that all electronic communications received or

processed in any manner by Paxfire were provided to Paxfire by Defendant RCN Corporation

("RCN") and other Internet Service Providers ("ISPs"), under conditions and circumstances

where Paxfire believed that RCN and such other ISPs were each properly and lawfully providing

such communications to Paxfire.

**Fourteenth Affirmative Defense**
(Failure to State a Claim)

Plaintiff and putative class members, if any, fail to State a Claim for Relief because they

fail to state that any identifiable electronic communication was intercepted by Paxfire, and that

any identifiable personal information was collected or sold by Paxfire.

**Fifteenth Affirmative Defense**
(Lack of Standing)

Plaintiff and putative class members, if any, lack standing to bring any claims against

Paxfire because they failed to suffer any damages from Paxfire's conduct.

**Sixteenth Affirmative Defense**
(Lack of Privity)

Plaintiff and putative class members, if any, are not entitled to any relief on any claim inasmuch as there was no business relationship, contractual or otherwise, between Plaintiff and any class member and Paxfire.

**Seventeenth Affirmative Defense**
(General Denial)

Paxfire denies generally Plaintiff's allegations and denies that Plaintiff and putative class members, if any, are entitled to any relief on their claims.

**Eighteenth Affirmative Defense**
(Legal Impossibility: ECPA)

To the extent that the Plaintiff's allegations are based upon the processing of information placed by an End User in the search bar located in a border of such user's Internet browser, any processing, capture or redirection of such information is not an "interception" between the End User and any third party search engine for the purposes of the Electronic Communications Privacy Act, as such search bar (unlike the search box located in the web page of a search engine) is a link for communication between the End User and such user's ISP, and not between the End User and any search engine.

**AMENDED COUNTERCLAIMS**

Paxfire brings counterclaims against Betsy Feist under New York law, and states as follows:

**PARTIES AND CONSPIRATORS**

1.     Counterclaim Plaintiff Paxfire, Inc. ("Paxfire") is a Delaware corporation with its principal place of business located in Sterling, in the Commonwealth of Virginia.  Paxfire's primary business is the provision of technology, that is, services based upon hardware and software devices, to Internet Service Providers ("ISPs").  Paxfire has no place of business in the State of New York.

2.     Upon information and belief, Counterclaim Defendant Betsy Feist ("Feist") resides in the Southern District New York State, in the State of New York.

3.     Counterclaim Defendant Feist has never been a customer or otherwise had a direct business relationship with Paxfire.

4.     At all times pertinent to this Complaint, the Electronic Frontier Foundation ("EFF") was and is a an organization based in San Francisco, California, primarily involved in investigating and lobbying focusing issues involving electronic privacy and civil liberties.

5.     At all times pertinent to this Complaint, the International Computer Science Institute ("ICSI") was and is an organization based in Berkeley, California, whose self-styled mission as listed on its website is: "'Furthering computer science research through international collaboration. Furthering international collaboration through computer science research.'"

**JURISDICTION AND VENUE**

6.     This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1332(1), as the parties are citizens of different states and the amount in controversy is in excess of seventy-five thousand dollars ($75,000); and pursuant to 28 U.S.C. § 1367, as the

counterclaims here alleged are so related to the original claims brought by the Plaintiff in her

Class Action Complaint that they form part of the same case or controversy under Article III of

the United States Constitution.

7.      This Court has personal jurisdiction over Counterclaim Defendant Feist as she

resides in this District and has brought the original action as alleged in her Class Action

Complaint in this District

8.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391, as the

Counterclaim Defendant Feist, who is the only counterclaim defendant named herein, resides in

this District.

## PAXFIRE'S BUSINESS

### A. Paxfire's Business Arrangements

9.      At all times pertinent to these counterclaims, Paxfire was involved in the business

of generating advertising revenues from address bar error traffic generated by End Users who

were customers of those Internet Service Providers that had contracted with Paxfire to provide

such services ("Error Traffic services") for their customers.

10.      Beginning in 2008, Paxfire also provided direct navigation to the websites of

certain trademark holders for End Users who entered trademarks into address bars, and, in 2010,

into search boxes embedded in their web browsers, where such End Users were customers of

Internet Service Providers that had contracted with Paxfire to provide such services ("Direct

Navigation services") for their customers.

11.      Paxfire, through and with the ISPs with which Paxfire contracted, gave notice to

End Users who were customers of such ISPs that the above described Error Traffic and Direct

Navigation services were being provided, and allowed such End Users to opt out of such

services.

