**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **BETSY FEIST,** individually, and on behalf of all others similarly situated, | ) ) ) |
| | ) Case No. 11-cv-5436 (JGK) |
| Plaintiff, | ) |
| | ) **MEMORANDUM OF LAW IN** |
| vs. | ) **SUPPORT OF BETSY FEIST'S** |
| | ) **MOTION TO DISMISS PAXFIRE'S** |
| **RCN CORPORATION** and **PAXFIRE, INC.,** | ) **FIRST AMENDED** |
| | ) **COUNTERCLAIMS** |
| Defendants. | ) |
| | ) |
| | ) |

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ................................................................................................1

II.   FACTS ................................................................................................................3

III.  STANDARD ON A MOTION TO DISMISS ......................................................4

IV.   ARGUMENT ......................................................................................................5

    A.    PAXFIRE HAS NOT STATED A CLAIM FOR DEFAMATION ......................5

        1.    Paxfire Has Not Alleged a Defamation Claim with the Required
            Particularity ................................................................................................5

            a.    Paxfire Has Not Adequately Alleged that Ms. Feist Knew
               the Alleged Statements were False ...............................................5

            b.    Paxfire Has Not Set Forth the "Particular Words
               Complained of" or Established Their Falsity...................................6

            c.    Paxfire Has Failed To Adequately Identify the Recipients,
               Timing, or Place of the Alleged Statements .................................12

            d.    Paxfire Has Failed To Sufficiently Allege That Ms. Feist
               Caused Its Alleged Injury ............................................................12

        2.    The Allegedly Defamatory Statements are Privileged and Ms. Feist
            is Immune from the Defamation Claims...................................................13

            a.    The Alleged Statements Were Pertinent to a Litigation ...............13

            b.    The Alleged Statements were a Fair and True Report of a
               Judicial Proceeding .....................................................................15

    B.    PAXFIRE HAS NOT STATED A CLAIM FOR TORTIOUS
        INTERFERENCE ......................................................................................15

        1.    Paxfire Has Failed to Allege the Elements of a Tortious
            Interference Claim ...................................................................................16

            a.    Paxfire Fails to Provide Sufficient Facts to Allege that it
               Had "Valid Contracts" .................................................................16

            b.    Paxfire Fails to Allege That Ms. Feist Had Actual
               Knowledge of Paxfire's Business Relationship with XO
              Communications, or of any Valid Contracts with an ISP ............17

c.      Paxfire Failed to Allege that Ms. Feist Interfered with the
Business Relationships or Procured the Breach of Any
Contract ....................................................................................18

d.      Paxfire Failed to Allege that Ms. Feist Acted "Solely out of
Malice," or used "Dishonest, Unfair, or Improper Means" ..........18

e.      Paxfire Has Failed to Adequately Allege Damages, or that
Ms. Feist Caused Paxfire's Damages ...........................................20

2.      Noerr-Pennington Protects Litigants from Liability for Filing a
Court Proceeding ......................................................................................21

C.      PAXFIRE'S CONSPIRACY AND VICARIOUS LIABILITY
ALLEGATIONS ARE A RED HERRING ........................................................23

V.      CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AA Tube Testing Co. v. Sohne,*
  20 A.D.2d 639 (2d Dep't 1964) ..........................................................................17

*Aetna Cas. and Sur. Co. v. Aniero Concrete Co.,*
  404 F.3d 566 (2d. Cir. 2005)..............................................................................20

*Aronson v Wiersma,*
  65 N.Y. 2d 592 (1985) .......................................................................................13

*Ashcroft v. Iqbal,*
  556 U.S. 662, 129 S. Ct. 1937 (2009) .........................................................4, 5, 21

*Bath Petroleum Storage Inc. v. Mkt. Hub Partners, L.P.,*
  229 F.3d 1135, 2000 WL 1508873 (2d Cir. 2000) .......................................21, 22

*Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.,*
  No. 00-7302, 2000 U.S. App. LEXIS 25440 (2d Cir. Oct. 11, 2000) ....................21

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007)..............................................................................................4

*Carvel Corp. v. Noonan,*
  3 N.Y.3d 182 (2004) .....................................................................................18, 19

*City of N.Y. v. Lead Indus. Ass'n, Inc.,*
  No. 14365/89, 1991 WL 284454 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 23, 1991) .........24

*Cofacredit S.A. v. Windsor Plumbing Supply Co.,*
  187 F.3d 229 (2d Cir. 1999).........................................................................24, 25

*Cunningham v. Hagedorn,*
  72 A.D.2d 702 (1st Dep't 1979) .........................................................................24

*Combina Inc. v. Iconic Wireless Inc.,*
  No. 4222/2011, 2011 WL 3518185 (N.Y. Sup. Ct. Kings Cnty. Aug. 11, 2011)....16

*D.A. Collins Constr. Co. v. ICOS/NCCA a Joint Venture,*
  No. 91-933, 1994 WL 328626 (N.D.N.Y June 28, 1994).................................19, 20

*Diario El Pais, S.L. v. Nielsen Co.,*
  No. 07-11295, 2008 WL 4833012 (S.D.N.Y Nov. 6, 2008)............................15, 21

*Dillon v. City of N.Y.,*
  261 A.D.2d 34 (1st Dep't 1999) ............................................................................6

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
  365 U.S. 127 (1961).................................................................................. 23

*Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.,*
  312 F. Supp. 2d 379 (E.D.N.Y. 2004) ...............................................16, 17

*Floyd Harbor Animal Hosp. v. Doran,*
  No. 06-18109, 2009 N.Y. Misc. LEXIS 5610 (N.Y. Sup. Ct. Suffolk Cnty. Dec. 3,
  2009) .................................................................................................12

*Foster v. Churchill,*
  87 N.Y.2d 744 (1996) ..........................................................................20

*Friedman v. Coldwater Creek, Inc.,*
  321 F. App'x 58 (2d Cir. 2009) ............................................................18

*Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen,*
  313 F. Supp. 2d 339 (S.D.N.Y. 2004)....................................................22

*Geddes v. Princess Props. Int'll, Ltd.,*
  88 A.D.2d 835 (1st Dep't 1982) .............................................................8

*Gianni Versace, S.p.A. v. Versace,*
  No. 01-9645, 2003 WL 470340 (S.D.N.Y. Feb. 25, 2003)......................18

*Goldstein v. Siegel,*
  19 A.D.2d 489 (1st Dep't 1963) ............................................................24

*Gristedes Foods, Inc. v. Poospatuck (Unkechauge) Nation,*
  No. 06-1260, 2009 WL 4547792 (E.D.N.Y. Dec. 1, 2009)......................15

*I.G. Second Generation Partners, L.P. v. Duane Reade,*
  17 A.D. 3d 206 (1st Dep't 2005) ...........................................................22

*Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon,*
  No. 07-1445, 2010 WL 2596927 (D. Conn. June 24, 2010).....................22

*John R. Loftus, Inc. v. White,*
  150 A.D.2d 857 (3d Dep't 1989) ...........................................................19

*Jones v. SmithKlineBeecham,*
  No. 07-0033, 2007 U.S. Dist. LEXIS 59980 (N.D.N.Y Aug. 14, 2007) ..............14

*Kirch v. Liberty Media Corp.,*
  449 F.3d 388 (2d Cir. 2006)..................................................................16

*Konikoff v. Prudential Ins. Co. of Am.*,
  No. 94-6863, 1999 WL 688460 (S.D.N.Y. Sept. 1, 1999),
  *aff'd*, 234 F.3d 92 (2d Cir. 2000) ..................................................................................14

*Kopperl v. Bain*,
  No. 09-1754, 2010 WL 3490980 (D. Conn. Aug. 30, 2010) ....................................................4

*Lacher v. Engel*,
  33 A.D.3d 10 (1st Dep't 2006) ........................................................................................14, 15

*Lama Holding Co. v. Smith Barney Inc.*,
  88 N.Y.2d 413 (1996) .........................................................................................................16

*Lee v. City of Rochester*,
  174 Misc. 2d 763 (N.Y. Sup. Ct. Monroe Cnty. 1997)...........................................................6

*Litras v. Litras*,
  254 A.D.2d 395 (2d Dep't 1998) ..........................................................................................25

*Lore v. City of Syracuse*,
  583 F. Supp. 2d 345 (N.D.N.Y 2008) ...............................................................................5, 12

