C9idfeim                        Motion

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    BETSY FEIST, Individually, and
3   on behalf of all others
    similarly situated,
4
                    Plaintiff,
5
                v.                          11 Civ. 5436 (JGK)
6
    RCN Corporation and PAXFIRE,
7   INC.,
8                   Defendants.
    ------------------------------x
9                                           New York, N.Y.
                                            September 18, 2012
10                                          10:36 a.m.

11  Before:

12                        HON. JOHN G. KOELTL,

13                                          District Judge

14                            APPEARANCES

15  MILBERG, LLP
         Attorneys for Plaintiff
16  BY:  MELISSA RYAN CLARK
         PETER E. SEIDMAN
17       ADAM J. BOBKIN
         SANFORD DUMAIN
18
    REESE RICHMAN LLP
19       Attorneys for Plaintiff
    BY:  MICHAEL R. REESE
20
    BINGHAM McCUTCHEN LLP (NYC)
21       Attorneys for Defendant RCN Corporation
    BY:  PETER C. NEGER
22
    ANDREW GROSSO & ASSOCIATES
23       Attorneys for Paxfire, Inc.
    BY:  ANDREW GROSSO
24

25

C9idfeim                        Motion

1              THE CLERK:  Feist v. RCN.

2              All parties please state who they are for the record.

3              MR. SEIDMAN:  Peter Seidman, with Milberg LLP, for

4   Betsy Feist.

5              THE COURT:  I'm sorry.

6              MR. SEIDMAN:  Peter Seidman, S-e-i-d-m-a-n, with

7   Milberg LLP, for Ms. Feist.

8              THE COURT:  Thank you.

9              MS. CLARK:  Melissa Ryan Clark, with Milberg, also for

10  Ms. Feist.

11             MR. BOBKIN:  Good morning, your Honor.  Adam Bobkin,

12  Milberg, for the plaintiff, Ms. Feist.

13             MR. REESE:  Michael Reese, Reese Richman LLP, on

14  behalf of plaintiff, Ms. Feist.

15             MR. GROSSO:  For Paxfire, Andrew Grosso, of Andrew

16  Grosso & Associates.

17             MR. NEGER:  And for RCN Telecom Services LLC, Peter

18  Neger, with Bingham McCutchen, your Honor.

19             THE COURT:  An interested observer.

20             MR. NEGER:  Indeed.

21             THE COURT:  OK.  I received a letter from Mr. Grosso,

22  dated September 14, 2012, pointing out that there were -- in

23  addition to the motion to dismiss the counterclaims, there were

24  two other motions that were pending.  One was a motion for

25  leave to file a surreply.  I will grant that motion.

C9idfeim                          Motion

1          Second, there was a motion for leave to amend the

2     third affirmative defense and to file a second amended answer.

3     The only amendment would add Paxfire to the language of the

4     defense.  And there has been no opposition to that, has there?

5          MS. CLARK:  No, your Honor.

6          THE COURT:  OK.  So that motion is granted.

7          And the amended answer is deemed filed, and the

8     current motion directed against the counterclaims are directed

9     against the counterclaims in that most recent pleading.

10          All right.  We now come to the motion to dismiss the

11    counterclaims.

12          Now, I see that this process has resulted in narrowing

13    the counterclaims and several of the counterclaims have been

14    withdrawn, and now I have a motion to dismiss the remaining

15    counterclaims.  I am familiar with the papers.  I am certainly

16    prepared to listen to argument.

17          All right.  Yes?  If anyone wants to argue the motion

18    to dismiss the counterclaims?

19          MS. CLARK:  Good morning, your Honor.  I'm Melissa

20    Clark.  I am here today on behalf of the plaintiff.

21          As you know, we filed a motion to dismiss defendant

22    Paxfire's counterclaims.  Our plaintiff Betsy Feist filed a

23    class action complaint against Paxfire in August of last year,

24    and that complaint alleged, in sum, that Paxfire as well as

25    defendant RCN, who was her Internet service provider, monitored

C9idfeim                          Motion

1    and intercepted her Internet use in order to make money off of

2    her searches.  In response to that complaint, Paxfire filed

3    counterclaims seeking in excess of $80 million in damages.

4              THE COURT:  Paxfire alleges that, you know, sort of

5    unusually for this kind of case, that it has been grievously

6    hurt -- grievously -- lost lots and lots of money based in part

7    on what it alleges -- and, you know, these are only allegations

8    in the complaint -- were, among other things, false, defamatory

9    comments spread by the plaintiff even prior to any statements

10   made in the complaint.  But the language appears to be fairly

11   specific.  The charges appear to be fairly specific and quite,

12   you know, damaging -- violation of law spread, allegedly, you

13   know, prior to the time that the lawsuit was even brought.

14             So rather than follow what, you know, some would say

15   is a reasonable way of litigation in the court, it's alleged in

16   the counterclaims that the plaintiff started a campaign prior

17   to the time that the lawsuit was brought and spread false and

18   defamatory comments that actually had a deleterious effect on

19   specific contracts that Paxfire had and on business relations

20   that Paxfire had.  Whether any of that is really true we don't

21   know; this is a motion to dismiss the counterclaims.

22             But the harms are allegedly very grievous, and the

23   statements are very specific.  And I realize that this is a

24   motion to dismiss.  So tell me how, in view of all of that, I

25   can simply, you know, ignore it, say go home, sorry.  You know,

C9idfeim                         Motion

1    the defendant claims that they've been grievously hurt to the

2    tune of millions of millions of dollars, and the allegations

3    are fairly specific.  I know you argue that some of them aren't

4    so plausible.

5           On another day you would be arguing to me that I ought

6    not to dismiss a plaintiff's complaint because the allegations

7    are, you know, sufficiently detailed and plausible and that the

8    standards to be applied should not be so rigorously applied as

9    to deny access to the courts.  It would be, you know,

10   interesting if I applied those standards to these

11   counterclaims.  All I do, though, is I apply the law as best I

12   read it.

13          So your motion.

14          MS. CLARK:  Your Honor, we agree, of course, that the

15   counterclaims must be plausible, and there are a number of

16   pleading standards that Paxfire has simply failed to meet that

17   warrant dismissal on the law.  We've previously moved to

18   dismiss this complaint.  We filed an opposition to Paxfire's

19   leave to amend this complaint -- these counterclaims, rather.

20          THE COURT:  And you were successful because, you know,

21   you read the counterclaims now and you see "withdrawn,"

22   "withdrawn," "withdrawn."

23          MS. CLARK:  Right.  We also moved for sanctions with

24   regard to the initial counterclaims, and yet there are still a

25   number of --

C9idfeim                          Motion

1          THE COURT:  And I think I denied that motion, right?

2          MS. CLARK:  You did.  You did.  And granted --

3          THE COURT:  And I did it with a little talk about not

4  multiplying the proceedings.  Now I have a motion to dismiss

5  the remaining counterclaims even though they are pretty

6  specifically pleaded.  Thankfully, I don't have a counter Rule

7  11 motion that says the other side threatened you that if you

8  didn't withdraw your motion to dismiss the counterclaims they

9  would bring a Rule 11 motion against the motion to dismiss the

10  counterclaims.  So I just have to decide the motion to dismiss

11  the counterclaims.