12.     At all times pertinent to these counterclaims, when such Error Traffic and Direct Navigation Services were provided through Paxfire to an End User, the resulting web page presented to the End User was clear in format and substance as being: (a) for Error Traffic, a page resulting from an error entered into the address bar, suggesting sites and url links that the End User might choose to visit; and (b) for Direct Navigation, a page belonging to the holder of the trademark entered by the End User in his or her address bar or search box embedded in the End User's web browser.

13.     At all times pertinent to these counterclaims, those ISPs that contracted with Paxfire incorporated Paxfire's Error Traffic services, Paxfire's Direct Navigation services, or both into their networks as part of the ordinary course of their businesses; and provided such services to their End Users in the ordinary course of their businesses.

14.     At no time did Paxfire's Error Traffic and Direct Navigation services violate any federal or state law in the manner or means by which Paxfire provided such services; and, more specifically, at no time did Paxfire engage in wiretapping under any federal or state law.

15.     At all times pertinent to these counterclaims, Paxfire held contracts, and had ongoing business relationships, to provide Error Traffic services or Direct Navigation services, or both, with the following ISPs, among others: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West; and these contracts and business relationships had economic value for Paxfire.

16.     At all times pertinent to these counterclaims, Paxfire held agreements, and had ongoing business relationships, to provide Direct Navigation services with the following Trademark Holders, among others: Ebay and Amazon.com; and these agreements and business relationships had economic value for Paxfire.

17.     At all times pertinent to these counterclaims, Paxfire held contracts, and had ongoing business relationships with companies ("Trademark Aggregators") that themselves had agreements with third party trademark holders to provide advertising; such contracts and relationships between Paxfire and the Trademark Aggregators required Paxfire to provide Direct Navigation services for the third party trademark holders; such Trademark Aggregators included Commission Junction, LinkShare, and Google, among others; and these contracts and business relations had economic value for Paxfire.

18.     At all times pertinent to these counterclaims, Paxfire held contracts and had ongoing business relationships with companies ("Affiliate Program Aggregators") that themselves had agreements with third party trademark holders, with which they had other ongoing business relationships, to provide advertising; such contracts and relationships required Paxfire to provide Direct Navigation services for the third party trademark holders; such Affiliate Program Aggregators included Ebay and Amazon.com; and these contracts and business relations had economic value for Paxfire.

**B. Paxfire's Privacy Policies**

19.     At no time did Paxfire, know, identify, or record the person who was an End User and engaged in searches using the Internet.

20.     At no time did Paxfire collect or compile information about End Users of ISPs in any manner that constituted profiling of such End Users, or of the searches of such End Users.

21.     At no time did Paxfire share information about End Users of ISPs, or of their searches, with third parties.

22.     At no time did Paxfire sell information about End Users of ISPs, or of their searches.

23.     At no time did Paxfire allow third parties to access information about End Users of ISPs.

24.     At no time did Paxfire allow third parties to access searches by End Users of ISPs.

25.     At no time did Paxfire allow third parties to monitor searches by End Users of ISPs.

26.     At no time did Paxfire allow third parties to intercept searches by End Users of ISPs.

24.     At not time did Paxfire disclose confidential or private information relating to the use of the Internet by End Users of ISPs.

25.     At no time did Paxfire convert personal information of End Users of ISPs, including search histories, by providing such to third parties.

26.     At no time did Paxfire receive or retain money from third parties as a result of sharing and/or allowing access to the personal information of End Users of ISPs.

27.     At no time did Paxfire impersonate the webpage or website of any Internet search engine.

28.     At all time pertinent to this Complaint, Paxfire protected any and all information generated through the use of its services by subscribers of ISPs.

## THE CONSPIRACY

### A. Lack of Knowledge: The "Known Unknowns"

29.     At no time did Counterclaim Defendant Feist, EFF, or the ICSI have any information about the privacy practices of Paxfire regarding the use or protection of the search histories and practices of End Users of ISPs; and they then knew that they did not know about such privacy practices.

30.     At no time did Counterclaim Defendant Feist, EFF or the ICSI make any effort to inquire of Paxfire about its aforesaid privacy practices.

31.     At no time did Counterclaim Defendant Feist, EFF, or the ICSI have any information about the practices of Paxfire regarding its use of proxy servers, and whether or not such use could give rise to the appearance that Paxfire impersonated website of other entities; and they then knew that they did not know about such practices regarding the use of proxy servers.

32.     At no time did Counterclaim Defendant Feist, EFF or the ICSI make any effort to inquire of Paxfire about its aforesaid practices regarding the use of proxy servers.