*McNally v. Yarnall*,
  764 F. Supp. 853 (S.D.N.Y. 1991) ......................................................................................15

*Mennen Co. v. Gillette Co.*,
  565 F. Supp. 648 (S.D.N.Y. 1983), *aff'd,* 742 F.2d 1437 (2d Cir. 1984) ..............................20

*Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*,
  No. 08-156, 2011 WL 4445626 (S.D.N.Y. Sept. 26, 2011) ....................................................22

*Nat'l Trends, Inc. v. Krimson Corp.*,
  No. 91-3178, 1994 WL 97058 (S.D.N.Y. Mar. 23, 1994).......................................................17

*O'Brien v. Alexander*,
  898 F. Supp. 162 (S.D.N.Y. 1995) ......................................................................................14

*Primetime 24 Joint Venture v. Nat'l Broad. Co.*,
  219 F.3d 92 (2d Cir. 2000)..................................................................................................22

*RFP LLC v. SCVNGR, Inc.*,
  788 F. Supp. 2d 191 (S.D.N.Y. 2011)........................................................................2, 19, 21

*Rizzo v. Edison, Inc.*,
  172 F. App'x 391 (2d Cir. 2006) ...........................................................................................5

*Rosenberg v. Metlife, Inc.*,
  8 N.Y.3d 359 (2007) ...........................................................................................................14

*Roth v. Atex Prods., Inc.*,
   35 Misc. 2d 136 (N.Y. Sup. Ct. Nassau Cnty. 1962)...............................................12

*Roth v. United Fed'n of Teachers*,
   787 N.Y.S. 2d 603 (N.Y. Sup. Ct. Kings Cnty. 2004)...............................................6

*Scalisi v. Fund Asset Mgmt, L.P.*,
   380 F.3d 133 (2d Cir. 2004).........................................................................4

*Sepenuk v. Marshall*,
   No. 98-1569, 2000 WL 1808977 (S.D.N.Y. Dec. 8, 2000)..........................................25

*Sexter & Warmflash, P.C. v. Margrabe*,
   38 A.D. 3d 163 (1st Dep't 2007)....................................................................15

*Sharma v. Skaarup Ship Mgmt. Corp.*,
   916 F.2d 820 (2d Cir. 1990).........................................................................21

*Sheng Gang Deng v. Shag Qing Chen*,
   No. 105363/09, 2010 N.Y. Misc. LEXIS 2135 (N.Y. Sup. Ct. N.Y. Cnty. May 13,
   2010) ...............................................................................................13

*Stephan v. Cawley*,
   890 N.Y.S. 2d 371, 2009 WL 1740827 (N.Y. Sup. Ct. N.Y. Cnty. 2009) ...........................5, 7

*Szwarce v. Buenaventura*,
   82 N.Y.S.2d 292 (N.Y. Sup. Ct. N.Y. Cnty. 1948).................................................12

*Tap Publ'ns., Inc. v. Chinese Yellow Pages (N.Y.) Inc.*,
   925 F. Supp. 212 (S.D.N.Y. 1996) ................................................................20

*T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*,
   312 F.3d 90 (2d Cir. 2002)..........................................................................22

*Tomasino v. Mount Sinai Med. Ctr.& Hosp.*,
   No. 97-5252, 2003 WL 1193726 (S.D.N.Y. Mar. 13, 2003)........................................13

*Twin Cnty. Grocers, Inc. v. Mendez & Co.*,
   81 F. Supp. 2d 276 (D.P.R. 1999)..................................................................17

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965).............................................................................21, 22

*Universal City Studios, Inc. v. Nintendo Co.*,
   797 F. 2d 70 (2d Cir. 1986).........................................................................19

*Vom Lehn v. Astor Art Galleries, Ltd.*,
   86 Misc. 2d 1 (N.Y. Sup. Ct. Suffolk Cnty. 1976) ...............................................24

*Watts v. Jackson Hewitt Tax Service Inc.*,
   675 F. Supp. 2d 274 (E.D.N.Y. 2009) ................................................25

*White Plains Coat & Apron Co. v. Cintas Corp.*,
   460 F.3d 281 (2d. Cir. 2006) .............................................................20

*Wiener v. Weintraub*,
   22 N.Y.2d 330 (1968) .........................................................................14

*Youmans v. Smith*,
   153 N.Y. 214 (1897) ...................................................................13, 14

**OTHER AUTHORITIES**

14 N.Y. Prac., New York Law of Torts § 1:50 ..........................................15

Fed. R. Civ. P. 8 ........................................................................................5

N.Y. C.P.L.R. 3016(a) ...........................................................................5, 6

Restatement (Second) of Torts.............................................................6, 19

## I.     INTRODUCTION

Plaintiff Betsy Feist is an Internet user who sought to protect her rights to privacy by serving as the representative of a putative class. Because Paxfire monitored, monetized, and filtered End Users' Internet searches, provided false IP addresses that connected End Users to Paxfire's proxy servers instead of the search engines with which they intended to communicate, and forwarded Users' searches through Trademark Aggregators (for profit) and onto Trademark Holders' websites, Ms. Feist brought a class action relating to the violation of her privacy rights and the wiretapping of her Internet use. In response, Paxfire filed counterclaims, seeking in excess of $80 million in damages on claims of tortious interference and defamation.[1]

There is no evidence that Ms. Feist has any interest in any Paxfire competitor, that she has ever contacted any of Paxfire's competitors, or that she is was a community organizer or activist. Indeed, Paxfire acknowledges that Ms. Feist "has never been a customer or otherwise had a direct business relationship with Paxfire." ¶ 3.[2] Nevertheless, Paxfire asserts a conspiracy theory that it derived solely from a single email provided to Paxfire by Plaintiff.

The email at issue was from a researcher with the UC Berkeley-affiliated International Computer Science Institute (ICSI) and served only to introduce Ms. Feist's attorneys to Jim Giles of the *New Scientist*, who had been researching Paxfire's conduct for several months prior to being put in touch with Ms. Feist. Ms. Feist voluntarily and deliberately provided the email to Paxfire to alleviate any of Paxfire's concerns regarding Ms. Feist's conduct, or her communications with media outlets, and to illustrate that Ms. Feist's counsel was only introduced to Jim Giles <u>after</u> the author's longstanding investigation of Paxfire was complete.

---

[1] Paxfire filed initial counterclaims on August 31, 2011, proposed amended counterclaims on November 28, 2011, and these Amended Counterclaims on February 13, 2012.

[2] Unless otherwise noted, all references to ¶ ___ are citations to Paxfire's Amended Counterclaims.

The email stated that Jim Giles was already "working on a story on the Paxfire affair" and that "Jim has been investigating Paxfire's search redirections for quite some time now and is fully up to date on our findings." Counterclaims Ex. 1 (emphasis added).[3]

Upon receipt of this email, Paxfire abandoned its original theory that Ms. Feist was a "self-appointed vigilante" who had initiated contact with various media outlets to publish her own false allegations, and instead alleges that the Electronic Frontier Foundation (EFF) and ICSI are the vigilantes, and that Ms. Feist agreed with them to participate in a "scheme" as their co-conspirator to destroy Paxfire. ¶ 44. Paxfire's sole support for this theory is an offhand, light-hearted remark from the email which states: "Jim, meet the legal front!" This sentence cannot and does not reasonably support Paxfire's allegations of a conspiracy, the alleged scheme, or any malicious intent on Ms. Feist's part. Indeed, "mere suspicions . . . are inadequate to support a claim. . . ." *RFP LLC v. SCVNGR, Inc.*, 788 F. Supp. 2d 191, 196-97 (S.D.N.Y. 2011) (quoting *Scutti Enters., LLC v. Park Place Entm't Corp.,* 322 F.3d 211, 217 (2d Cir. 2003)).

The obvious inference from the email is that ICSI, a consultant to Ms. Feist's counsel, was also reporting its independent findings to a long-time contact, Mr. Giles, and thought it would be helpful for all parties investigating the issue to have each other's contact information. It is also clear that Ms. Feist's involvement with the third parties began over a year after ICSI and Mr. Giles began their relationship and began studying the results obtained by the Netalyzr, and equally apparent that Ms. Feist has a legitimate interest in protecting her own privacy rights.