12          MS. CLARK:  Yes, your Honor.

13          There are two sets of statements that Paxfire alleged

14  harmed its business.  The first sort of statement is made in

15  the complaint.  And as we briefed in great detail, statements

16  made in a complaint are privileged.  Unless the complaint is

17  done entirely in bad faith for a solely malicious purpose with

18  no personal interest or intent to prosecute the litigation,

19  statements made in a complaint are protected.

20          The second set of statements that Paxfire has

21  identified are statements that appeared in an article written

22  by the New Scientist.  And I believe there are three specific

23  statements in that article that have been identified in the

24  counterclaims, two of which are a fair and accurate reporting

25  of the complaint and that, too, is protected --

C9idfeim                          Motion

1          THE COURT:  There had not yet been a complaint.  There

2     was no litigation yet.

3          MS. CLARK:  That is true.  It was written -- I believe

4     the article was published a few hours before the complete got

5     on file.

6          THE COURT:  And the statements must surely have been

7     made obviously before the litigation ever began.  It was an

8     effort to trumpet in the press the allegations.

9          Go ahead.

10          MS. CLARK:  Your Honor, the statements that appear in

11     the New Scientist regarding the litigation are fairly

12     straightforward.  The complaint claims and the complaint

13     alleges violations of the Wiretap Act, for example, and courts

14     have held --

15          THE COURT:  You know, as an allegation of violation of

16     law.

17          MS. CLARK:  Sure.  Sure.  But statements that are

18     pertinent --

19          THE COURT:  So what, right?

20          MS. CLARK:  Statements that are pertinent to a

21     litigation, even if they are made prior to the litigation or in

22     the course of an investigation, are privileged.  And the New

23     Scientist is not a randomly-selected media outlet that Paxfire

24     alleges Ms. Feist called to publish her allegations.

25          The New Scientist had been investigating Paxfire's

C9idfeim                    Motion

1   alleged course of conduct for a great deal of time, had

2   reported on the Netalyzr, which is a tool that assisted in

3   discovering Paxfire's alleged conduct.  I wrote about that in

4   May of 2010.  And the two parties had a common interest in

5   investigating the issue.

6           THE COURT:  Well, you know, that argument sort of

7   feeds into the conspiracy arguments by Paxfire, that this was

8   an effort on the part of various people, including the

9   plaintiff, to put Paxfire out of business because they didn't

10  like Paxfire's business.  And you say, well, they have a common

11  interest.  What was their common interest?  Putting Paxfire out

12  of business because they didn't like Paxfire.

13          Even if there were a common interest, the common

14  interest is a qualified privilege, which of course can be

15  overcome by either common law malice or constitutional malice.

16  Very difficult to decide that on a motion to dismiss.

17          Was the plaintiff motivated solely by spite?  Malice?

18  Ill will?  Did the plaintiff know that the charges were in fact

19  not accurate, or was the plaintiff reckless in making the

20  charges?  Difficult to decide on a motion to dismiss.

21          But I'm sorry, I interrupted you.

22          MS. CLARK:  I don't believe that Paxfire alleges that

23  New Scientist was part of the alleged conspiracy.  Paxfire

24  alleges that Ms. Feist, through her counsel, was engaged in a

25  conspiracy with the Electronic Frontier Foundation (EFF) and

C9idfeim                         Motion

1    the International Computer Science Institute (ICSI).  Those two

2    organizations are academic research organizations that Ms.

3    Feist's counsel consulted with in investigating her complaint.

4    And, clearly, investigation of one's claims before they are

5    filed is mandated by Rule 11.  And if every consultation with a

6    technology expert was -- you know, put a plaintiff at risk for

7    conspiracy allegations, I think that would have significant

8    effects on the ability for a plaintiff to have his or her day

9    in court.

10          As far as the malice allegation, they do defeat

11   privileges if they are plausibly pled.  But Ms. Feist, who is

12   present in the courtroom today, is an individual Internet user.

13   She is not a competitor of Paxfire.  She is not a privacy

14   advocate.  She found out that her Internet searches were being

15   viewed and monitored, and has a legitimate interest in not only

16   protecting her privacy but receiving compensation because

17   Paxfire and RCN themselves received compensation from her

18   private information.

19          To defeat a common interest privilege, her intention

20   has to be solely malicious.  If she has any interest, even if

21   it is as a competitor, she can still assert the privilege and

22   be protected for any claims that are alleged to be defamatory.

23          So here I don't think Paxfire has come close to

24   setting forth any plausible theory as to why Ms. Feist would

25   bring such a litigation for a solely malicious intent.

C9idfeim                              Motion

1          With regard to common interest privilege, in addition

2     to having a common interest with the New Scientist, as they

3     were both investigating a privacy concern, <u>Konikoff v.</u>

4     <u>Prudential</u>, which came out of this court in 1999, addressed

5     communications with the media regarding litigation, and stated

6     that, generally, the media is not the entity that the

7     information is being disseminated to, it is the entity the

8     information is being disseminated through.  That wasn't so much

9     the case here.  Ms. Feist's counsel spoke with the New

10    Scientist in the course of investigation of a complaint.  But

11    Ms. Feist also has a common interest with thousands of absent

12    class members.

13         She is a putative representative of a class of

14    thousands of Internet users across multiple Internet service

15    providers, and <u>Konikoff v. Prudential</u> says that where a speaker

16    has an interest in informing a widely dispersed audience of

17    certain facts, it may do so even through the media and is

18    protected from the kinds of allegations that Paxfire is making.

19         In addition, there is a third statement that appears

20    in Paxfire's allegations as a defamatory statement that it

21    alleges Ms. Feist made, but if you actually look at the article

22    its preface was "Researchers believe" and expressly attributes

23    that statement to someone other than Ms. Feist.

24         I think it is also important to note the overarching

25    failure to allege that Ms. Feist herself did anything wrong.

C9idfeim                          Motion

1   She moved into this complaint kind of ambiguously by and

2   through her counsel through communications with EFF and ICSI,

3   but she is not alleged to have personally made any statements,

4   authorized any statements, spoken to EFF, ICSI, or the New

5   Scientist.

6            I think it becomes quite clear that this is a

7   retaliatory action based on the fact that a complaint was filed

8   against Paxfire.

9            I think the same applies with regard to the tortious

10  interference allegations which themselves have a prima facie

11  requirement that you plead malice, wrongful means.  That has

12  not been appropriately pled.

13           And there is also the Noerr-Pennington doctrine which

14  protects the First Amendment right to petition the government

15  to redress your claims, and in this instance Ms. Feist had a

16  legitimate privacy interest.  That petition to the government

17  can be in the form of a publicity campaign or the filing of a

18  complaint, and so she has done so.

19           But even beyond the, you know, perhaps more ambiguous

20  elements of malice and intent, there are simple pleading

21  failures.  For the defamation claims, C.P.L.R. 3016 requires

22  that the particular words be specified in the complaint

23  verbatim.  Paxfire has seen numerous briefings by plaintiff

24  citing this argument and yet has failed to actually quote or

25  specify or even cite paragraphs in the complaint where any of

C9idfeim                         Motion

1   this defamatory language appears.  That is a failure as a

2   matter of law to plead a defamation claim.  Paxfire was unable

3   to plead who the statements were made to, the exact timing of

4   the statements, who exactly made the statements.