### B. Improper Motives and the Manner and Means

33.     At all times pertinent to these Counterclaims, Counterclaim Defendant Feist, EFF and the ICSI, collectively and individually, knew that Paxfire held contracts, or had ongoing business relationships, for Error Traffic services, Direct Navigation services, or both, with the following ISPs: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West; and knew that these contracts and business relationships had economic value for Paxfire.

34.     At all times pertinent to these Counterclaims, EFF and the ICSI opposed Paxfire's business practices of providing Error Traffic and Direct Navigation services to these and other ISPs as part of the services ISPs provided for their End Users.

35.     EFF and the ICSI opposed Paxfire's aforesaid business practices for the following reasons, among others: (a) EFF and the ICSI held the view that Internet users expect the Internet to function without recourse to services and technology implemented by Paxfire, and that changes affecting such expectations should be "opt-in" rather than "opt-out"; and (b) EFF and

the ICSI feared that Paxfire's theoretical capabilities to directly monitor all searches made by

End Users, and to modify such users' underlying Internet traffic, was the actual conduct in which

Paxfire engaged, conduct which EFF and the ICSI opposed.  The EFF and the ICSI wanted to

stop, prevent, and deter such direct monitoring and such modification of Internet traffic,

regardless of whether or not Paxfire, or any ISP, actually engaged in or intended to engage in

such conduct, and regardless of whether such conduct was or was not lawful; and to impose or

encourage a rule that all implementation of services and technology similar to that implemented

by Paxfire be done only after an "opt-in" selected by each End-User, in disregard of the fact that

no legal requirement for such rule existed.

36.     The EFF and ICIS were also concerned about, both, the privacy and network

neutrality implications of Paxfire's business practices, despite no legal requirement existing that

prohibited Paxfire's business practices.

37.     In furtherance of the aforesaid purpose, EFF and the ICSI agreed to act as

vigilantes, that is, as self-appointed enforcement officials policing the Internet to deter conduct to

which they objected, whether or not such conduct was actually occurring.

38.     Among the Manner and Means whereby EFF and the ICSI carried out the

aforesaid agreement were the following:

(a) Assume the worst-case scenarios concerning the conduct in which Paxfire, and the

ISPs that were its customers, might be involved;

(b) Knowingly avoid making any attempt to verify whether or not such conduct was

actually occurring by not making inquiry of Paxfire, or of any ISP that was its customer,

before taking overt action;

(c) Publish directly, and cause to be published through third parties, the worst-case allegations, presenting them as facts and by innuendo, on websites, blogs, and other electronic media;

(d) Induce a third party individual to bring a class action lawsuit against Paxfire, and at least one ISP that was its customers, incorporating the aforesaid unverified, worst-case scenarios based upon unverified representations and innuendo;

(e) In all material regards, "blindside" Paxfire and the ISPs that were then its customers with regard to the execution of the plan that EFF and the ICSI had agreed upon.

38.     By the aforesaid manner and means, EFF and the ICSI pursued the goals of: damaging and destroying Paxfire and its business model; causing ISPs that were then customers of Paxfire to terminate or curtail their contracts and business relationships with Paxfire; and discouraging ISPs and other companies from engaging in the same business model and practices as Paxfire and its ISP customers.

### C. The Role of Betsy Feist

39.     At an unknown time prior to August 1, 2011, Counterclaim Defendant Betsy Feist agreed with EFF and the ICSI to participate in the aforesaid scheme, and in each of its manner and means, and to serve as the necessary third party plaintiff for the purpose of bringing the class action lawsuit to accomplish the agreement's goals; and she agreed to serve as the "legal front" for the scheme agreed upon by and between EFF, the ICSI, and Counterclaim Defendant Betsy Feist.

40.     At no time prior to the filing of her Class Action Complaint did Counterclaim Defendant Betsy Feist contact Paxfire to inform Paxfire of her opposition, if any, to the business practices of Paxfire or of the ISP that was providing her access to the Internet and which was

then a customer of Paxfire, this ISP being the RCN Corporation; and at no time did Feist opt-out of such services.

      41.      At no time prior to the filing of her Class Action Complaint did Counterclaim Defendant Betsy Feist verify or attempt to verify that the allegations that she brought in her Complaint were in fact true and correct.

      42.      At no time prior to the filing of her Class Action Complaint did Counterclaim defendant Betsy Feist contact Paxfire or the RCN Corporation to determine whether her allegations were correct; to seek changes in Paxfire's business model, generally or with respect to her own Internet activities; or to propose compensation for alleged damages that she had incurred *in lieu* of commencing litigation.