Although Paxfire's counsel represented at the January 31, 2012, status conference that

---

[3] Mr. Giles had been in touch with ICSI since prior to May 25, 2010, when he had published an article regarding ICSI's "Netalyzr," the Internet program that ultimately revealed Paxfire's alleged wrongdoing in 2011. *See* Jim Giles, *Understanding your Netalyzr results*, New Scientist (May 25, 2010), http://www.newscientist.com/article/dn18953-understanding-your-netalyzr-results.html (attached to the Motion to Dismiss as Exhibit C).

"more time has passed [since it submitted its proposed amended counterclaims], we have learned more, we'll be happy to submit . . . amended counterclaims," Tr. At 11, the Amended Counterclaims offer no new support and still fail to state a claim against Ms. Feist. Accordingly, and as discussed below, Paxfire's Amended Complaint should be dismissed with prejudice.

## II.   FACTS

Paxfire provides Error Traffic services and Direct Navigation services. Error Traffic services provide "a page resulting from an error entered into the address bar [e.g., a mistyped web address], suggesting sites and url [sic] links that the End User might choose to visit." ¶ 12. Direct Navigation services occur when an End User types a search term that matches any one of more than 100 brand (or trademark) keywords that Paxfire recognizes. Cpl. ¶ 20. Instead of running a search for that term, as requested by the End User, Paxfire redirects the End User to a page belonging to the trademark user. ¶ 12.

In the course of this redirection, Paxfire passes the search through to various third parties. *See* ¶¶ 15-18. Paxfire concedes that it had agreements with what it calls "Trademark Aggregators" (i.e., companies that pay for the Internet traffic or redirection) like Commission Junction, LinkShare, and Google, to provide Direct Navigation services for the holders of the trademarks that corresponded to the various monitored key words. ¶ 17. And Paxfire accomplishes much of its services by using proxy servers and providing inaccurate IP addresses. Cpl. ¶¶ 3, 15-16.

Because of Paxfire's improper conduct, Ms. Feist filed a complaint against RCN and Paxfire on August 4, 2011. Paxfire filed counterclaims, alleging that this complaint, and purported statements made by Ms. Feist's attorneys regarding the contents of the complaint, were tortious and defamatory. Although Paxfire conclusorily alleges that Ms. Feist sought to "compel[] Paxfire to stop and shut down its Error Traffic and Direct Navigation services," ¶ 56,

Ms. Feist has never taken any issue with Paxfire's Error Traffic services, and her concerns regarding its Direct Navigation Services stem largely from Paxfire's lack of disclosure and failure to obtain consent. *See e.g.,* Cpl. ¶¶ 1, 32, 47, 63, 74.

## III.   STANDARD ON A MOTION TO DISMISS

"At the pleading stage, governed by Rule 12(b)(6), [plaintiff] must satisfy the [*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007),] and [*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009),] requirement of factual, non-conclusory allegations stating a plausible claim that defendant's conduct caused specific economic harm in a quantifiable amount." *Kopperl v. Bain*, No. 09-1754, 2010 WL 3490980, at *4 (D. Conn. Aug. 30, 2010) ("Defendants' formulaic repetition in each counterclaim of the mantra that they 'suffered damages' as the result of [plaintiff's] conduct does not satisfy the pleading requirements of *Twombly* and *Iqbal.* Nor is the deficiency cured by reference to the 40 prefatory paragraphs."). The complaint must include something more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 129 S. Ct. at 1949. To survive a motion to dismiss, a complaint must set forth sufficient facts to "state a claim to relief that is plausible on its face," *id.*, and crosses "the line from conceivable to plausible," *Twombly,* 550 U.S. at 570.

While allegations must generally be accepted as true on a motion to dismiss, the Court is not bound to accept as true a "legal conclusion couched as a factual allegation," conclusory allegations that are contradicted by documents referred to in the complaint or that are central to plaintiff's claim, unwarranted deductions of fact, or unreasonable inferences; "[t]hreadbare recitals of . . . a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 129 S. Ct. at 1949-50; *Scalisi v. Fund Asset Mgmt, L.P.*, 380 F.3d 133, 137 (2d Cir. 2004).

4

## IV.   ARGUMENT

### A.   PAXFIRE HAS NOT STATED A CLAIM FOR DEFAMATION

Paxfire's allegations do not meet Fed. R. Civ. P. 8's pleading standard or the more stringent requirements for pleading a defamation claim as set forth in New York General Practice Rule 3016(a). Moreover, the statements about which Paxfire complains all fall squarely within New York's common law and statutory privileges for statements made in the context of litigation. Consequently, Paxfire's defamation claims should be dismissed.

#### 1.   Paxfire Has Not Alleged a Defamation Claim with the Required Particularity

To plead a defamation claim under New York law, plaintiff must allege that: (1) defendant made a false defamatory statement of fact; (2) the statement was published to a third party; (3) the statement concerned the plaintiff; (4) the defendant was responsible for making the statement; and (5) the statement caused injury. *Rizzo v. Edison, Inc.*, 172 F. App'x 391, 395 (2d Cir. 2006). A cause of action for libel also requires that the statement be written. *Id.*

Paxfire's allegations are subject to both the notice pleading standard imposed by Fed. R. Civ. P. 8, and the more stringent New York Civil Practice Law and Rule 3016 pleading requirement that "the particular words complained of shall be set forth in the complaint." N.Y. C.P.L.R. 3016(a);  *Stephan v. Cawley*, 890 N.Y.S. 2d 371, 2009 WL 1740827, at *2 (N.Y. Sup. Ct. N.Y. Cnty. 2009) ("A claim for defamation requires no less than a statement, in *haec verba* [verbatim], of the particular defamatory words claimed to have been uttered by defendants."). To meet this pleading standard, the plaintiff must also state "the time, place, manner of the allegedly defamatory statement as well as the persons to whom the statement was made." *Lore v. City of Syracuse*, 583 F. Supp. 2d 345, 383 (N.D.N.Y 2008). Paxfire has failed to meet this standard.

##### a.   Paxfire Has Not Adequately Alleged that Ms. Feist Knew the Alleged Statements were False

To establish a defamation claim, Ms. Feist would have had to be at least negligent as to the truth of the statements. *Dillon v. City of N.Y.*, 261 A.D.2d 34, 38 (1st Dep't 1999) (citing Restatement, Torts 2d, § 588). The question is whether "the defendant either knew it to be false, or believing it to be true, lacked reasonable grounds for such belief, or acted negligently in failing to ascertain the facts on which the publication was based." *Lee v. City of Rochester*, 174 Misc. 2d 763, 786 (N.Y. Sup. Ct. Monroe Cnty. 1997). Ms. Feist is not an expert in computer science, DNS resolution, the use of proxy servers, or any of Paxfire's services. However, she retained counsel, her counsel retained consultants who are experts in the field, and she reasonably relied upon the skill, judgment, and expertise of EFF and ICSI in understanding Defendants' conduct.[4] Even Paxfire claims that Ms. Feist was "induced" by these experts in technology. ¶ 41. Even if the alleged statements were untrue, she had no reason to know they were false, she had reasonable grounds for her belief, and no claim that Ms. Feist failed to ascertain the facts upon which her complaint was based can succeed.

> **b.** **Paxfire Has Not Set Forth the "Particular Words Complained of" or Established Their Falsity**

The complaint must also set forth "the particular defamatory words claimed to have been uttered by defendant[]," verbatim. *Roth v. United Fed'n of Teachers*, 787 N.Y.S. 2d 603, 609 (N.Y. Sup. Ct. Kings Cnty. 2004). "This requirement is strictly enforced and the exact words must be set forth." *Id.* Paxfire has failed to identify the "particular words complained of" and, therefore, does not meet the N.Y. C.P.L.R. 3016(a) pleading requirement. *See also* 1/31/12 Tr. at 10:23-10:25 ("With respect to claims of defamation, they plainly have to be pleaded with

---

[4]Paxfire's claim that "EFF and the ICSI . . . falsely attribute[ed] the Netalyzr as having determined that Paxfire logged, compiled, profiled and sold histories of individual End Users. . . ," ¶ 42(b), and that Ms. Feist "used and operated the Netalzyr . . . [and] [t]his use and operation of the Netalyzr could not and did not demonstrated [sic] to her" what Paxfire did, ¶ 48, *see also* ¶ 53, both misrepresents Ms. Feist's allegations and ignores the extensive investigation and research conducted that went beyond the use of the Netalyzr.

particularity as to what the defamation was and what the plaintiff did.").