5           So there are bigger-picture pleading deficiencies in

6   Paxfire's claims that warrant dismissal.

7           Another issue that Paxfire must establish, that

8   Ms. Feist knew that her statements were false or were

9   negligent, was negligent in failing to investigate her claims.

10  And one of Paxfire's own allegations is that she purportedly

11  conspired with EFF and ICSI.  She consulted with these major

12  research organizations about the accuracy and background of her

13  complaint and --

14          THE COURT:  Do you think that the standard is properly

15  negligence or gross irresponsibility?

16          MS. CLARK:  I think the standard for defamation can be

17  negligence as to her failure to ascertain the truth or falsity

18  of her statement.

19          THE COURT:  OK.  I think the standard may actually be

20  higher.  I mean, I think I would be prepared to say that it's

21  gross irresponsibility under Chapadeau, but I am not sure I

22  have to reach that.

23          MS. CLARK:  I agree.  Under any standard, she went

24  above and beyond to investigate her claims.

25          In addition, reasonable reliance on an investigation

C9idfeim                        Motion

1    defeats any inference that she acted with malice or wrongful

2    means in filing her complaint.

3            There are also other privileges that we've identified

4    in the briefing such as the self-interest privilege, and there

5    is a reasonable belief that the information is of sufficiently

6    important interest to the publisher and that the recipient's

7    knowledge of that information will be of service in the

8    protection of her interests.  So to the extent the Court is not

9    persuaded by these other very strong privileges, certainly

10   Ms. Feist is reasonable in believing that speaking to the New

11   Scientist who is investigating Paxfire's conduct could assist

12   her in protecting her own privacy rights.

13           There is also a privilege that protects statements

14   made that are a legitimate public concern where if privacy --

15   where -- excuse me.  If Feist acted in a grossly irresponsible

16   manner here in failing to rely on a thorough investigation,

17   then perhaps her statements about legitimate public concerns

18   would not be protected.  But privacy rights of thousands of

19   Internet users is in the news every day and is undoubtedly a

20   concern that affects almost the entire population, and such

21   statements are also protected.

22           With regard to damages, Paxfire has also failed to

23   plead some crucial elements.  It pleads very generally that it

24   has business relationships and contracts.  But certainly for

25   tortious interference with contracts, you have to plead the

C9idfeim                         Motion

 1    terms of those contracts, whether they were terminable at will

 2    and whether the alleged tortious interference was the but for

 3    cause of the contract's termination, and Paxfire has failed to

 4    provide any detail about its contracts or those terms.

 5          It also has tortious interference with business

 6    relationships claims, but it has yet to allege that Ms. Feist

 7    took any action towards those third parties to actually induce

 8    them to terminate their relationship with Paxfire.  And that,

 9    too, is a required pleading element that none of the issues

10    that I've discussed today create issues of fact.  These are

11    elements that Paxfire must have pled in its counterclaims, and

12    this is its third attempt to do so and it has still failed.

13          I think that covers some of the larger failures in the

14    counterclaims.  If your Honor has any questions?

15          THE COURT:  No.  Thank you.

16          MS. CLARK:  Thank you.

17          MR. GROSSO:  Good morning, your Honor.

18          This case began with EFF in San Francisco.  We've

19    alleged that it was EFF and ICSI that decided, for policy

20    reasons, to destroy Paxfire and its business model.  They then

21    contacted Ms. Feist's lawyers, and Ms. Feist was eventually

22    convinced to bring this case and act as the front.

23          The statements made by the New Scientist three hours

24    before the complaint was filed and the statements made by EFF

25    on its blog after the case was filed are false, as are numerous

C9idfeim                          Motion

1    allegations in the complaint itself.

2                The judicial privilege does not apply.  It does not

3    apply to the New Scientist article because the New Scientist

4    was not reporting upon a case that had been filed.  Rather, it

5    was reporting upon leaks that Ms. Feist's attorneys gave to the

6    New Scientist in order to buttress their ad terrorem pact

7    against Paxfire.

8                That New Scientist article has numerous false

9    statements, three of which are clearly specifically correctly

10   specified.  One of them is that Paxfire hijacked searches of

11   millions of Internet users.  Now, we've heard Ms. Clark say

12   that what the language was was that "researchers believe."

13   That is in that article but it's not the only time the term

14   "hijacking" is used.

15               Now, even though the article is not attached to the

16   complaint, it is referenced, and it has been provided to the

17   Court as Exhibit 1B in a filing in January, specifically my

18   opposition to their Rule 11 motion and my response to their

19   opposition to prevent me from filing the amended complaint, so

20   with that, and without trying to turn this into a motion for

21   summary judgment, I am going to read the first sentence of that

22   article.  It says:  "Searches made by millions of Internet

23   users are being hijacked."That is an express defamatory

24   statement and it is false.

25               That Paxfire violated numerous statutes, including

C9idfeim                          Motion

1    wiretapping laws, is also in that article, and it is defamatory

2    because it says that we're violating criminal law.

3           That Paxfire violated privacy safeguards enshrined in

4    the 1968 Wiretap Act is similarly defamatory to Paxfire.

5           Therefore, we have sufficiently met the standard in

6    terms of specifying defamatory statements in the New Scientist

7    article.  The New Scientist article was not reporting on a

8    lawsuit that had been filed but, rather, was being used by

9    Ms. Feist in order to further terrorize Paxfire.

10          The common interest privilege does not apply.  The

11   case cited by Ms. Clark, Konikoff v. Prudential Insurance

12   Company, says that that privilege does not protect publication

13   to the whole world, which is what the New Scientist did with

14   its magazine and with its website.  So there is no support

15   there for that concept.

16          The article on the website of EFF is similarly not

17   protected.  And I would cite to Williams v. Williams in my

18   brief as well as Long v. -- I can never pronounce this --

19   Marubeni America Corporation, 406 F.Supp.2d 285 (S.D.N.Y),

20   where they specify that there is no protection when a lawsuit

21   is filed purposely in order to enable somebody to publicize

22   defamatory statements afterwards.  That is the situation we

23   have here.  The lawsuit was a vehicle so that EFF and ICSI

24   could take down Paxfire.

25          Similarly, the complaint itself is not protected, and

C9idfeim                          Motion

1    that is because the judicial privilege was waived by the

2    leaking to the press before the lawsuit was filed.  And we

3    relied upon Cantu v. Flanigan, cited in our brief.

4              I turn my attention to the Noerr-Pennington Doctrine.

5              The case that Ms. Feist brought is not plausible.  She

6    had a privacy agreement with RCN, that really should be

7    specified as a non-- or anti-privacy agreement, that permitted

8    RCN to do everything that she is now alleging RCN and Paxfire

9    did.  And Paxfire was RCN's contractor and, therefore, its

10   actions fall under the same provisions.  As a result of that,

11   she could not have a plausible belief that her lawsuit would

12   succeed.

13             Further, we take a look at the Netalyzr.  Now, the

14   Netalyzr, which is this software package, initially figured to

15   be prominent before the trier of fact, but I'm not sure that is

16   going to happen anymore.  Out in the West Coast I served

17   subpoenas on the three researchers who designed the Netalyzr

18   and published articles about it and upon ICSI, the

19   International Computer Science Institute, for whom they worked.

20   Ms. Feist filed motions to quash those subpoenas, citing expert

21   consulting privilege, saying they would not call those people

22   as expert witnesses and therefore the privilege prohibited me

23   from interviewing -- from deposing them and obtaining documents

24   from them.