### D. Overt Acts

      43.      In furtherance of and to effect the purposes of this conspiracy, EFF, the ICSI, and Counterclaim Defendant Betsy Feist engaged in and executed the following overt acts in furtherance of their conspiracy:

      (a) On or about August 1, 2011, Christian Kriebich of the ICSI sent an email to the attorneys for Counterclaim Defendant Feist and to Jim Giles of the New Scientist, a media outlet on the Internet (Exhibit 1).  This email reads in pertinent part:

> Allow me to introduce you to Jim Giles, the reporter at New Scientist who's currently working on a story on the Paxfire affair.  Jim, meet the legal front!  Jim has been investigating Paxfire's search redirections for quite some time now and is fully up to date on our findings, so it seems helpful for all of you to have each other's contact information.

      (b) Sometime during the period August 1 to noon on August 4, 2011, Eastern Time, Counterclaim Defendant Betsy Feist, directly or through her agents and attorneys, communicated with Jim Giles of the New Scientist, falsely stating that Paxfire's business practices violated numerous statutes, including wiretapping laws affecting the subscribers of its ISP customers; and

informing him that Counterclaim Defendant Betsy Feist was filing a Class Action Complaint on

August 4, 2011.

(c) On August 4, at or before 12:40 pm, Eastern Time, Counterclaim Betsy Feist, directly

or through her agents and attorneys, caused the New Scientist to publish an article on the Internet

stating, falsely, that Paxfire's business practices violated numerous statutes, including

wiretapping laws affecting the subscribers of its ISP customers; and stating that she had filed a

Class Action Complaint with such allegations.

(d) On August 4, EFF and ICSI published on the EFF website and blog an article

alleging, among other false and misleading representations:

(i) That Paxfire's proxies collected a user's web searches and the corresponding

web search results; whereas in truth and in fact, Paxfire's proxies only logged a small

subset of search queries that were entered into a browser search box and related to certain

trademark holders with whom Paxfire had a direct or indirect (through a Trademark

Aggregator or Program Affiliate Aggregator) business contract or relationship; and

(ii) That Paxfire's practices allowed Paxfire and/or its ISP customers to directly

monitor all searches made by the ISPs' customers and to build up corresponding profiles;

whereas, in truth and fact, while Paxfire's code examined queries and responses, it

selected out and logged only those that were of relevance to its business for accounting

and debugging purposes, and maintained the confidentiality of such logs from any and all

third parties.

(e) On August 4, at 3:39 pm, Eastern Time, Counterclaim Betsy Feist, directly or through

her agents and attorneys, filed the instant Class Action Complaint naming Paxfire and the RCN

as defendants.

44.     Counterclaim Defendant Feist falsely stated and alleged in her Class Action Complaint that, directly or indirectly (by enabling one or more of the ISPs to which it provided its services to do the same):

a)      Paxfire identified persons who were End Users and engaged in searches using the Internet;

b)      Paxfire collected and compiled information about End Users of ISPs in a manner that constituted profiling of such End Users, or of the searches of such End Users;

c)      Paxfire shared information about End Users of ISPs, or of their searches, with third parties;

d)      Paxfire sold information about End Users of ISPs, or of their searches;

e)      Paxfire allowed third parties to access information about End Users of ISPs;

f)      Paxfire allowed third parties to access searches by End Users of ISPs;

g)      Paxfire allowed third parties to monitor searches by End Users of ISPs;

h)      Paxfire allowed third parties to intercept searches by End Users of ISPs;

i)      Paxfire disclosed confidential or private information relating to the use of the Internet by End Users of ISPs;

j)      Paxfire converted personal information of End Users of ISPs, including search histories, by providing such to third parties;

k)      Paxfire received or retained money from third parties as a result of sharing and/or allowing access to the personal information of End Users of ISPs;

l)      Paxfire impersonated the webpages and websites of Internet search engines; and

m)      Paxfire engaged in violation of wiretap statutes affecting subscribers of its ISP customers.

45.     At the time that Counterclaim Defendant Feist filed her Class Action Complaint, she knew that the aforesaid allegations were defamatory, and knew that she had insufficient basis to make such allegations.

46.     At the time that Counterclaim Defendant Betsy Feist published these defamatory statements in her Class Action Complaint, they were false; and Counterclaim Defendant Feist made these defamatory statements knowing that they were pejorative and that she did not have evidence as to the truth or falsity of such statement.