> **(1)** **The Purported Defamatory Statements Made to the *New Scientist* Were Attributed to Other Sources or Otherwise Inactionable**

Paxfire identifies three alleged defamatory statements in the *New Scientist* article and claims that Ms. Feist "caused" the *New Scientist* to publish them on August 4, 2011. Paxfire provides the actual, quoted language for only two of those statements. The first statement, that "Paxfire 'hijacked' searches of millions of Internet users," ¶ 49(b)(i), was expressly attributed to researchers, not Ms. Feist. Jim Giles, *US internet providers hijacking users' search queries*, New Scientist (Aug. 10, 2011), http://www.newscientist.com/article/dn20768-us-internet-providers-hijacking-users-search-queries.html ("**researchers believe** [Paxfire] provided the equipment used to hijack and redirect the searches.") (emphasis added). The second statement, that "Paxfire violated 'privacy safeguards enshrined'" in the 1968 Wiretap Act," ¶ 49(b)(iii), is a fair and accurate report of the contents of a complaint, and is inactionable and protected. *See* § IV.A.2. The final statement that Paxfire alleges Ms. Feist made to the *New Scientist* (although not quoted or otherwise identified with specificity) is "that Paxfire violated numerous statutes, including wiretapping laws." ¶ 49(b)(ii). Although Paxfire's failure to plead this statement with the requisite particularity is futile to its claims, this statement is also protected. *Id.*

> **(2)** **The Generalized Statements Paxfire Alleges are Defamatory are Actually True, Legally Protected, or Were Never Said by Ms. Feist**

Paxfire identified other alleged defamatory statements and represents that they were "stated and alleged in [Ms. Feist's] Class Action Complaint." ¶ 50. Paxfire does not provide any citations to any paragraphs or pages of the Complaint, nor does it provide quotes or otherwise identify the statements with the requisite level of specificity. This alone is a ground for dismissal. *See Stephan,* 2009 WL 1740827, at *2 ("Such imprecise qualification or paraphrasing not only

opens the complaint to the question of whether the words were ever published, but also renders the complaint defective as a matter of law."). [5]

Moreover, each of the alleged "statements" is legally protected; true, as demonstrated by judicially noticeable facts and the record; or was never said by Ms. Feist:

- Paxfire alleges that Ms. Feist stated that Paxfire "shared information about End Users of ISPs, or of their searches, with third parties"; "allowed third parties to access information about [or "searches by"] End Users of ISPs"; and "disclosed confidential or private information relating to the use of the Internet by End Users of ISPs." ¶ 50(c), (e), (f), (i). Paxfire has acknowledged the truth of these allegations. In his declaration, Allan Sullivan (one of Paxfire's founders and its Chief Executive Officer until September 2011, just after the alleged wrongdoing was revealed) admits that Paxfire's business practice was based on "**redirection** of Internet traffic," Paxfire's Opposition to Motion for Sanctions ("Sanctions Opp."), ECF No. 39, Ex. 3 ¶¶ 2, 3 (emphasis added). Paxfire's counterclaims acknowledge that it had agreements to provide direct navigation services to third-party trademark holders, trademark aggregators, advertising aggregators, and affiliate program aggregators. *E.g.*, 10-18; withdrawn Counts III-V. In addition, Paxfire has commended EFF's revised blog posting,[6] but the EFF posting, even as "retracted" states, in part, that: Paxfire's "redirections mostly occur transparently [invisibly] to the user and few if any of the affected ISP customers are likely to have ever heard of Paxfire, let alone

---

[5] *Geddes v. Princess Props. Int'll, Ltd.*, 88 A.D.2d 835 (1st Dep't 1982) ("Any qualification in the pleading thereof by use of the words 'to the effect', 'substantially', or words of similar import generally renders the complaint defective.") (quoting *Gardner v Alexander Rent-A-Car, Inc.*, 28 A.D. 2d 667 (1st Dep't 1967)); *Compare* ¶ 49 ("**Among** these false and defamatory statements were....") (emphasis added).

[6] Paxfire issued a press release stating: "We believe the EFF plays an important and valuable role in insuring the privacy of those who use the Internet. . . .We appreciate the courage and responsibility that was required for the EFF to correct its mistakes," Press Release, Paxfire, Inc., *Electronic Frontier Foundation Issues Retraction of Allegations About Paxfire* (Aug. 30, 2011), http://www.prweb.com/releases/2011/8/prweb8758239.html; *see also* Sanctions Opp. at 10-11 (Paxfire "convinced" EFF of its business practices, "EFF agreed to retract and clarify its article" enabling Paxfire "stabilize[] its own front with EFF").

consented to this rerouting and occasional logging and alteration of their communications with search engines," "ICSI Networking's investigation has revealed that Paxfire's HTTP proxies selectively siphon search requests out of the proxied traffic flows and redirect them through one or more affiliate marketing programs, presumably resulting in commission payments to Paxfire and the ISPs involved," Paxfire's "proxies receive, examine and process all search terms and results, but only log a small subset of search queries," which "allows Paxfire's code to examine the queries and responses."

- Paxfire alleges that Ms. Feist stated that Paxfire "identified persons who were End Users and engaged in searches using the Internet." ¶ 50(a). Ms. Feist never made such a statement. She did allege that a "search history **can be** connected to [a user's] actual identity" **if** s/he "is logged in to a service connected with the Search Engine," Cpl. ¶ 24, but Paxfire admits that this statement is true. *See* Sanctions Opp. at 4 (stating that Paxfire knew the IP addresses of the end users, and that IP addresses can be matched with user identities).

- Paxfire alleges that Ms. Feist stated that Paxfire "collected and compiled information about End Users of ISPs in a manner that constituted profiling of such End Users, or of the searches of such End Users," ¶ 50 (b), but this is not what Ms. Feist alleged. She alleged that Defendants RCN and Paxfire "**can** monitor searches and market the data to advertisers and data aggregators **interested in** creating demographic profiles." Cpl. ¶ 14 (emphasis added); *see also* Cpl. ¶ 24 (the "breach of Plaintiff's privacy and computer security is meaningful . . . [because] it **allows** Defendant [RCN] and Paxfire to receive, review, and compile the content of each of the user's searches,") (emphasis added); *Compare* Cpl. ¶ 25 (discussing the value of "demographic data and search history of customers") *with* Sanctions Opp. at 20 (claiming that ¶ 25 states that Paxfire profiled users); *see also* Sanctions Opp. Ex. 6I (letter informing Mr. Grosso that plaintiff

makes no such allegations).

- Paxfire alleges that Ms. Feist stated that Paxfire "allowed third parties to monitor [or "intercept"] searches by End Users of ISPs." ¶ 50 (g), (h). Ms Feist never stated this. The complaint alleges that Defendant *RCN* allowed third parties--i.e., Paxfire-- to monitor and intercept searches. Cpl. ¶ 28. And Paxfire has admitted that this is true. *See* Sanctions Opp. Ex. 3 (Sullivan Declaration) (stating that Paxfire's "detection and **redirection** service, works by **intercepting** [the] DNS system's error message before it reaches the end user's computer," that the "detection and **redirection** is accomplished using . . . a separate computer or 'server' . . . [that] **monitors** the DNS system traffic. . .[and] **modifies** the DNS system's message.") (emphasis added).

- Paxfire alleges that Ms. Feist stated that Paxfire "sold information about End Users of ISPs, or of their searches"; converted personal information of End Users of ISPs, including search histories, by providing such to third parties;" and "received or retained money from third parties as a result of sharing and/or allowing access to the personal information of End Users of ISPs." ¶ 50(d), (j), (k). Paxfire's former CEO, however, admits that this statements is true, conceding that Paxfire's business is focused on the "'**monetization**' **or conversion** into revenue of such traffic redirection." Sanctions Opp. Ex. 3 ¶ 3 (emphasis added). Likewise, EFF's blog posting notes that "the purpose [of Paxfire's redirection] appears to be monetization of users' searches." Sanctions Opp. Ex. 1C at 1 (also noting that Paxfire "redirect[s searches] through one or more affiliate marketing programs, presumably resulting in commission payments"). In addition, Paxfire's counterclaims originally asserted damages to its contracts and business relationships with third-party "trademark holders" and "advertising aggregators," Withdrawn Counts III, IV, V. Its amended counterclaims allege agreements, contracts, and business

10

relationships, which had "economic value for Paxfire," with Trademark Holders (e.g., eBay and Amazon.com), Trademark Aggregators (e.g., Commission Junction, LinkShare, and Google), and Affiliate Program Aggregators (e.g., Ebay and Amazon). ¶¶ 16-17. Paxfire acknowledges that it provided "Direct Navigation services" with or for these third parties. *Id.* Further, Ms. Feist's complaint alleges that "Direct Navigation" (i.e., sending users to third party websites, for profit, instead of providing them search results) is actionable, *see e.g.,* Cpl. ¶¶ 20-22, and Paxfire admits these services were provided in the ordinary course of the ISPs' business, Sanctions Opp. at 3-4; *see also* Sanctions Opp. Ex. 2 ¶ 4 ("Paxfire is paid by he [sic] trademark holder for his [sic] service, and it then shares his [sic] revenue with the user's ISP.").