25             The Court, in large part, granted that motion.  I had

C9idfeim                    Motion

1    not appealed that portion of the motion.  But what it does is

2    if those witnesses are unavailable to me because of the actions

3    of Ms. Feist, they cannot introduce any evidence about the

4    Netalyzr into the fact proceedings of this case.

5           So we're left with a situation where Ms. Feist says

6    that, gee, I looked at the Netalyzr and it showed me that they

7    were doing all of these terrible things, but the Netalyzr

8    cannot do that.  Those are her allegations in the complaint,

9    and we will support that.

10          In other words, using the Netalyzr, Ms. Feist could

11   not possibly have come up with the conclusions that she put

12   into her complaint.  She lied.  Now, whether she lied

13   personally or upon the reliance of her lawyers is not relevant,

14   although, again, the allegation is she personally used the

15   Netalyzr.  But just assuming for the moment that there is some

16   justification that she relied on her lawyers.  Her lawyers are

17   her agents, and the law in this circuit is that attorney

18   knowledge is attributable to a client because there is that

19   attorney relationship.

20          With regard to damages --

21          THE COURT:  On the defamation claim, the standard of

22   responsibility in your view is what?

23          MR. GROSSO:  I think that it would be more than just

24   negligence.  I think --

25          THE COURT:  Gross irresponsibility?

C9idfeim                    Motion

1          MR. GROSSO:  Right.  And in view of the fact that she

2    used the Netalyzr and never bothered to verify that with the

3    researchers, the Netalyzr cannot do what she said it did.  I

4    think we meet that.

5          With regard to damages, we have alleged that Paxfire

6    was about to be offered $10 million or more, and as a direct

7    result of this lawsuit and the publicity around it, that offer

8    was withdrawn and the deal was quashed.  As a result, Paxfire

9    is now effectively bankrupt, and we would demonstrate that.  We

10   have been seriously hurt.

11         The tortious interference was directed against

12   Paxfire's clients, its own customers, ISPs, because it was by

13   publicizing this information to the world that the counterclaim

14   defendant knew that Paxfire's customers would believe it.  In

15   fact, there was such a tremendous uproar that among the ten

16   companies mentioned by Ms. Feist in her complaint as being

17   customers of Paxfire, that is ISPs using Paxfire's services,

18   four of them have so far left Paxfire entirely:  RCN

19   Corporation, which is named in count one, for tortious

20   interference.  Since the time that complaint was filed, Wide

21   Open West used, also known as PC Direct, and Insight also

22   terminated their contracts with Paxfire because of this

23   lawsuit.  Others have also left Paxfire but those were not

24   mentioned in --

25         THE COURT:  I thought in your papers you agreed that

C9idfeim                    Motion

1   you could only maintain the tortious interference with contract

2   based on your prior contract with RCN.

3            MR. GROSSO:  That was at that time because that was

4   the only one of the ten named that had terminated the agreement

5   with Paxfire.  The other -- I will back up.

6            Two tortious interference counts.  Count one is

7   termination of contract.

8            THE COURT:  Right.

9            MR. GROSSO:  At the time the complaint was filed, only

10  one company terminated its contract.  That was RCN.

11           Also a number of other companies mentioned in count

12  two had cut back, curtailed their business with Paxfire.  So

13  that's tortious interference with prospective business

14  advantage.

15           THE COURT:  And tortious interference with business,

16  you relied on XO, RCN, Wide Open West and Direct?

17           MR. GROSSO:  Right.  And I think -- yes.  But since

18  that time Wide Open West used Insight to join RCN in

19  terminating the --

20           THE COURT:  I don't think I can amend your

21  counterclaim at this point.

22           MR. GROSSO:  I understand, but we do have them named

23  in count two so we'll get something for them.

24           But the damage is significant.  We are losing our

25  customers.  We are going out of business, and we lost a $10

C9idfeim                          Motion

million client deal.

        With regard to Ms. Clark's complaint that I have not
specified in the complaint that the RCN contract was not
terminable at will, the contract is obviously an integral part
of the complaint.  And, again, one can reference contracts if
they are an integral part of the complaint and if they had been
provided -- the contract has been provided to the other
parties.  This has been provided to the plaintiff.  Obviously,
RCN has a copy of it.

        And I am willing to give one to the Court.  It is not
terminable at will, and we can satisfy that requirement.

        THE COURT:  It is your representation in your papers?

        MR. GROSSO:  Yes.

        In summary, the privileges -- there is one more thing.

        In addition to it being implausible for the reasons
I've said, there is a case in this circuit, <u>Paul v. Earthlink</u>,
which holds that if an Internet service provider transfers
electronic signals to a device in its ordinary course of
business, that that is not an interception.  And, indeed, all
of the signals that Ms. Feist complains about were transferred
to devices of Paxfire in RCN's ordinary course of business.

        So coupled between the privacy agreement, the law of
this circuit and Ms. Feist's misuse of the Netalyzr, there is
no way she could have legitimately believed that her case had a
basis.  And it was brought for another purpose, it was brought

C9idfeim                          Motion

1   for the purpose of knocking out Paxfire.

2              THE COURT:  All right.  Thank you.

3              All right.  I am prepared to decide.

4              The defendant, Paxfire, Inc., brought counterclaims

5   against the plaintiff, Betsy Feist, alleging libel, slander,

6   tortious interference with contracts, tortious interference

7   with business relationships, and civil conspiracy.  The

8   plaintiff has filed a motion to dismiss Paxfire's counterclaims

9   pursuant to Rule 12(b)(6) of the Federal Rules of Civil

10  Procedure.

11             On a motion to dismiss a counterclaim pursuant to

12  Federal Rule of Civil Procedure 12(b)(6), the allegations in

13  the counterclaim are accepted as true.  See Grandon v. Merrill

14  Lynch & Co., Inc., 147 F.3d 184, 188 (2d Cir. 1998).  In

15  deciding a motion to dismiss, all reasonable inferences must be

16  drawn in the counter plaintiff's favor.  See Gant v.

17  Wallingford Board of Education, 69 F.3d 669, 673 (2d Cir.

18  1995); Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).  The

19  Court's function on a motion to dismiss is "not to weigh the

20  evidence that might be presented at a trial but merely to

21  determine whether the [counterclaim] itself is legally

22  sufficient."  See Goldman v. Belden, 754 F.2d 1059, 1067 (2d

23  Cir. 1985).

24             The Court should not dismiss counterclaim if the

25  counter-plaintiff has stated "enough facts to state a claim to

C9idfeim                    Decision

relief that it is plausible on its face." See Twombly v. Bell

Atlantic Corp., 550 U.S. 544, 570 (2007).  "A claim has facial

plausibility when the counter-plaintiff pleads factual content

that allows the Court to draw the reasonable inference that the

counter-defendant is liable for the misconduct alleged." See

Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  In deciding the

counter-defendant's motion to dismiss, the Court may consider

documents attached to the counterclaim or incorporated in it by

reference, matters of which judicial notice may be taken, or

documents that the counter-plaintiff relied upon in bringing

suit and either are in her possession or of which she had

knowledge.  See Chambers v. Time Warner, Inc., 282 F.3d 147,

153 (2d Cir. 2002); see also Jofen v. Epoch Biosciences, Inc.,

No. 01 Civ. 4129, 2002 WL 1461351, at *1 (S.D.N.Y. July 8,

2002).  While the Court should construe the factual allegations

in the light most favorable to the counter-plaintiff, "the

tenet that a court must accept as true all of the allegations

contained in a counterclaim is inapplicable to legal

conclusions." See Iqbal, 556 U.S. at 678; see also Port Dock &

Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir.