47.     The publication by Counterclaim Defendant Betsy Feist of these false and pejorative statements, individually and collectively, resulted in damage to Paxfire's business relationships and reputation.

48.     Counterclaim Defendant Betsy Feist knew that her publication of these false and pejorative statements would result in damage to Paxfire's business relationships and reputation; and she intended such result.

49.     The improper motive of Counterclaim Defendant Feist in the filing of the her Class Action Complaint and in communicating with the above described media outlets was to act in concert with and as the "legal front" for the EFF and the ICSI to generate additional publicity of these false, pejorative, and unfounded allegations, all for the purpose of interfering with, obstructing, and destroying Paxfire's contracts, agreements, and ongoing business relationships with the aforesaid ISPs and other businesses; and compelling Paxfire to stop and shut down its Error Traffic and Direct Navigation Services.

50.     At all times pertinent to this Complaint, for the reasons set forth above, the Class Action Complaint filed by Counterclaim Defendant Betsy Feist was a sham.

**COUNT ONE**
**(Tortious Interference with Contracts: ISPs)**

51.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through fifty of these counterclaims and further alleges:

52.     At all times pertinent to these counterclaims, Paxfire had a valid contract with each of the following ISPs: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West.

53.     At all times pertinent to these counterclaims, Counterclaim Defendant Feist, EFF, and the ICSI knew, individually and collectively, that Paxfire had a valid contract with each of the aforesaid ISPs.

54.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist intentionally procured, directly and vicariously through her co-conspirators, a breach of Paxfire's contracts with XO Communications and RCN Corporation.

55.     Counterclaim Defendant Feist procured this breach intentionally and without justification.

56.     As a result of this breach, Paxfire suffered actual damages.

**COUNT TWO**
**(Tortious Interference with Business Relationships: ISPs)**

57.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through fifty-six of these counterclaims and further alleges:

27

58.     At all times pertinent to these counterclaims, Paxfire had an ongoing business relationship with each of the following ISPs: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West.

59.     At all times pertinent to these counterclaims, Counterclaim Defendant Feist, EFF, and the ICSI knew, individually and collectively, that Paxfire had an ongoing business relationship with each of the aforesaid ISPs.

60.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist intentionally interfered, directly and vicariously through her co-conspirators, with Paxfire's ongoing business relationships with each of these aforesaid ISPs, causing the following ISPs to reduce, suspend, or terminate business with Paxfire: XO Communications, RCN Corporation, Wide Open West, and Direct PC (Hughes Network).

61.     As a result of this interference, Paxfire's business relationships with each of these ISPs were injured.

62.     As a result of such injury, Paxfire has suffered actual damages.


**COUNT THREE**
**(Tortious Interference with Business Relationships: Trademark Holders)**
**(Withdrawn)**


**COUNT FOUR**
**(Tortious Interference with Contracts: Advertising Aggregators)**
**(Withdrawn)**

**COUNT FIVE**
**(Tortious Interference with Business Relationships: Advertising Aggregators)**
**(Withdrawn)**

**COUNT SIX**
**(Defamation: Slander)**

63.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through sixty-two of these counterclaims and further alleges:

64.     At all times pertinent to these Counterclaims, Paxfire had a contract and an ongoing business relationship with each of the following ISPs, among others: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, Wide Open West; Global Crossing, Sprint, LocalNet, Earthlink, and Verizon Business.

65.     At all times pertinent to these Counterclaims, Paxfire had a contract and an ongoing business relationship with each of the following Trademark Aggregators and Affiliate Program Aggregators, among others: Commission Junction, Linkshare, Google, Amazon.com, and Ebay.

66.     At all times pertinent to this Complaint, Paxfire had a contract and an ongoing business relationship with each of the following Trademark Holders, among others: Amazon.com, and Ebay.

67.     At all times pertinent to this Complaint, Paxfire was in negotiations with a third party Internet company for the sale of Paxfire to such company; and such company intended to make an offer during the week of August 11, 2011, of at least $10 million plus additional monetary considerations for Paxfire's assets and equity, or for both.

68.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist, directly and vicariously through her co-conspirators, slandered Paxfire by verbally publishing to the New Scientist the false statement that Paxfire's business practices violated numerous statutes, including wiretapping laws affecting the subscribers of its ISP customers; doing so for the purpose of causing the New Scientist to publish such statements in an article on the Internet.

69.     Counterclaim Defendant Feist was neither privileged nor authorized to publish such statements to the New Scientist.