- Paxfire takes issue with the allegation that it "impersonated the webpages and websites of Internet search engines," ¶ 50(l), but Paxfire's Director of Product Development, Matthew Kirn, admitted that Paxfire uses "proxy servers" as an intermediary between the Internet user and the search engine. Sanctions Opp. Ex. 5 ¶ 5. Mr. Kirn implies that this is not impersonation because the proxy uses its "own IP address," *id.*, but Paxfire has no basis to allege that the Internet user would be aware of the IP address of the server with which it was communicating, or whether that IP address belonged to the search engine or to Paxfire. As explained in the EFF article, such redirections are invisible and "few if any of the affected ISP customers are likely to have ever heard of Paxfire, let alone consented to this rerouting and occasional logging and alteration of their communications with search engines." Peter Eckersley, *Widespread Hijacking of Search Traffic in the United States*, Electronic Frontier Foundation (Aug. 4, 2011), https://www.eff.org/deeplinks/2011/07/widespread-search-hijacking-in-the-us.

- Paxfire alleges that Ms. Feist stated that "Paxfire engaged in violation of wiretap statutes affecting subscribers of its ISP customers." ¶ 50 (m). Ms. Feist's complaint does make

such allegations, but they are inactionable and protected by the judicial privilege. *See* § IV.A.2.

> **c.**   **Paxfire Has Failed To Adequately Identify the Recipients, Timing, or Place of the Alleged Statements**

A plaintiff in a defamation action must "plead with the requisite particularity the persons to whom the allegedly defamatory statement[s] w[ere] made." *Lore*, 583 F. Supp. 2d at 383. It must also specify *when* the allegedly defamatory statements were made. *Id.*; *see also Szwarce v. Buenaventura*, 82 N.Y.S.2d 292, 293 (N.Y. Sup. Ct. N.Y. Cnty. 1948) ("**each time and place and the words then and there uttered shall be set forth as separate causes of action.**") (emphasis added); *Roth v. Atex Prods., Inc.*, 35 Misc. 2d 136, 138 (N.Y. Sup. Ct. Nassau Cnty. 1962) ("a **specific date should be pleaded**.") (emphasis added).

Paxfire's allegations here are too general and unsupported by the facts. Paxfire does not provide a "specific date," but instead alleges that Ms. Feist spoke to Jim Giles "[s]ometime during the period August 1 [when Ms. Feist's counsel were introduced to Mr. Giles] to noon on August 4, 2011. . . . [when the *New Scientist* article was published]." ¶ 49(b) (citing Ex. B, but referring to Ex. 2). To support this claim, Paxfire attaches an email in which Mr. Giles asks "How are you fixed tomorrow? It would be great if someone could spare a few minutes to discuss your thinking regarding Paxfire's activities." *See id.* (citing Ex. B, but referring to Ex. 2). This email does not support the allegation that Mr. Giles and Ms. Feist's counsel spoke at all -- let alone does it provide a "specific date."

> **d.**   **Paxfire Has Failed To Sufficiently Allege That Ms. Feist Caused Its Alleged Injury**

Finally, to satisfy a claim for defamation, a plaintiff must allege special damages or "per se" defamation. "The general rule is that libel or slander is not actionable unless the plaintiff suffers special damages, i.e., those contemplating the loss of something having economic or pecuniary value." *Floyd Harbor Animal Hosp. v. Doran*, No. 06-18109, 2009 N.Y. Misc. LEXIS

5610, at *5 (N.Y. Sup. Ct. Suffolk Cnty. Dec. 3, 2009). There must be "supporting factual allegations or details" suggesting a "causal connection" between the purportedly false and pejorative statements and any alleged damages. *Sheng Gang Deng v. Shag Qing Chen,* No. 105363/09, 2010 N.Y. Misc. LEXIS 2135, at *13-14 (N.Y. Sup. Ct. N.Y. Cnty. May 13, 2010) (citing *Aronson v Wiersma*, 65 N.Y. 2d 592, 595 (1985)).

Paxfire has not provided any support for the suggestion that there is a causal connection between the allegedly defamatory statements and any purported damage. Numerous media outlets and academic papers reported on Paxfire's alleged misconduct, and these reports may have caused the harm. It is also likely that Paxfire incurred damages because its clients and associates discovered and disapproved of Paxfire's undisclosed conduct -- which happened to be exposed by the media reports and later, the Complaint -- not as a result of the publications themselves. Paxfire has also failed to provide any detail regarding the terms of the contracts, whether they were terminable at will, or the reason for breach; any number of other, unrelated economic or business considerations may have caused Paxfire's clients to end their contracts.

### 2. The Allegedly Defamatory Statements are Privileged and Ms. Feist is Immune from the Defamation Claims

#### a. The Alleged Statements Were Pertinent to a Litigation

The only alleged defamatory statements are 1) Ms. Feist's complaint and 2) statements her attorneys made to the *New Scientist* regarding the filing of the complaint. It is well established that statements pertinent to a litigation are protected from allegations of defamation by New York's common law absolute privilege. *Youmans v. Smith*, 153 N.Y. 214, 219 (1897).[7]

---

[7] Ms. Feist's alleged statements are also protected by the self-interest and common-interest privileges. Under the common-interest privilege, "'defamatory communications made by one person to another upon a subject in which both have an interest' are afforded qualified protection." *Tomasino v. Mount Sinai Med. Ctr.& Hosp.*, No. 97-5252, 2003 WL 1193726, at *15 (S.D.N.Y. Mar. 13, 2003) (citation omitted). Here, Ms. Feist had a common interest with the *New Scientist* and the court—Internet privacy and the legality of Paxfire's conduct.

*Youmans* was a seminal case that "made clear that the rule rests on the policy that counsel should be able to 'speak with that free and open mind which the administration of justice demands' without the constant fear of libel suits." *Lacher v. Engel*, 33 A.D.3d 10, 13 (1st Dep't 2006) (quoting *Youmans*, 153 N.Y. at 223); *See also*; *O'Brien v. Alexander*, 898 F. Supp. 162, 171 (S.D.N.Y. 1995) ("Under New York law, 'in the context of a legal proceeding, **statements by parties and their attorneys are absolutely privileged if, by any view or under any circumstances, they are pertinent to the litigation**.'") (quoting *Grasso v. Mathe*w, 164 A.D.2d 476, 479 (3d Dep't 1991)) (emphasis added).

"The test of 'pertinency' is extremely broad" and the proper inquiry is whether the statements at issue "may possibly . . . be . . . pertinent." *O'Brien,* 898 F. Supp at 171 (quoting *Grasso*, 164 A.D. 2d at 479); *Jones v. SmithKlineBeecham*, No. 07-0033, 2007 U.S. Dist. LEXIS 59980, at *12 (N.D.N.Y Aug. 14, 2007) ("When deciding whether a statement is pertinent, courts apply an 'extremely liberal' standard which is 'whether the statement is *at all pertinent* to the litigation.'") (emphasis in original).