2007); Smith v. Local 819 I.B.T. Pension Plan, 291 F.3d 236,

240 (2d Cir. 2002).

       The following factual allegations set forth in the

Amended Counterclaims are accepted as true for the purposes of

this motion to dismiss unless otherwise noted.

C9idfeim                         Decision

Paxfire is a Delaware corporation with its principal place of business in Virginia.  Paxfire's primary business involves the sale of technology services to Internet service providers ("ISPs").  This business consists of providing error traffic services and direct navigation services.  Both of these services direct ISP end-users or customers to Web pages.  Error traffic services direct end-users to a page suggesting sites and URL links that the end-user might choose to visit after an end-user enters an error into the address bar.  Direct navigation services direct ISP end-users to a trademark holder's page after the end-user enters the trademark into the address bar or Web browser.

The Electronic Frontier Foundation ("EFF") and the International Computer Science Institute ("ICSI") disproved of Paxfire's business practices of providing error traffic and direct navigation services to ISPs and their end-users.  EFF and ICSI believed these services violated end-users' privacy and should be elective.  Paxfire alleges that this common disapproval formed the basis of an agreement between ICSI and EFF to act as "self-appointed enforcement officials policing the Internet to deter conduct to which they objected."

Sometime prior to August 1, 2011, Betsy Feist, the plaintiff, agreed to join EFF and ICI allegedly in accomplishing their goal of discouraging Paxfire's business practices.  Paxfire alleges that Feist acted as the "legal

C9idfeim                        Decision

front," serving "as the necessary third-party plaintiff for the

purposes of bringing the class action lawsuit to accomplish the

agreement's goals."  (Amended Counterclaim Paragraph 44.)

Sometime between August 1, 2011 and August 4, 2011,

Feist communicated with Jim Giles of The New Scientist, a media

outlet on the Internet.  Paxfire alleges that in addition to

informing Giles that she was filing a class action complaint,

Feist also made "numerous false and defamatory statements about

Paxfire."  (Amended Counterclaim Paragraph 49.)  Specifically,

Paxfire alleges that Feist stated (1) "Paxfire 'hijacked'

searches of millions of Internet users"; (2) "Paxfire violated

numerous statutes, including wiretapping laws'; and (3)

"Paxfire violated 'privacy safeguards enshrined' in the 1968

Wiretap Act."  (Amended Counterclaim Paragraph 49(d).)  In

addition, Paxfire alleges that Feist made these statements "for

the purpose of causing an article with these statements to be

published."  (Amended Counterclaim Paragraph 49.)

On August 4, 2011, Feist filed a class action

complaint against Paxfire and RCN Corp. ("RCN").  Paxfire

contends that the complaint contains additional defamatory

statements.  Paxfire further contends that at the time Feist

filed her Class Action Complaint, she "knew that she had

insufficient basis to make such statements" and "purposely

avoided making inquiry of Paxfire so as not to learn the truth

regarding these statements and allegations."

C9idfeim                         Decision

1        Paxfire asserts that Feist's defamatory statements

2   damaged Paxfire's business relationships and reputation.  In

3   particular, Paxfire alleges that Feist "intentionally procured,

4   directly and vicariously through her co-conspirators, a breach

5   of Paxfire's contract with RCN."  (Amended Counterclaim

6   Paragraph 61.)  In addition, Paxfire contends that Feist

7   intentionally procured the "reduction, suspension, and

8   termination of Paxfire's business relationships through

9   wrongful means, including misrepresentations and her civil

10  class action lawsuit."  (Amended Counterclaim Paragraph 68.)

11  Paxfire specifically alleges that Feist harmed Paxfire's

12  ongoing business relationships with the following companies:

13  XO Communications, Wide Open West, Direct PC, and RCN.

14  (Amended Counterclaim Paragraph 67.)

15       On August 31, 2011 Paxfire filed initial counterclaims

16  against Feist.  On February 13, 2012 Paxfire filed the present

17  amended counterclaims asserting claims against Feist for (1)

18  slander; (2) libel; (3) tortious interference with contract;

19  (4) tortious interference with business relationships; and (5)

20  civil conspiracy.

21       Feist moves to dismiss the defamation, tortious

22  interference, and civil conspiracy counterclaims pursuant to

23  Federal Rule of Civil Procedure 12(b)(6).  Feist argues that

24  Paxfire's counterclaims should be dismissed because:  (a)

25  Paxfire has not stated a defamation claim with the required

C9idfeim                    Decision

particularity; (b) Feist is immune from defamation claims; (c)

Paxfire has failed to adequately allege the elements of a

tortious interference claim; (d) Feist is protected from

tortious interference claims by the Noerr-Pennington doctrine;

and (e) Paxfire has not adequately pleaded a civil conspiracy

claim.

         The elements of a defamation claim under New York law

are "[1] a false statement, [2] published without privilege or

authorization to a third party, [3] constituting fault as

judged by, at minimum, a negligence standard, and . . . [4]

either caus[ing] special harm or constitut[ing] defamation per

se." Dillon v. City of N.Y., 704 N.Y.S.2d 1, 5 (App. Div.

1999).  A claim for libel has an added element, namely that [5]

the defamatory statement must be in writing.  See Meloff v. New

York Life Insurance Co., 240 F.3d 138, 145, (2d Cir. 2001).

         For a claim of defamation to meet this standard,

courts in this Circuit have held that a plaintiff must

identify:  (1) the allegedly defamatory statements; (2) the

person who made the statements; (3) the time when the

statements were made; and (4) the third parties to whom the

statements were published.  Reserve Solutions, Inc. v.

Vernaglia, 438 F.Supp.2d 280, 289, (S.D.N.Y. 2006).  See also

Mobile Data Shred, Inc. v. United Bank of Switzerland, No. 99

Civ. 10315, 2000 WL 351516, at *6 (S.D.N.Y. April 5, 2000).

New York Civil Practice Law and Rules Section 3016(a) also

C9idfeim                    Decision

1    requires that "[i]n an action for libel or slander, the

2    particular words complained of shall be set forth in the

3    complaint, but their application to the plaintiff may be stated

4    generally."  N.Y. C.P.L.R. Section 3016(a) (McKinney 1991).

5          As a preliminary matter, the Court must determine the

6    level of fault applicable in this defamation action.  Under New

7    York law where the content of a publication is "arguably within

8    the sphere of legitimate public concern, which is reasonably

9    related to matters warranting public exposition," the party

10   allegedly defamed by such publication may not recover unless

11   "the publisher acted in a grocery irresponsible manner without

12   due consideration for the standards of information gathering

13   and dissemination ordinarily followed by responsible parties."