70.     Counterclaim Defendant Feist acted with intent to publish such false, pejorative and unfounded statements; or acted with knowledge that she did not know the truth about such statements; or acted with negligence as to the truth of such statements.

71.     The statements of Counterclaim Defendant Feist damaged the reputation of Paxfire, which resulted in special harm, including the following:

(a) the termination of contracts with the following ISPs: Global Crossing, Sprint, RCN Corporation, XO Communications, and LocalNet;

(b) the reduction or suspension of business relationships with the following ISPs: Wide Open West, PCDirect (Hughes Network), Earthlink, and Verizon Business;

(c) the termination of contracts and business relationships with the following Trademark Aggregators, Affiliate Program Aggregators, and Trademark Holders: Commission Junction, LinkShare, Google, Amazon.com, and Ebay;

(d) the termination of discussions for a pending business relationship with Trademark Aggregator Catalog.com;

(e) the refusal of these and other ISPs, Trademark Aggregators, Affiliate Program Aggregators, and Trademarks Holders, to do additional business with Paxfire; and

(f) the termination of negotiations with the aforementioned Internet company for the sale of Paxfire's assets, equity, or both; and

(g) the loss of value of Paxfire's name, reputation, good will and trademark.

72.     The statements of Counterclaim Defendant Feist damaged the reputation of Paxfire, which resulted in special harm, as specified above.

73.     The aforesaid defamatory statements of Counterclaim Defendant Feist comprised defamation *per se*, as they included allegations of criminal conduct under the Electronic Communications Privacy Act.

74.     As a result of such injury, Paxfire has suffered actual damages.


**COUNT SEVEN**
**(Defamation: Libel)**

75.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through seventy-four of these counterclaims and further alleges:

76.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist, directly and vicariously through her co-conspirators, libeled Paxfire by publishing on the EFF website and blog, in the instant Class Action Complaint, and to the New Scientist by email, and causing the New Scientist to publish in an article on the Internet, the aforesaid false, pejorative, and unfounded statements.

77.     Counterclaim Defendant Feist was neither privileged nor authorized to publish such statements.

78.     Counterclaim Defendant Feist acted with intent to publish such false, pejorative and unfounded statements; or acted with knowledge that she did not know the truth about such statements; or acted with negligence as to the truth of such statements.

79.     The statements of Counterclaim Defendant Feist damaged the reputation of Paxfire, which resulted in special harm, as specified above.

80.     The aforesaid defamatory statements of Counterclaim Defendant Feist comprised defamation per se, as they included allegations of criminal conduct under the Electronic Communications Privacy Act.

81.     As a result of such injury, Paxfire has suffered actual damages.

## REQUEST FOR RELIEF

Defendant Paxfire asks for judgment in its favor as follows:

1.     Plaintiff's Class Action Complaint be dismissed with prejudice and Judgment be entered in favor of Defendant Paxfire;

2.     No class is certified, but in the event that a class is certified, that Judgment on Plaintiff's Class Action Complaint be entered against Plaintiff and putative class members and in favor of Defendant Paxfire;

3.     Judgment be entered against Plaintiff and in favor of Defendant Paxfire on Paxfire's Counterclaims, in the amount of thirty million dollars ($30,000,000) for compensatory and special damages and fifty million dollars ($50,000,000) in punitive damages;

4.     Defendant Paxfire be awarded attorneys' fees costs, and expenses; and

5.     Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Defendant Paxfire requests trial by jury of all claims that may be tried in the United

States District Court for the Southern District of New York.


Respectfully Submitted,

/s/Andrew Grosso
_____
Andrew Grosso, Esq.
ANDREW GROSSO & ASSOCIATES
GEORGETOWN PLACE
1101 THIRTIETH STREET, NW, SUITE
300
WASHINGTON, D.C.  20007
(202) 298-6500 Tel.
(202) 298-5599 Fax
Agrosso@acm.org Email

# EXHIBIT A

**From:**          Christian Kreibich

**To:**            Giles, Jim; Seidman, Peter; Clark, Melissa; Michael Reese;
                   Kim Richman;

**CC:**

**Subject:**       Introduction

**Date:**          Monday, August 01, 2011 6:24:40 PM

**Attachments:**

Hello everyone,

Allow me to introduce you to Jim Giles, the reporter at New Scientist
who's currently working on a story on the Paxfire affair. Jim, meet the
legal front! Jim has been investigating Paxfire's search redirections
for quite some time now and is fully up to date on our findings, so it
seems helpful for all of you to have each other's contact information.

Best,
Christian