The privilege applies to statements made before and during the litigation. *Rosenberg v. Metlife, Inc.,* 8 N.Y.3d 359, 365 (2007) ("'as long as such statements are material and pertinent to the questions involved,' we have indicated that the absolute privilege can extend to **preliminary or investigative stages of the process**") (emphasis added); *see also Wiener v. Weintraub*, 22 N.Y.2d 330, 331 (1968); 14 N.Y. Prac., New York Law of Torts § 1:50 ("The

---

The self-interest privilege applies to defamatory statements "made in circumstances inducing a 'correct or reasonable belief that (a) there is information that affects a sufficiently important interest of the publisher, and (b) the recipient's knowledge of the defamatory matter will be of service in the lawful protection, of the interest.'" *Konikoff v. Prudential Ins. Co. of Am.,* No. 94-6863, 1999 WL 688460, at *12 (S.D.N.Y. Sept. 1, 1999), *aff'd*, 234 F.3d 92 (2d Cir. 2000) (citations omitted). Accepting Paxfire's allegations as true, it would have been reasonable and correct for Ms. Feist to have believed that there was information that affected a sufficiently important interest of hers—the privacy of her information and her Internet use—and the recipients' (the Court's and the *New Scientist*'s) knowledge of the matter would be of service in the lawful protection of her interest.

privilege attaches not only at the trial or hearing phase, but to **every step of the proceeding in question, even if it is preliminary and/or investigatory**."); *see also Sexter & Warmflash, P.C. v. Margrabe*, 38 A.D. 3d 163 (1st Dep't 2007) (emphasis added).

> **b.    The Alleged Statements were a Fair and True Report of a Judicial Proceeding**

Regarding the purported statements to the *New Scientist*, Section 74 of New York's Civil Rights Law provides that "[a] civil action cannot be maintained against any person . . . for the publication of a fair and true report of any judicial proceeding . . . ." *See Gristedes Foods, Inc. v. Poospatuck (Unkechauge) Nation*, No. 06-1260, 2009 WL 4547792, at *17 (E.D.N.Y. Dec. 1, 2009); *McNally v. Yarnall*, 764 F. Supp. 853, 856 (S.D.N.Y. 1991) (applying § 74 privilege to attorney's allegedly defamatory statements to a newspaper where attorney, "in his alleged statement, was merely restating his clients position in defending the action"); *Lacher*, 33 A.D.3d at 12 (applying § 74 privilege to attorneys allegedly defamatory statements to New York Law Journal in an article headlined, "'Malpractice Suit Claims Attorney Padded Bills.'").

In *Lacher*, the court held that the defendant's statement to the media outlet was covered because "[t]he section 74 privilege . . . applies to comments made *about* proceedings. **Comments that essentially summarize or restate the allegations of a pleading filed in an action are the type of statements that fall within section 74's privilege**. 33 A.D.3d at 17 (emphasis in bold added). As in *Lacher*, the alleged defamatory statements in the instant case "essentially summarize or restate the allegations of a pleading filed in an action" and, therefore fall squarely within § 74's privilege.

## B.    PAXFIRE HAS NOT STATED A CLAIM FOR TORTIOUS INTERFERENCE

"Tortious interference claims have a limited scope and an extremely high pleading standard." *Diario El Pais, S.L. v. Nielsen Co.*, No. 07-11295, 2008 WL 4833012, at *7 (S.D.N.Y

Nov. 6, 2008). To state a claim for tortious interference with business relationships or contracts, Paxfire must allege that: 1) Paxfire had a business relationship or a valid contract with a third party; 2) Ms. Feist knew of that relationship or contract; 3) Ms. Feist intentionally interfered with the business relationship or procured the third-party's breach of the contract; 4) Ms. Feist acted solely out of malice, or used dishonest, unfair, or improper means; 5) The contract was breached or the business relationship was injured; and 6) damages. *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 400 (2d Cir. 2006) (regarding tortious interference with business relationships).[8]

### 1. Paxfire Has Failed to Allege the Elements of a Tortious Interference Claim

Aside from unsupported, conclusory statements that need not be accepted as true, *see* Section III, Paxfire provides no support for its contention that Paxfire had ongoing business relationships and valid contacts, of which Ms. Feist was aware, and that she intentionally interfered with such relationships and contracts, solely out of malice or through improper means. Paxfire has also not articulated the damages that resulted from any breached relationships or contracts, or alleged how or why Ms. Feist was responsible for any such damages.

### a. Paxfire Fails to Provide Sufficient Facts to Allege that it Had "Valid Contracts"

Paxfire does not adequately allege that Paxfire had the requisite contracts or business relationships. A "failure to specify which contracts . . . were interfered with and whether or not those contracts were terminable at will warrants dismissal of this claim." *Flash Elecs., Inc. v. Universal Music & Video Distrib. Corp.,* 312 F. Supp. 2d 379, 405-06 (E.D.N.Y. 2004) ("without pleading anything beyond the existence of 'contracts,' we cannot find that the

---

[8] *See also Combina Inc. v. Iconic Wireless Inc.*, No. 4222/2011, 2011 WL 3518185, at *5 (N.Y. Sup. Ct. Kings Cnty. Aug. 11, 2011). ("plaintiff must plead defendants 'engaged in the use of wrongful or unlawful means to secure a competitive advantage over plaintiffs, or that defendants acted for the sole purpose of inflicting intentional harm on plaintiffs'") (citations omitted); *Lama Holding Co. v. Smith Barney Inc.,* 88 N.Y.2d 413, 424 (1996) (addressing tortious interference with contracts).

interference alleged is wrongful or improper, and therefore tortious." *Id.* at 406 (internal quotations omitted). While Paxfire claims generally to have had "valid contract[s]" it failed to allege anything else about the purported contracts—such as when they started, their duration, whether they were terminable at will, what services or products were to be provided, or any other terms. This lack of detail warrants dismissal.

### b.   Paxfire Fails to Allege That Ms. Feist Had Actual Knowledge of Paxfire's Business Relationship with XO Communications, or of any Valid Contracts with an ISP

Paxfire fails to allege facts supporting its conclusion that Ms. Feist knew of Paxfire's business relationships and contracts. Paxfire must (but has failed to) allege that Ms. Feist had actual knowledge of specific contracts and business relationships such that she could have intentionally directed her conduct to the parties to these contracts and induced them to breach the contracts or end the relationships. *See AA Tube Testing Co. v. Sohne,* 20 A.D.2d 639, 639 (2d Dep't 1964) ("As an essential element of the cause of action sought to be pleaded [tortious interference with contract] the plaintiff must allege that the defendants had *actual* knowledge; an allegation that they 'should have known' of the existence of the contract is insufficient.") (emphasis in original).[9]

Ms. Feist stipulates that she knew, on information and belief, of business relationships between Paxfire and the nine ISPs identified in her Complaint. However, XO Communications (*see* ¶¶ 36, 67) was not named among them. And there are no allegations that she knew of any specific contracts.

---

[9] *See also Nat'l Trends, Inc. v. Krimson Corp.*, No. 91-3178, 1994 WL 97058, at *24 (S.D.N.Y. Mar. 23, 1994) (noting that while "the party allegedly inducing the breach need not be aware of all the terms set forth in the contract; 'actual knowledge of a specific contract'" is required) (emphasis added) (citation omitted); *Twin Cnty. Grocers, Inc. v. Mendez & Co.*, 81 F. Supp. 2d 276, 291-92 (D.P.R. 1999) (refusing to impute knowledge of one individual to another, noting that "none of the cases cited [where knowledge was imputed when a fiduciary duty owed to one party by the other]... support the proposition that courts may impute ... knowledge ... because of the mere fact they may be joint tortfeasors").

> **c.     Paxfire Failed to Allege that Ms. Feist Interfered with the Business Relationships or Procured the Breach of Any Contract**

Paxfire fails to allege with sufficient particularity what the purported tortious communications were, when they occurred, or how they were made. Moreover, the defendant against whom a tortious interference claim is lodged **must have directed its alleged wrongful conduct at the third party with whom a plaintiff has a business relationship, and not against the plaintiff itself.** *Carvel Corp. v. Noonan,* 3 N.Y.3d 182, 192 (2004) ("As federal courts applying New York law have recognized, conduct constituting tortious interference with business relations is, by definition, **conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship**") (emphasis added); *Gianni Versace, S.p.A. v. Versace,* No. 01-9645, 2003 WL 470340, at *2 (S.D.N.Y. Feb. 25, 2003) ("[counterclaim] **defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship** with the [counterclaim] plaintiff.") (internal quotations omitted) (emphasis added). Paxfire has not alleged (and cannot allege) that Ms. Feist directed any conduct or statements to the ISPs, let alone that she attempted to convince them to end their business relationship with Paxfire.