14   Chapadeau v. Utica Observer-Dispatch, Inc., 341 N.E.2d 569, 571

15   (N.Y. 1975).  "To act in a 'grocery irresponsible manner' under

16   Chapadeau is to act with more recklessness than the 'ordinary

17   negligence' standard of care."  Med-Sales Associates, Inc. v.

18   Lebhar-Friedman, Inc., 663 F.Supp. 908, 912 (S.D.N.Y. 1987).

19         Although the plaintiff is not a media defendant and

20   did not personally publish any article, the Chapadeau gross

21   irresponsibility standard has been held to apply to a private

22   plaintiff speaking on matters of public concern.  See Konikoff

23   v. Prudential Insurance Co. of America, 234 F.3d 92, 102 (2d

24   Cir. 2000).

25         Here, Feist's statements are arguably within the

C9idfeim                          Decision

1   sphere of public concern.  The statements Feist made to Giles

2   allege that Paxfire was breaking the law by violating the

3   privacy of millions of Internet users.  Feist then filed a

4   class action lawsuit seeking to curb this activity.  The public

5   welfare is benefited from the exposure of illegal activity.

6   See Pollnow v. Poughkeepsie Newspapers, Inc., 486 N.Y.S.2d 11,

7   16 (App. Div. 1985).  ('it is [] plain that a private person's

8   alleged criminal conduct and the operation of the criminal

9   justice system with respect to the disposition of the charges

10  against such an individual are matters of legitimate public

11  concern.")  Paxfire agrees that gross irresponsibility is the

12  proper standard of fault to be applied.  Accordingly, Feist's

13  statements will be analyzed under the Chapadeau standard.

14       Feist argues that Paxfire has not adequately alleged

15  that she was grossly irresponsible in making the defamatory

16  statements.  But Paxfire has alleged that Feist made "numerous

17  false and defamatory statements about Paxfire" to Jim Giles of

18  The New Scientist.  Moreover, Paxfire has alleged that Feist

19  "did not have evidence as to the truth or falsity of [the]

20  statements," See Amended Counterclaim Paragraph 51, and

21  "purposely avoided . . . learn[ing] the truth regarding these

22  statements and allegations."  See Amended Counterclaim

23  Paragraph 52.  If true, Feist's actions could constitute gross

24  irresponsibility.  See Sepenuk v. Marshall, No. 98 Civ. 1569,

25  2000 WL 1808977 at *3 (S.D.N.Y. Dec. 8, 2000) ('[plaintiff] has

C9idfeim                         Decision

put forth evidence which could support a finding that the
[defendant's] statements . . . were knowingly false, thus
evincing gross irresponsibility"); see also Lewis v. Newsday,
Inc., 668 N.Y.S.2d 377, 379 (App. Div. 1998) (finding that
newspaper's publication of statements from sources who were
"mere conduits for unverified rumor" raised a triable issue of
fact as to whether the newspaper was "grossly irresponsible"
where it made no effort to substantiate statements and sources
and made no representation that they had done so).  Feist
contends that she cannot be found grossly irresponsible because
she reasonably relied on EFF and ICSI when she made her
statements.  However, whether Feist's reliance was reasonable
is a question of fact best left for the jury.  See Kerman v.
City of New York, 374 F.3d 93, 116 (2d Cir. 2004) ("questions
as to whether there was gross negligence, intent, or reckless
disregard are questions of fact to be answered by the jury.").
Accordingly, Paxfire has adequately alleged that Feist was
grossly irresponsible when she made the defamatory remarks to
Giles with the intent that they be published.

     Feist next argues that Paxfire has failed to set forth
the particular defamatory words complained of or established
their falsity.  In order to survive a motion to dismiss "a
plaintiff must plead a claim for defamation with adequate
specificity to afford defendant sufficient notice of the
communications complained of to enable her to defend herself."

C9idfeim                    Decision

1    See Tasso v. Platinum Guild International, No. 94 Civ. 8288,

2    1997 WL 16066, at *2 (S.D.N.Y. January 16, 1997.)  Paxfire has

3    met this standard by alleging three specific defamatory

4    statements that are allegedly attributable to Feist, and which

5    are the subject of the defamation claim.  See Amended

6    counterclaim Paragraph 49.  Paxfire has also alleged that Feist

7    reported the defamatory statements to Jim Giles at a specific

8    time, namely, "during the period of August 1 to noon on

9    August 4, 2011."  See Amended Counterclaim Paragraph 49.  This

10   is sufficient to put Feist on notice of the communications

11   complained of and enable her to defend herself.

12        Although Feist argues that Paxfire has failed to

13   establish the falsity of the defamatory statements, on a motion

14   to dismiss "the Court accepts plaintiff's allegations as true,

15   it assumes that defendants' statements are false and that

16   defendants were culpable in making the statements."  Henneberry

17   v. Sumitomo Corp. of America, No. 04 Civ. 2128, 2005 WL 991772,

18   at *16 (S.D.N.Y. April 27, 2005); see also Lucking v. Maier,

19   No. 03 Civ. 1401, 2003 WL 23018787, at *3 n. 4 (S.D.N.Y.

20   December 23, 2003).  Paxfire has alleged that Feist's

21   statements were false.  Accordingly, Paxfire's allegations of

22   falsity are sufficient to survive a motion to dismiss.  See

23   Daniels v. Provident Life & Casualty Insurance Co., No. 02 Civ.

24   0668E, 2002 WL 31887800, at *5, (W.D.N.Y. December 22, 2002).

25   See also Tuff-N-Rumble Management, Inc. v. Sugarhill Music

C9idfeim                    Decision

Publishing, Inc., 8 F.Supp.2d 357, 362 (S.D.N.Y. 1998).

("[defendant's] claim that its statements are true raises a

factual issue that does not weaken the sufficiency of the

pleading").

        Paxfire also alleges special damages.  See Amended

Complaint Paragraph 82.  In addition, Paxfire alleges that

Feist made statements that compromised the integrity of

Paxfire's business when she accused Paxfire of illegal conduct.

Such allegations support a claim of defamation per se.  See

Ruder & Finn, Inc. v. Seaboard Surety Co, 422 N.E.2d 518, 522

(N.Y. 1981).  See also Treppel v. Biovail Corp., No. 03 Civ.

3002, 2004 WL 2339759, at *17 (S.D.N.Y. October 15, 2004).

        These allegations are sufficient to put Feist on

notice of the claims against her.  Accordingly, Feist's motion

to dismiss Paxfire's defamation counterclaim on this basis is

denied.

        Feist alternatively argues that her statements were

not defamatory because they are protected by the absolute and

common interest privileges.

        "Statements uttered in the course of a judicial or

quasi-judicial proceeding are absolutely privileged so long as

they are material and pertinent to the questions involved."

Bernstein v. Seeman, 593 F.Supp.2d 630, 636 (S.D.N.Y. 2009).

"Proceedings are quasi-judicial if:  (1) a hearing is held; (2)

both parties may participate; (3) the presiding officer may

C9idfeim                         Decision

1    subpoena witnesses; and (4) the body has the power to take

2    remedial action." Boice v. Unisys Corp., 50 F.3d 1145, 1150

3    (2d Cir. 1995).