> **d.     Paxfire Failed to Allege that Ms. Feist Acted "Solely out of Malice," or used "Dishonest, Unfair, or Improper Means"**

Paxfire has failed to allege that Ms. Feist filed her Complaint or spoke with the *New Scientist* with the requisite malice or wrongful means.[10] The motive "must be solely malicious,

---

[10] "Wrongful means' include physical violence, fraud or misrepresentation, civil suits and criminal prosecutions," and "'extreme and unfair' economic pressure." *Friedman v. Coldwater Creek, Inc.,* 321 F. App'x 58, 60 (2d Cir. 2009) (quoting *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,* 50 N.Y.2d 183, 191 (1980); Restatement (Second) of Torts § 768, cmt. e; § 767, cmt. c)); *Carvel,* 3 N.Y.3d at 190. "The New York Court of Appeals has never held that *any* misrepresentation to a third party is sufficient to sustain a claim for tortious interference with prospective economic relations." *Friedman,* 321 F. App'x at 60 (emphasis in original).

and the plaintiff has the burden of proving this fact." *John R. Loftus, Inc. v. White*, 150 A.D.2d 857, 860 (3d Dep't 1989) (quoted in *Argilus, LLC v. PNC Fin. Servs. Group, Inc.*, 419 F. App'x 115, 120 (2d Cir. 2011)). **If the alleged "'interference [was] intended, at least in part, to advance [their] own competing interests,' then there was no 'wrongful purpose.'"** *RFP*, 788 F. Supp. 2d at 196 (quoting *PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 226, 269 (2d Cir. 1987)) (emphasis added). Here, Ms. Feist is a customer of RCN, which utilizes Paxfire's services; she has a legitimate grievance against Paxfire, and filed a case to protect her own interests — her privacy. Ms. Feist has no personal interest in interfering with Paxfire's business relationships or contracts, she merely seeks to protect her online privacy.[11] In fact, Paxfire itself argues that Ms. Feist's conduct was to support the competing interests of EFF and ICSI who were "concerned about . . . the privacy and network neutrality implication of Paxfire's business practices." ¶ 39, *see also* ¶¶ 4, 37, 40-41.

Moreover, the Second Circuit has explained that, when allegations of tortious interference arise from the threat or filing of a "civil suit," the litigation must be "wrongful," and the actor must have **"no belief in the merit of the litigation"** or have brought the litigation **"in bad faith, intending only to harass the third parties and not to bring his claim to definitive adjudication."** *Universal City Studios, Inc. v. Nintendo Co.*, 797 F. 2d 70, 75 (2d Cir. 1986) (citing Restatement (Second) of Torts)) (emphasis added); see also *D.A. Collins Constr. Co. v. ICOS/NCCA a Joint Venture,* No. 91-933, 1994 WL 328626, at *17 (N.D.N.Y June 28, 1994) **("Simply put, missing here is any evidence of wrongful or improper conduct on the part of**

---

[11] Indeed, intentionally disrupting Paxfire's business would be counterproductive to Ms. Feist's claims for monetary damages sufficient to reimburse a nationwide-class of affected Internet users.

**plaintiffs when they sought legal redress against [defendant]**") (emphasis added).[12] There is simply no allegation or evidence that Ms. Feist lacks belief in the merit of her litigation.[13]

Paxfire's allegations of motive include that Ms. Feist "purposely avoided making inquiry of Paxfire so as not to learn the truth regarding these statements and allegations"; she "knew that her publication of the false and defamatory statements would result in damage to Paxfire's business relationships and reputation; and she intended such result;" and her "improper motive . . . was to act in concert with and as the 'legal front' for the EFF and ICSI to generate additional publicity of these [allegations] . . . all for the purpose of interfering with, obstructing, and destroying Paxfire's contracts, agreements, and ongoing business relationships . . . ." ¶¶ 52 - 56. These conclusory allegations (that Ms. Feist "avoided," "intended," and "interfere[ed]") do explain what Ms. Feist's state of mind was, why she had such motive, or provide support for a conclusion that she acted in bad faith.

### e.   Paxfire Has Failed to Adequately Allege Damages, or that Ms. Feist Caused Paxfire's Damages

Except for its conclusory allegations that purported contracts were "breached," Paxfire fails to allege any damages associated with the termination of contracts or business relationships. Paxfire's generic assertions that its "business relationships . . . were injured" will not suffice. *RFP*, 788 F. Supp. 2d at 198 (Noting that interference must "rise to the level of a breach . . . or

---

[12] *See also Tap Publ'ns., Inc. v. Chinese Yellow Pages (N.Y.) Inc.*, 925 F. Supp. 212, 222 (S.D.N.Y. 1996). In *Mennen Co. v. Gillette Co.*, 565 F. Supp. 648, 657 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1437 (2d Cir. 1984), for example, the District Court found the plaintiff's case to be so lacking in merit that there was a "substantial overtone . . . to warrant an inference that [the] suit was initiated as a competitive ploy."

[13] Furthermore, Ms. Feist is permitted to procure a breach of contract—although she plainly did not—"in the exercise of equal or superior right." *Foster v. Churchill*, 87 N.Y.2d 744, 750-51 (1996) (cited by *White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281, 283 (2d. Cir. 2006)); *see also Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 589 (2d. Cir. 2005) ("A claim for tortious interference with contract cannot rest on conduct that is 'incidental to some other lawful purpose.'") (citations omitted). Ms. Feist's intention to protect her privacy and control who possesses and views her personal, valuable search information is "just cause" for her investigation and filing of litigation, even if it results in the breach of a contract. *See White Plains*, 460 F.3d at 286.

severance" and where "the underlying business relations remained undisturbed," a claim for tortious interference is "fatally defective.") (citations omitted) (emphasis added). Paxfire does not provide any detail regarding the terms of these contracts or business relationships or any lost compensation.

Moreover, to render a tortious interference claim "plausible," *see Iqbal,* 129 S. Ct. at 1949, Paxfire must provide some factual allegations that "but-for" Ms. Feist's alleged acts, Paxfire would not have suffered the alleged harm. *Diario El Pais,* 2008 WL 4833012, at *7 (citing *Sch. of Visual Arts v. Kuprewicz,* 771 N.Y.S.2d 804, 813 (N.Y. Sup. Ct. N.Y. Cnty 2003)); *see also Sharma v. Skaarup Ship Mgmt. Corp.,* 916 F.2d 820, 828 (2d Cir. 1990). Even accepting Paxfire's allegations as true, Paxfire has failed to allege that its harm would not have occurred "but-for" Ms. Feist's alleged acts, particularly given that the independent research discussed in the EFF blog and *New Scientist* article could have provided contractors sufficient reason to change their business dealings with Paxfire. *See* above, § IV.A.1.d.

## 2. Noerr-Pennington Protects Litigants from Liability for Filing a Court Proceeding

Even had Paxfire pled a tortious interference claim, it cannot "surmount the significant hurdles imposed by the 'Noerr Pennington' Doctrine established by the United States Supreme Court in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127 … (1961), and *United Mine Workers of America v. Pennington,* 381 U.S. 657 ... (1965)." *Bath Petroleum Storage, Inc. v. Mkt. Hub Partners, L.P.,* No. 00-7302, 2000 U.S. App. LEXIS 25440, at *2-3 (2d Cir. Oct. 11, 2000). The doctrine protects litigants from liability for exercising their First Amendment rights to influence governmental action through litigation. *Bath Petroleum Storage Inc. v. Mkt. Hub Partners, L.P.*, 229 F.3d 1135, 2000 WL 1508873, at *1 (2d Cir. 2000). "The *Noerr-Pennington* doctrine generally immunizes from liability a party's commencement of

a [] court proceeding." *T.F.T.F. Capital Corp. v. Marcus Dairy, Inc.*, 312 F.3d 90, 93 (2d Cir. 2002); *see also I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D. 3d 206, 208 (1st Dep't 2005) ("Defendant's commencement of the declaratory judgment action is immunized [from liability for tortious interference with contract] by the *Noerr-Pennington* doctrine . . . .").