4          Here, any statements in Feist's complaint are

5    protected by the absolute privilege because judicial action is

6    commenced by filing a complaint with the court.  However, the

7    absolute privilege does not extend to any statements Feist or

8    her attorneys made to Jim Giles before the lawsuit was filed

9    because Giles was not involved in the lawsuit. See Long v.

10   Marubeni Am. Corp., 406 F.Supp.2d 285, 294 (S.D.N.Y. 2005).

11   ("The privilege is usually understood as not applying . . . to

12   out-of-court statements made to persons not related to the

13   litigation."); see also Schulman v. Anderson Russell Kill &

14   Olick, PC, 458 N.Y.S.2d 448, 453-54 (Sup. Ct. 1982) ("the

15   absolute privilege protecting statements in the course of

16   judicial proceedings does not apply to lawyers' informal

17   communications designed to gather information or to identify

18   potential witnesses").  Furthermore, there is no argument that

19   the statements Feist made to Giles were uttered in the course

20   of a judicial or quasi-judicial proceeding.  Accordingly, the

21   statements Feist made to Giles are not absolutely privileged.

22         Likewise, the common interest privilege does not

23   protect Feist's statements to Giles.  "[D]efamatory

24   communications made by one person to another upon a subject in

25   which both have an interest are protected by the common

C9idfeim                    Decision

interest privilege, which is a defense to defamation.  Meloff,

240 F.3d at 145 (citing Konikoff, 234 F.3d at 98 (2d Cir.

2000).  A plaintiff may overcome the privilege by proving that

the statement was not substantially true and that the defendant

abused the privilege.  See id. at 146.  A defendant abuses the

privilege if the defendant acted beyond the scope of the

privilege, acted with common law malice, or acted "with

knowledge that the statement was false or with a reckless

disregard as to its truth."  Id.  (Citing Weldy v. Piedmont

Airlines, Inc., 985 F.2d 57, 62 (2d Cir. 1993)).

          Here, Feist alleges that her communications with Giles

are protected by the qualified privilege because she has a

common interest with Jim Giles.  However, Paxfire contends that

Feist abused her common interest privilege because she acted

with malice.  See Amended Complaint Paragraph 81.  Thus,

whether the common interest privilege protects Feist's

communications is a question of fact that cannot be decided at

this stage of the litigation.  See Boyd v. Nationwide Mut. Ins.

Co., 208 F.3d 406, 410 (2d Cir. 2000) ("[Plaintiff]'s claim

raises doubts about the defendant's good faith, which is the

linchpin of any qualified privilege . . . [that] permits a

sufficient inference that Nationwide abused its qualified

privilege."); see also Stern v. Leucadia Nat.'l Corp., 844 F.2d

997, 1004 (2d Cir. 1988).  Thus, it cannot be determined on a

motion to dismiss that Feist's statements to Giles are

C9idfeim                     Decision

privileged and Paxfire has adequately pleaded its defamation

claim.  Accordingly, Feist's motion to dismiss Paxfire's

defamation counterclaim is denied with respect to any

statements Feist made to Giles before she filed her lawsuit.

Feist next argues that Paxfire has failed to

adequately plead a claim for tortious interference.

In particular, Feist contends that Paxfire has not

adequately allege the existence of valid contracts with the

ISPs.  Under New York law, the elements of a tortious

interference with contract claim are (1) the existence of a

valid contract between the plaintiff and a third party; (2) the

defendant's knowledge of the contract; (3) the defendant's

intentional procurement of the third party's breach of the

contract without justification; (4) actual breach of the

contract; and (5) damages resulting therefrom.  Kirch v.

Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006).

Paxfire has alleged that it had valid contracts with eleven

ISPs.  See Amended Complaint Paragraph 59.  Paxfire has also

alleged that Feist had actual knowledge of these contracts.

See Amended Counterclaim Paragraph 60.  This allegation is

supported by the fact that Feist identified that Paxfire had

business relationships with all the relevant ISPs, except XO

Communications, in her own complaint.  Further, Paxfire alleges

that it suffered damages as a result of Feist's actions.  See

Amended Counterclaim Paragraph 63 and 82.  Although Feist

C9idfeim                    Decision

1    argues that Paxfire has failed to plead that its contracts were

2    not terminable at will, this does not warrant dismissal unless

3    it is clear that such contracts were in fact terminable at

4    will.  See AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No.

5    02 Civ. 1363, 2003 WL 21203503, at *5 (S.D.N.Y. 2003).  Thus,

6    because it is not clear from the Amended Counterclaim that

7    Paxfire's contracts are terminable at will, this does not

8    provide a basis for dismissal.  Indeed, Paxfire has proffered

9    that its contracts with the ISPs were not terminable at will.

10   See Plaintiff's Memo of Law at 13.

11           However, of the eleven ISPs cited, Paxfire has only

12   alleged actual contract breaches with RCN and XO

13   Communications.  See Amended Counterclaims Paragraphs 61 and

14   82.  Further, Paxfire only alleges that Feist intentionally

15   procured an unjustified breach of Paxfire's contract with RCN.

16   See Amended Counterclaim Paragraph 61.  Indeed, Paxfire

17   concedes this point.  Accordingly, Paxfire may only maintain a

18   claim for tortious interference with contract based on its

19   previous contract with RCN.  See RSM Production Corp. v.

20   Fridman, 643 F.Supp.2d 382, 405 (S.D.N.Y. 2009).

21           Although Paxfire may not maintain a claim for tortious

22   interference with contract with the other ISPs, it may sustain

23   its claim for tortious interference with business relationships

24   with the ISPs.  To state a claim for tortious interference with

25   a business relationship a plaintiff must allege that "(1) the

C9idfeim                    Decision

1    plaintiff had a business relation with a third party; (2) the

2    defendant interfered with those business relations; (3) the

3    defendant acted for a wrongful purpose or used dishonest,

4    unfair, or improper means; and (4) the defendant's acts injured

5    the relationship." Catskill Development, L.L.C. v. Park Place

6    Entertainment Corp., 547 F.3d 115, 132 (2d Cir. 2008).

7            Feist argues that Paxfire has inadequately pleaded

8    that it had business relationships, but Paxfire has alleged

9    prior business relationships with ten ISPs. See Amended

10   Complaint Paragraph 65. Paxfire also alleges that Feist

11   interfered with its ongoing business relationships with these

12   ISPs. See Amended Counterclaim Paragraph 67. Further, Paxfire

13   alleges that Feist used wrongful means to interfere with these

14   business relationships. See Amended Counterclaim Paragraph 68.

15   Feist argues that this is insufficient because Paxfire has

16   failed to allege that Feist acted solely by wrongful means.

17   However, the wrongfulness of Feist's actions cannot be

18   determined at the motion to dismiss stage of the litigation.

19   See, for example, Cerveceria Modelo S.A. De C.V. v. USPA

20   Accessories LLC, No. 07 Civ. 7998, 2008 WL 1710910, at *5

21   (s.D.N.Y. April 10, 2008); see also Mina Inv. Holdings Ltd. v.

22   Lefkowitz, 184 F.R.D. 245, 251 (S.D.N.Y. 1999).

23           However, at this point Paxfire has only alleged actual

24   injuries to its business relationships with XO Communications,

25   RCN Corporation, Wide Open West and Direct PC. See Amended

C9idfeim                        Decision

1    Counterclaim Paragraph 67.  Paxfire also alleges that Feist was

2    aware of its business relationship with each of these entities.