The doctrine "has been held to protect the exercise of a defendant's First Amendment rights even when such action would normally constitute tortious interference." *Jackson Hill Rd. Sharon CT, LLC v. Town of Sharon*, No. 07-1445, 2010 WL 2596927, at *8 (D. Conn. June 24, 2010) (citations omitted) (emphasis added); *see also Friends of Rockland Shelter Animals, Inc. (FORSA) v. Mullen,* 313 F. Supp. 2d 339, 343 (S.D.N.Y. 2004) (applying Noerr-Pennington doctrine to tortious interference claim). The doctrine has also been "extended . . . to encompass concerted efforts incident to litigation," including pre-trial actions. *See Primetime 24 Joint Venture v. Nat'l Broad. Co.,* 219 F.3d 92, 100 (2d Cir. 2000) (emphasis added). "The doctrine seeks to protect conduct that falls within the ambit of the First Amendment right to petition, 'regardless of [the] intent or purpose' behind that conduct, so long as that conduct does not constitute sham activity." *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills*, No. 08-156, 2011 WL 4445626, at * 26 n. 3 (S.D.N.Y. Sept. 26, 2011) (quoting *Pennington,* 381 U.S. at 670).

Paxfire argues that EFF is "primarily involved in investigating, lobbying, and publicizing issues involving electronic privacy and civil liberties," ¶ 4, and argues that "EFF and the ICSI opposed Paxfire's business practices . . . considered [them] to be 'troubling' and 'a deep violation of users' trust and expectations on how the Internet is supposed to function,'" ¶ 37, were "concerned about . . . the privacy and network neutrality implication of Paxfire's business practices," ¶ 39, and "agreed to act as vigilantes," ¶ 40, by publishing their allegations and

"induc[ing]" Ms. Feist to get involved, ¶ 41. Even accepting this as true, the Supreme Court has expressly recognized that "[i]t is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed," and has for that reason protected litigants with the Noerr-Pennington Doctrine. *Noerr*, 365 U.S. at 143.

Accordingly, any statements made by Ms. Feist in her complaint, or made "incident to the litigation," cannot form the basis for liability for a tortious interference claim, and Paxfire's claims thus fail.

### C.   PAXFIRE'S CONSPIRACY AND VICARIOUS LIABILITY ALLEGATIONS ARE A RED HERRING

In its counterclaims, Paxfire uses various buzzwords that imply secondary or collective liability. *E.g.*, ¶ 67 ("Feist intentionally interfered, directly and **vicariously** through her co-conspirators, with Paxfire's ongoing business relationships . . . "); Counterclaims at 15 ("Parties and **Conspirators**"); Counterclaims at 24 ("Overt Acts"). But Paxfire has not alleged an employee-employer, agency, or otherwise controlling relationship between Ms. Feist and EFF or ICSI, such that vicarious liability might be applicable or relevant to these claims.

Paxfire's allegations of a conspiracy are also a red herring, and imply that Ms. Feist can be held liable if she committed some part of one or both of the alleged torts, i.e., implying that if Ms. Feist made statements, she is liable even if she had no intent, or wasn't aware of the statements' falsity.[14] But Paxfire's inability to allege that Ms. Feist herself acted with actual

---

[14] For example, with regard to tortious interference, Paxfire alleges that Ms. Feist or her counsel made false statements about Paxfire (see Counterclaims at 24-28, "Overt Acts"), but as to the motive, malice, and intent element of such a claim, Paxfire alleges "Improper Motives" only with regard to EFF and ICSI. See e.g., ¶ 37 ("EFF and the ICSI opposed Paxfire's business practices"); ¶ 38 ("EFF and the ICSI opposed Paxfire's aforesaid business

knowledge, motive, or intent defeats its ability to allege she was part of a conspiracy. A civil conspiracy requires "an agreement or confederation between two or more persons **intentionally** participating in the furtherance of a **preconceived common plan or purpose** to defraud. . . . [P]laintiffs must establish not only the corrupt agreement . . . but their **intentional participation in the furtherance of the plan or purpose**, and resulting damage. *Vom Lehn v. Astor Art Galleries, Ltd.,* 86 Misc. 2d 1, 7 (N.Y. Sup. Ct. Suffolk Cnty. 1976) (as quoted in *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986)) (emphasis added); *see also Goldstein v. Siegel,* 19 A.D.2d 489, 493 (1st Dep't 1963) (a civil conspiracy requires "common action for a common purpose by common agreement or **understanding** among a group, from which common responsibility derives") (emphasis added); *City of N.Y. v. Lead Indus. Ass'n, Inc.*, No. 14365/89, 1991 WL 284454, at * 6 (N.Y. Sup. Ct. N.Y. Cnty. Dec. 23, 1991) (finding a conspiracy where "the defendants **knowingly agreed to mislead** the public") (emphasis added).[15] Paxfire cannot impute Ms. Feist with EFF's and ICSI's purported knowledge or intent to allege a conspiracy, and then use that conspiracy to allege a tort.

Moreover, New York does not recognize "a substantive tort of conspiracy," *Cunningham v. Hagedorn*, 72 A.D.2d 702, 704 (1st Dep't 1979) (citations omitted). Instead, where a plaintiff establishes **"membership in the conspiracy by each defendant,"** *Cofacredit S.A. v. Windsor Plumbing Supply Co.,* 187 F.3d 229, 240 (2d Cir. 1999), and independently establishes an **"actionable tort,"** allegations of a conspiracy may be used to "demonstrate that each defendant's

---

practices); ¶ 39 ("The EFF and ICIS [sic] were also concerned about . . . "); ¶ 40 "EFF and the ICSI agreed to act as vigilantes"); *see also* ¶¶ 41-43.

[15] To prove a conspiracy, a plaintiff must show a corrupt agreement, an overt act in furtherance of that agreement, and membership in the conspiracy by each defendant. *Cofacredit S.A. v. Windsor Plumbing Supply Co,* 187 F.3d 229, 240 (2d Cir. 1999). Even if EFF and ICSI were named as defendants here, and Paxfire had established an underlying tort, it has not and cannot show these elements. Beyond the fact that Plaintiff relied on EFF's and ICSI's research in filing her Complaint, there is no evidence of any conduct among the parties, let alone membership in a conspiracy, a "corrupt agreement" to destroy Paxfire's business, and "overt act(s) in furtherance of that agreement."

conduct was part of a common scheme. . . [and hold them] jointly and severally liable for any compensatory and punitive damages for the underlying torts." *Sepenuk v. Marshall*, No. 98-1569, 2000 WL 1808977, at *6 (S.D.N.Y. Dec. 8, 2000); *See also Litras v. Litras*, 254 A.D.2d 395, 396 (2d Dep't 1998) ("the jury found that each of the [defendants] committed one of the underlying torts . . . and that all of the defendants conspired to commit such tortious acts as part of a scheme to destroy the plaintiffs' business. Accordingly, the defendants were jointly and severally liable for any compensatory and punitive damages awarded for the underlying torts.").

In *Watts v. Jackson Hewitt Tax Service Inc.*, 675 F. Supp. 2d 274 (E.D.N.Y. 2009), for example, defendants attempt to assert a "misappropriation of confidential information" claim against plaintiffs. The Court noted that this tort applies to former employees, and that plaintiffs had never been employees of the defendants. *Id.* at 279. "Defendants attempt[ed] to circumvent this threshold requirement by alleging a conspiracy between plaintiffs and 'unnamed former employees.'" *Id.* But the Court found that, "[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort," and "[i]n the absence of a misappropriation tort against their employees, the [] Defendants have no 'actionable tort' with which to connect plaintiffs, and, thus, the conspiracy argument cannot stand." *Id.* (citations omitted).

Here, Paxfire has not named any other defendants with which Ms. Feist can be held jointly or severally liable, nor with which she could have participated in a "common scheme." Paxfire has thus failed to allege an underlying tort or the existence of a conspiracy.

## V.   CONCLUSION

Ms. Feist respectfully requests that Paxfire's counterclaims be denied with prejudice.

Dated: February 27, 2012              Respectfully Submitted,
                                                    /s/ Peter E. Seidman

**MILBERG LLP**
Sanford P. Dumain
Peter E. Seidman
Melissa Ryan Clark
Charles Slidders
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
E-mail: sdumain@milberg.com
         pseidman@milberg.com
         mclark@milberg.com
         cslidders@milberg.com

-and-

**REESE RICHMAN LLP**

Michael E. Reese
Kim Richman
875 Avenue of the Americas, 18thFloor
New York, NY 10001
Telephone: (212) 579-4625
Facsimile: (212) 253-4272
E-mail:mreese@reeserichman.com
         krichman@reeserichman.com

*Attorneys for Plaintiff and Counterclaim Defendant*
*Betsy Feist*