3    See Amended Counterclaim Paragraph 66.  Therefore, Paxfire's

4    Counterclaim alleging tortious interference with its business

5    relations with each of these four ISPs cannot be dismissed on

6    this motion to dismiss.

7         Feist argues that even if Paxfire has adequately

8    pleaded a tortious interference claim, she is protected by the

9    Noerr-Pennington Doctrine.  This Doctrine, which derives from a

10   trilogy of antitrust cases decided by the Supreme Court and is

11   based on First Amendment principles guaranteeing the right to

12   petition the government, immunizes from antitrust scrutiny

13   "mere attempts to influence the passage or enforcement of

14   laws,"  Eastern Railroad Presidents Conference v. Noerr Motor

15   Freight, Inc., 365 U.S. 127, 135 (1961), regardless of any

16   anticompetitive motives behind these attempts, as well as

17   good-faith attempts to secure legitimate goals through

18   administrative agencies and courts.  See California Motor

19   Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11

20   (1972).  The doctrine has also been extended to areas outside

21   of the antitrust arena, and has specifically been held to

22   protect the exercise a defendant's First Amendment rights even

23   when such action would normally constitute tortious

24   interference.  See NAACP v. Claiborne Hardware Co., 458 U.S.

25   886, 911-12 (1982).  The doctrine, however, does not shield a

C9idfeim                    Decision

1    defendant from liability for instituting "sham" litigation.

2    See Noerr, 365 U.S. at 144; see also Professional Real Estate

3    Investors v. Columbia Pictures Industries, Inc., 508 U.S. 49,

4    60-61 (1993).

5         Here, Paxfire alleges that Feist committed tortious

6    interference before filing her lawsuit by making false

7    statements to private third parties.  These actions would not

8    be protected by the Noerr-Pennington Doctrine because they were

9    not directed at any federal agency.  Moreover, these acts were

10   not in any way incident to her litigation.  Thus, the Doctrine

11   would not shield Feist from liability for any alleged tortious

12   interference that occurred prior to filing her lawsuit.

13        Paxfire also argues that Feist's litigation is a sham

14   and therefore that the Noerr-Pennington Doctrine is not

15   applicable to her lawsuit.  However, whether Feist's lawsuit is

16   a sham is a factual issue that cannot be decided at the

17   motion-to-dismiss stage of litigation.  See Riddell Sports,

18   Inc. v. Brooks, No. 92 Civ. 7851, 1997 WL 148818, at *5

19   (S.D.N.Y. March 27, 1997.  ("Whether litigation is a sham is a

20   fact-intensive inquiry that cannot be decided on a motion for

21   summary judgment."); see also N.Y. Jets LLC v. Cablevision

22   Systems Corp., No. 05 Civ. 2875, 2005 WL 3454652 at *2

23   (S.D.N.Y. December 19, 2005) ("where . . . facts are in

24   dispute, there is no requirement that a court determine whether

25   the sham exception applies without the benefit of full

C9idfeim                         Decision

1   discovery.")  (Internal quotation marks omitted.)

2              Finally, Feist moves to dismiss Paxfire's civil

3   conspiracy claim.  The elements of a civil conspiracy claim are

4   "(i) an agreement between two or more persons, (ii) an overt

5   act, (iii) an intentional participation in the furtherance of a

6   plan or purpose, and (iv) resulting damages."  Official

7   Committee of Unsecured Creditors v. Donaldson, Lufkin &

8   Jenrette Securities Corp., No. 00 Civ. 8688, 2002 WL 362794 at

9   *13 (S.D.N.Y. March 6, 2002.)  In addition, New York does not

10  recognize a substantive tort of civil conspiracy.  See, e.g.,

11  Antonios A. Alevizopoulos & Associates v. Comcast International

12  Holdings, Inc., 100 F.Supp.2d 178, 187 (S.D.N.Y. 2000).  In

13  order to state a claim for civil conspiracy, therefore, there

14  must be an allegation of an independent intentional tort.  See

15  Agron v. Douglas W. Dunham, Esq. & Assocs., No. 02 Civ. 10071,

16  2004 WL 691682, at *6 (S.D.N.Y. March 31, 2004); see also

17  Alevizopoulos & Associates, 100 F.Supp.2d at 187–88.

18             In the present case, Paxfire alleges that Feist

19  entered into an agreement with EFF and ICSI to disrupt

20  Paxfire's business.  See Amended Counterclaim Paragraph 44.

21  Paxfire alleges that this agreement was furthered, in part, by

22  an e-mail circulated between the alleged conspirators.  In

23  addition, Paxfire asserts that Feist intentionally participated

24  in this plan by making statements to Jim Giles, and that these

25  statements damaged Paxfire.  Paxfire has also alleged that

C9idfeim                          Decision

1  there are underlying intentional torts which were the object of

2  the civil conspiracy.  Thus, Paxfire has alleged enough facts

3  to adequately plead a civil conspiracy claim.  Accordingly,

4  because the civil conspiracy claim hinges on the aforementioned

5  tort claims, the same issues which preclude dismissal of those

6  claims prevent dismissal of the civil conspiracy claim.  See

7  Omni Consulting Group, Inc. v. Marina Consulting, Inc., No. 01

8  Civ. 511A, 20007 WL 2693813, at *8 (W.D.N.Y. September 12,

9  2007).

10      The Court has carefully considered all of the

11  arguments of the parties.  To the extent not specifically

12  addressed above, remaining arguments are either moot or without

13  merit.  For the foregoing reasons, the plaintiff's motion to

14  dismiss the Amended Counterclaims is denied in part and granted

15  in part.

16      The Clerk is directed to close Docket No. 747.

17      So ordered.

18      All right.  There is a scheduling order and the case

19  is proceeding apace.

20      MR. NEGER:  This is Peter Neger, your Honor.

21      We had a status conference with Magistrate Judge Ellis

22  I guess it would be a week ago, and he directed the parties to

23  make some adjustments to the scheduling order.  We submitted a

24  proposed revised order to him I think it was yesterday.  I

25  could hand that up to your Honor if you wish, but I know it is

C9idfeim                          Decision

1   before Magistrate Judge Ellis for his review, and I suspect

2   that he will approve it and pass it on to your Honor.

3               THE COURT:  OK.  Actually, I assigned it to Magistrate

4   Judge Ellis for general pretrial, right?

5               MR. NEGER:  Yes.

6               THE COURT:  So I assume that he can sign the revised

7   scheduling order.

8               MR. NEGER:  Perfect.

9               THE COURT:  What is the date for the completion of

10  discovery?

11              MR. NEGER:  The fact discovery is completed, your

12  Honor --

13              THE COURT:  Could you pass it up.

14              MR. NEGER:  Yes.  Absolutely.

15              THE COURT:  It would be helpful.  Thank you.

16              (Pause)

17              OK.  Thank you.

18              Is this copy for me?

19              MR. NEGER:  You may have it, your Honor.

20              THE COURT:  All right.  Anything else?

21              (Pause)

22              OK.  Good morning, all.

23              MR. NEGER:  Thank you, your Honor.

24                              -   -   -

25